# In the United States District Court
# for the District of Columbia

---

)
**GIORGI RTSKHILADZE** )
32 Old Bethel Road )
Newtown. Connecticut 06470, )
)
*Plaintiff,* )
)
**v.** )     No._____
)
**ROBERT S. MUELLER, III** )
**Special Counsel for the Investigation into Russian** )
**Interference in the 2016 Presidential Election** )
1875 Pennsylvania Avenue, N.W. )
Washington, DC 20006 )
)
**and** )
)
**UNITED STATES DEPARTMENT OF JUSTICE** )
950 Pennsylvania Ave, N.W. )
Washington, D.C. 20530, )
)
*Defendants.* )
)

---

## COMPLAINT

**Summary of the Complaint** ............................................................................ 3

    *Summary of Allegations* ............................................................................ 3

    *Summary of Applicable Law* ...................................................................... 5

**Complaint** ....................................................................................................... 6

**Jurisdiction and Venue** ................................................................................. 6

**Parties** ............................................................................................................. 7

**Allegations** ...................................................................................................... 7

*Plaintiff Emigrated to the U.S. in 1991 from the Republic of Georgia* ..........................7

*Plaintiff Has Focused Passionately on Georgia and U.S. Relations* ..............................7

*Plaintiff Contacted the Trump Organization to Promote Georgia* ................................10

*Plaintiff Received a Call from a Friend about an Unknown Person Bragging at a Dinner Party about Compromising Tapes that May Not have Existed* .................11

*Plaintiff Fully Cooperated with the Mueller Investigation* ...........................................11

*The Mueller Report Defamed Plaintiff* ........................................................................12

*The Defamation in the Mueller Report Was Broadcast Worldwide* .............................17

*The Defamation Stigmatized Plaintiff, Causing a Tangible Change of Status* ...........................................................................................................20

 *The Defamation Destroyed Plaintiff's Ability to Function as a De Facto Emissary for Georgia-U.S. Relations* .................................................20

 *Georgia Abandoned the Process of Bestowing the Status of "Honorary Consul" on Plaintiff* ..........................................................21

 *OPIC Canceled a Loan Agreement and Has Declined to Do Further Business with Plaintiff* ..........................................................21

*The Defamation in the Mueller Report Caused Massive Financial and Emotional Harm* ....................................................................................................23

*Count I* ........................................................................................................................25

 *Deprivation of Liberty to Engage in Plaintiff's Chosen Business in Violation of Fifth Amendment's Due Process Clause*

*Count II* .......................................................................................................................26

 *Name-Clearing Claim under the Administrative Procedure Act and Declaratory Judgment Act*

**Prayer for Relief** ..........................................................................................................26

**Summary of the Complaint**[1]

*Summary of Allegations*

This action is brought by Giorgi Rtskhiladze, a citizen of the United States, who emigrated from the Republic of Georgia in 1991 just before the collapse of the Soviet Union. Prior to the appointment of Robert S. Mueller III as special counsel to investigate the degree to which Russia interfered in the 2016 presidential election, plaintiff was a successful American businessman, whose career-spanning mission was to strengthen the strategically important relationship between the United States and Georgia to counterbalance Russia's systematic aggression towards Georgia to restore Soviet-style influence in the region.

After Mr. Mueller completed his investigation and the Department of Justice released a redacted version of the Report on the Investigation into Russian Interference in the 2016 Presidential Election (Russian Interference Report, Mueller Report, or Report), plaintiff's life was upended as his good name and favorable business reputation were shattered—even his nationality is now routinely questioned.  This happened to plaintiff simply because of his desire to bring the most visible American real-estate brand—Trump Tower—to his native country.

The apparent pressure on the special prosecutors to find Russian collusion with the Trump campaign—which they concluded did not occur—appears to have led them nevertheless to create a counterfactual and wildly speculative footnote that leads the reader to believe there was collusion—*but at plaintiff's expense.*  Footnote 112 of Volume II of the Mueller Report weaponized the unverified and debunked Steele Dossier when it falsely but sensationally

---

[1] The Summary of the Complaint is not part of this pleading and, therefore, the paragraphs are not numbered under Rule 9(b) of the Federal Rules of Civil Procedure and no response to them is required.  The Summary is provided as an aid to understanding the claims asserted and the alleged transactions and occurrences that support those claims.

introduced plaintiff to the world as a nefarious "*Russian businessman*," involved in surreptitious actions with a Russian oligarch to assure that purportedly salacious tapes of Mr. Donald J. Trump did not become public and hinder Russia's efforts to influence the 2016 presidential election.  Footnote 112 states that on October 30, 2016—just days before the 2016 presidential election—plaintiff texted Mr. Michael Cohen, then Presidential Candidate Trump's personal attorney, to tell him that he had successfully suppressed videos of Mr. Trump taken when he visited Russia in connection with the 2013 Miss Universe Pageant.  Footnote 112 insinuates that the referenced tapes were the shocking tapes mentioned in the so-called Steele Dossier that supposedly were in the possession of the Crocus Group, a Russian real estate conglomerate and, further, that plaintiff cavorted with the owner of the Crocus Group to assure the tapes did not become public.  Footnote 112 further speciously suggests that plaintiff knew the purported tapes were fake but failed to tell Mr. Cohen.

These statements were false, reckless, and misleading.  Special Counsel Mueller and his team knew that there was no connection between plaintiff and the Steele Dossier, that plaintiff had no contact with anyone associated with the Crocus Group about the purported tapes, and that plaintiff had no knowledge about the whereabouts, existence, or authenticity of such tapes.  The Mueller team knew that what plaintiff related to Mr. Cohen was based on a telephone call plaintiff received at his home in Connecticut from a friend telling plaintiff that the he had overheard a person at a dinner party in Moscow—sitting at another table—bragging about tapes of Mr. Trump.  Plaintiff related this rumor to Mr. Cohen because he knew plaintiff was working to bring a Trump Tower in Georgia.  At the time of the text, there was widespread speculation that there might be other damaging tapes surfacing after the *Access Hollywood* tape was made

public several weeks before plaintiff texted Mr. Cohen.  The public—including plaintiff—did not become aware of the Steele Dossier until several months after the election.

Within days of the Report's release, plaintiff, through his counsel, sent a letter to Attorney General William P. Barr demanding a retraction of these highly defamatory and false statements.  Plaintiff received no response.  Although plaintiff through media appearances used his best efforts to uncouple himself from the highly controversial and unverified Steel Dossier, the magnitude of the harm caused by negative worldwide media coverage proved too great.

The Mueller Report's freshly minted—but counterfeit—public portrait of plaintiff as a "Russian businessman" involved in furtive dealings with a Russian oligarch was broadcast worldwide and has stigmatized plaintiff.  This stigmatization has imposed tangible and dramatic negative changes to his status as an American businessman dedicated to fostering positive relations between his adopted country, the United States, and his native country, Georgia—something vital to both countries in deterring Russian aggression.  The great irony is that plaintiff has spent his adult life fostering a relationship that the Putin regime tirelessly seeks to subvert.

### *Summary of Applicable Law*

Count I asserts a defamation-plus claim under the Fifth Amendment.  The purpose of the Fifth Amendment is to protect the individual from an abuse of power by the Executive Branch. Although the Federal Tort Claims Act does not waive the sovereign immunity of the United States for claims arising out of "slander" or "misrepresentation,"  28 U.S.C. § 2680(h), the Supreme Court of the United States has recognized that stigmatization caused by government defamation that broadly precludes an individual from a chosen livelihood—or other tangible change in status—without an opportunity to refute the defamatory statements deprives that

individual of liberty in violation of the Due Process Clause and entitles that individual to damages.  Although these claims typically arise in the federal-employment context, they are not limited to that context.  If plaintiff's reputation and livelihood can be shattered without consequence simply because he became a pawn in a highly charged political investigation then the reputation and livelihood of any individual is at risk of being crushed whenever that individual gets caught in the crossfires of government forces beyond that person's control.

Count II asserts a name-clearing claim under the Administrative Procedure Act, 5 U.S.C. § 706 and the Declaratory Judgment Act, 28 U.S.C. § 2201.  Plaintiff seeks (i) a declaration that the statements about him in Footnote 112 are defamatory and, therefore, arbitrary, capricious, an abuse of discretion, not otherwise in accordance with law, or unconstitutional, and (ii) a mandatory injunction directing the Department of Justice to delete references to plaintiff in Footnote 112.

# **COMPLAINT**

**Jurisdiction and Venue**

1. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 which provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treatise of the United States."  Count I asserts a claim for the violation of procedural guarantees in the Due Process Clause of the Fifth Amendment to the Constitution of the United States.  Count II asserts a name-clearing claim under 5 U.S.C. § 706 and 28 U.S.C. § 2201, seeking declaratory and injunctive relief.

2. Venue is proper in this Court under 28 U.S.C. § 1391(b)(1).

**Parties**

3. Plaintiff Giorgi Rtskhiladze is a citizen of the United States who resides at 32 Old Bethel Road, Newtown, Connecticut 06470. Prior to the release of the Mueller Report, plaintiff was a strategic advisor in the United States to the Silk Road Group.

4. Pursuant to 28 U.S.C. §501, defendant U.S. Department of Justice is an Executive Department of the United States Government, headquartered at 950 Pennsylvania Ave, N.W., Washington, D.C. 20530-0001.

5. Defendant Robert S. Mueller III is an attorney in private practice at WilmerHale, 1875 Pennsylvania Avenue, N.W., Washington, DC 20006.

**Allegations**

*Plaintiff Emigrated to the U.S. in 1991 from the Republic of Georgia.*

6. In 1991, at the age of twenty-one and only several months before the collapse of the Soviet Union, plaintiff secured a visa with the help of his now late mother and left his native country, Georgia (then Soviet Georgia). Plaintiff arrived at JFK International Airport as an immigrant with $50 in his pocket—a Soviet customs agent confiscated $950 at the gate because he supposedly lacked a cash permit to take more than $50 out of the Soviet Union.

7. For the past twenty-nine years, plaintiff has been a resident of the United States and is now a proud citizen of the United States. He lives in Newtown, Connecticut with his wife and his three children under ten years old. Both of plaintiff's parents also emigrated to the United States from the Georgia and became citizens of the United States.

*Plaintiff Has Focused Passionately on Georgia and U.S. Relations.*

8. Plaintiff's life in Soviet Georgia was one of resolute resistance to Soviet Russian suppression. Indeed, several of his childhood friends were executed for trying to leave the

Soviet Union without permission and his favorite uncle—a well-known Soviet dissident—spent twelve years in the Soviet gulag solely because of his political convictions.

9. Plaintiff has dedicated his adult life to strengthening the bonds between the United States and Georgia to counterbalance Russia's threat to Georgia's independence—a threat vividly displayed during the 2008 military conflict between Russia and Georgia which resulted in the unlawful takeover of Georgian territories by the Putin regime.

10. To this end, plaintiff has endeavored to strengthen economic, investment, cultural, and humanitarian relations between the United States and Georgia through the establishment of the United States-Georgia Economic Summit in New York and annually hosting the United States-Georgia Legacy Foundation's economic, cultural, and philanthropic events in New York City.

11. In September 2008, one month after Russia invaded Georgia, plaintiff in partnership with others announced the establishment of the Silk Road Trans-Atlantic Alliance (SRTA), a U.S.-based company. The announcement was made in New York City with Georgian President Saakashvili in attendance. SRTA endeavors to strengthen Georgia-U.S. relations through the promotion in Georgia of well-known U.S. brands.

12. In September 2014, SRTA co-hosted an economic forum in New York City, attended by Georgian Prime Minister Garibashvili.

13. In 2018, SRTA facilitated the signing of a letter of intent between the Grace Farms Foundation (located in New Canaan, Connecticut), Georgia, and the Unchained Project to work towards creating social and equitable supply-chain-transparency standards and eradicating modern-day slavery. The signing in New York City was attended by Georgian Prime Minister Bakhtadze.

14. Plaintiff has assisted American-based businesses to expand their presence in Georgia. A few examples include assisting the expansion of General Electric's presence in Georgia, assisting the CNN and CNBC/NBC news channels to gain access in Georgia, facilitating the presence of National Geographic and Billboard brands in Georgia, and assisting Philip Morris and Procter & Gamble in establishing product distribution in Georgia.

15.  In 2017, plaintiff and the Silk Road Group entered a funding relationship with the Overseas Private Investment Corporation (OPIC), a federally chartered corporation, related to an investment in Georgia.  The mission of OPIC was to solve critical development challenges and thereby advance the foreign policy of the United States and national-security objectives.  OPIC achieved its mission by providing investors with financing, political risk insurance, and support for private-equity-investment funds when commercial funding could not be obtained elsewhere. In December 2019, OPIC and the Development Credit Corporation were merged to create the U.S. International Development Finance Corporation.

16. OPIC agreed to guarantee a $10 million loan for an investment by the Silk Road Group in Georgia related to the construction of the Radisson BLU Tsinandali Hotel in Tsinandali, Georgia.  After the OPIC loan agreement was executed on June 30, 2017, the Silk Road Group invested millions of dollars in the project.

17. Plaintiff's efforts to promote relations between the United States and Georgia did not go unrecognized.  In the summer and fall of 2017, plaintiff was under active consideration by the Georgian Government for bestowal of the title of "Honorary Counsel."  The Georgian government initiated this action because of the many events plaintiff had hosted to promote the alliance between the United States and Georgia and because of his strong network of influential leaders in corporate America.

*Plaintiff Contacted the Trump Organization to Promote Georgia.*

18. Plaintiff has long believed that developing the strategic seacoast of Georgia into a resort area would solidify Georgia's connection to the West, especially the United States. Shortly after Russia's invasion of Georgia, plaintiff approached the Trump Organization about the possibility of constructing a Trump Tower in Georgia. This contact led to a 2010 meeting between plaintiff and Mr. Michael Cohen, Mr. Donald J. Trump's attorney. Starting in 2010 plaintiff and Mr. Cohen developed a friendly working relationship. Soon after the initial meeting with Mr. Cohen, plaintiff met with Mr. Trump. Thereafter, plaintiff met with Mr. Trump and members of the Trump family about the Georgia project.

19. In April 2012, plaintiff co-hosted Mr. Trump in Georgia during the groundbreaking ceremony for the Trump Tower project in Batumi, Georgia. After Mr. Trump was elected President of the United States and just before the tower was to open, however, plaintiff negotiated a joint termination of the Trump Tower Batumi project. The residential tower will now be called the Silk Tower and it is to be constructed in the near future.

20. Because of plaintiff's knowledge of the former Soviet-region, plaintiff also worked with Mr. Cohen on several other Trump Tower licensing projects, including in Kazakhstan and Russia. In the summer and fall of 2015, plaintiff briefly explored with Mr. Cohen a possible licensing transaction for a residential Trump Tower in Moscow. Subsequently, however, Mr. Cohen decided to explore the Moscow possibility through another avenue and plaintiff's involvement in the project ended in the fall of 2015. Both the Kazakhstan project and the Moscow project were abandoned without formal agreements being executed.

***Plaintiff Received a Call from a Friend about an Unknown Person Bragging
at a Dinner Party about Compromising Tapes that May Not have Existed.***

21. In late October 2016, plaintiff received a telephone call at his home in Connecticut
from a longtime friend.  During that conversation, the friend told plaintiff that he had recently
attended a dinner party in Moscow at which he overheard a person at the next table—whom he
did not know—bragging about some tapes related to a trip by Mr. Trump to Moscow.  The friend
said he was passing along the information because he knew plaintiff had an ongoing business
relationship with the Trump Organization about building a Trump Tower in Georgia.  This
telephone conversation was the sole basis for an exchange of texts between plaintiff and Mr.
Cohen on October 30, 2016.

22. Plaintiff never discussed this topic with Mr. Cohen or anyone else associated with the
Trump Organization either before or after the October 30, 2016 exchange of texts.

23. Assuming the person overheard by plaintiff's friend at the dinner party had first-hand
knowledge of the purported tapes—highly unlikely—the information conveyed to plaintiff was
hearsay, then double hearsay to Mr. Cohen, and finally triple hearsay to Candidate Trump.

***Plaintiff Fully Cooperated with the Mueller Investigation.***

24. On May 17, 2017, Robert S. Mueller III was appointed under 28 C.F.R. Part 600.1
by Deputy Attorney General Rod Rosenstein as special counsel charged with investigating
whether Russia actively interfered in the 2016 U.S. presidential election.

25. During the evening of April 4, 2018, two FBI agents knocked on plaintiff's door
unannounced and asked whether plaintiff would agree to answer a few questions related to the
Russian interference investigation.  Plaintiff invited the agents into his home and cooperated
fully.  He was perplexed when the agents produced paper copies of the exchange of texts with

Mr. Cohen on October 30, 2016.  As the agents were leaving, they served plaintiff with a grand jury *ad testificandum* and *duces tecum* subpoena.

26. After being subpoenaed, plaintiff retained the law firm of Quinn Emanuel Urquhart & Sullivan, LLP to assist in responding to the subpoena and preparing him for his testimony before the grand jury.  Plaintiff produced approximately 25,000 pages of documents to the grand jury. In doing so, plaintiff incurred hundreds of thousands of dollars in legal fees.

27. In early May 2018, plaintiff was questioned by the special prosecutors at the Department of Justice.  On May 10, 2018, plaintiff testified before the grand jury.  Between June and July 2018, plaintiff also received several follow-up emails from the senior prosecutor to which he fully responded.  In all, plaintiff was questioned for approximately seventeen hours. He subsequently was questioned for eight hours before the House Intelligence Committee and answered a long list of questions from the Senate Intelligence Committee, incurring additional legal fees of more than $100,000.

### *The Mueller Report Defamed Plaintiff.*

28. On March 22, 2019, the Special Counsel concluded his investigation and sent a 448-page written report to Attorney General Barr.  Two days later, on March 24, 2019, the Attorney General sent a four-page letter to the heads of the House and Senate Judiciary Committees detailing what he stated were the Report's principal conclusions on Russian interference in the 2016 presidential election.  On April 18, 2019, the Department of Justice released to the public a two-volume redacted version of the Report.

29. Footnote 112 of Volume II of the Report on Russian Interference reads in relevant part:

… Comey's briefing included the Steele reporting's unverified allegation that the Russians had compromising tapes of the President involving conduct when he was a private citizen in a 2013 trip to Moscow for the Miss Universe Pageant. During the 2016 presidential campaign, a similar claim may have reached candidate Trump.  On October 30, 2016, Michael Cohen received a text from Russian businessman Giorgi Rtskhiladze that said, "Stopped flow of tapes from Russia but not sure if there's anything else.  Just so you know … ."  10/30/16 Text Message, Rtskhiladze to Cohen.  Rtskhiladze has said "tapes" referred to compromising tapes of Trump rumored to be held by persons associated with the Russian real estate conglomerate Crocus Group, which had helped host the 2013 Miss Universe Pageant in Russia.  Rtskhiladze 4/4/18 302, at 12.  Cohen said he spoke to Trump about the issue after receiving the texts from Rtskhiladze.  Cohen 9/12/18 302, at 13.  Rtskhiladze said he was told the tapes were fake, but he did not communicate that to Cohen.  Rtskhiladze 5/10/18, at 7.

30. Footnote 112 falsely states that plaintiff is a "Russian businessman."  As a result of his cooperation with the Department of Justice and testimony before the grand jury, Special Counsel Mueller and the special prosecutors working for him:

- knew that plaintiff is a citizen of the United States and has resided in the United States since 1991,

- knew that plaintiff is a native of Georgia, not Russia,

- knew plaintiff is not and never has been a "Russian businessman,"

- knew that since the collapse of the Soviet Union in 1991 Georgia has been an independent country,

- knew that Georgia has a strained relationship with Russia due to Russia's military invasion in 2008 and its unlawful occupation of twenty percent of Georgian territory,

- knew that Georgia is and has been an important ally of the United States in countering Russian influence in the region,

- knew about plaintiff's and the Silk Road Group's efforts to promote ties between Georgia, his native country, and the United States, his adoptive country,

- knew that a Georgian native working to further the interest of the Russian government would be considered by Georgians as a betrayal of Georgia,

- knew that the suggestion that plaintiff cavorted with a Russian oligarch to assist Russia's agenda to interfere in the 2016 presidential election would disparage plaintiff's integrity, tarnish his reputation, and impede his ability to do business in his native country, the United States, and elsewhere.

31. The full transcript of the exchange of texts between plaintiff and Mr. Cohen on October 30, 2016 reads:

- *Rtskhiladze*: "Stopped flow of some tapes from Russia but not sure if there's anything else.  Just so u know …"

- *Cohen*: "Tapes of what?"

- *Rtskhiladze*: "Not sure of the content but person in Moscow was bragging had tapes from Russia trip.  Will try to dial you tomorrow but wanted to be aware.  I'm sure it's not a big deal but there are lots of stupid people."

- *Cohen*: "You have no idea"

- *Rtskhiladze:* "I do trust me."

(ellipsis original).

32. The exchange of texts was so unremarkable that plaintiff cannot recall with specificity what he was doing when they occurred.  As best he can recollect, the texts were sent at about the time he was rocking his three-year-old son to sleep at his home in Connecticut.

33. Footnote 112 misquotes the exchange of texts between plaintiff and Mr. Cohen on October 30, 2016.  The footnote states that Mr. Cohen received a text from plaintiff that said, "Stopped flow of tapes from Russia but not sure if there's anything else.  Just so you know …." The text actually stated, "Stopped flow of *some* tapes from Russia but not sure if there is anything else.  Just so u know."  (emphasis added).   The omission of "some" in the quoted text is significant.  "Stopped the flow of tapes" suggests familiarity with their content while "stopped flow of *some* tapes" indicates a lack of familiarity with their content.

34. The special prosecutors were aware that while plaintiff's English is quite good it is not his native language.  His attempts at American slang—and particularly in text messages which are commonly cryptic and sloppy for most people—can be unclear.   The initial text about tapes prompted a request for clarification for Mr. Cohen "Tapes of what?"  The clarification from plaintiff was clear: "[n]ot sure of the content but person in Moscow was bragging had tapes from Russian trip."

35. Because plaintiff and the Silk Road Group were working with the Trump Organization to open a Trump Tower in Georgia, the purpose of the text exchange was to alert Mr. Cohen that he had been given information—for what it was worth—by his friend that could be damaging to the Trump brand, namely that someone was bragging about compromising videos.  He told Mr. Cohen that he had no knowledge of the content

of the tapes and that he had no reason to take the bragging seriously—"[n]ot sure of the content …." and "I'm sure it's not a big deal …."

36. Plaintiff's response to Mr. Cohen's request for clarification, however, was excluded from Footnote 112.  The exclusion appears likely to have been intentional because it assisted the special prosecutors' narrative that "a Russian businessman" had engaged in shadowy conspiratorial and/or covert activities with a Russian oligarch who owned a real estate conglomerate called Crocus Group.  Plaintiff told the special prosecutors that he had no interaction with the Crocus Group regarding the purported tapes referenced in the Steele Dossier and, in fact, that he had not had any dealings with the Crocus Group for the past fourteen years.

37. Given the timing of these events, it is beyond credulity to suggest—as Footnote 112 does—that plaintiff was referring to the tapes mentioned in the Steele Dossier.  The Steel Dossier did not become public until January 10, 2017 when it was published by BuzzFeed.  However, on October 7, 2016—three weeks before plaintiff exchanged the texts with Mr. Cohen—*The Washington Post* published a 2005 conversation recorded by a hot mic on the set of *Access Hollywood* between Mr. Trump and Billy Bush, the show's host, about women that was offensive.  The recording received so much media attention that Candidate Trump addressed it during the next presidential debate.

38. After the *Access Hollywood* disclosure, there was much speculation in the media about whether there might be other recordings or videos that could be embarrassing to Candidate Trump.  It was this speculation that caused plaintiff to give a heads up to Mr. Cohen about what his friend had overheard at a dinner party in Moscow.

39. Had plaintiff had knowledge that the subject of the tapes was the salacious tapes mentioned in the unverified Steele Dossier, he would not have told Mr. Cohen that he was "[n]ot sure of the content" and he surely would not have told Mr. Cohen that he was "sure it's not a big deal but there are lots of stupid people." The aberrant and troubling behavior described in the debunked Steele Dossier could under no circumstances be characterized as "not a big deal."

40. The phrase "but there are lots of stupid people" meant that plaintiff was concerned that unsophisticated people might believe unsupported rumors of unflattering tapes.

41. Footnote 112 states, "Rtskhiladze said he was told the tapes were fake, but he did not communicate that to Cohen." The exchange of texts makes plain that plaintiff had no way of knowing whether the tapes existed let alone whether they were authentic. There is a citation to plaintiff's testimony on May 10, 2018 but there is no context provided. Aside from the telephone call from his friend relating what had been overheard at a dinner party in Moscow, plaintiff had no further discussions with his friend or anyone else about the nature of the tapes discussed in the exchange of texts on October 30, 2016.

42. Had plaintiff taken some action to bury highly embarrassing tapes, one would have expected the team of special prosecutors—armed with abundant funds to conduct the investigation—to have uncovered evidence of such action. They did not.

### *The Defamation in the Mueller Report Was Broadcast Worldwide.*

43. Immediately following the release of the Mueller Report, the media in the United States and around the world took the bait, tied plaintiff to the Steel Dossier, and proceeded to broadcast false, reckless, and defamatory statements about him. These

reports uniformly asserted that plaintiff was a "Russian businessman" engaged in clandestine actions to support the Russian Government's agenda of interfering in the 2016 United States election to help Candidate Trump.  Footnote 112 and the subsequent feeding frenzy in the media delivered a catastrophic blow to plaintiff's well-earned reputation as an honest Georgia-American businessman.

44. On April 23, 2019, plaintiff's attorney, A. Scott Bolden, a partner at Reed Smith in Washington, D.C., sent a letter to Attorney General Barr addressing the false, reckless, and misleading statements in Footnote 112 and demanding that all references to plaintiff be redacted from it.  The Department of Justice did not respond.

45. As a direct and foreseeable consequence of Footnote 112 and the Department of Justice's failure to retract its defamatory language—as plaintiff requested just days after the Report was released—the damage to plaintiff's professional and personal life has been overwhelming.  For example, on May 1, 2019, ABC News published an article titled "10 Best Footnotes of the Mueller Report."   First on its list was Footnote 112:

**1.  Those tapes: Footnote 112 (Volume II pg 27-28) describes conversations between Trump associates about rumored video recordings of the candidate in a Russian hotel room with prostitutes:**

In 2016, a dossier compiled by former British intelligence officer Christopher Steele brought to light the possible existence of a Russian-recorded video of Trump during a 2013 visit to Moscow showing Trump cavorting with prostitutes in his suite at the Moscow Ritz hotel.  A footnote in the Mueller Report discusses the unverified allegation, which Trump has maintained is false.

Two weeks before the election, the report says Trump's personal attorney Michael

Cohen received a text *from a Russian businessman Giorgi Rtskhiladze* that said,

*"Stopped flow of tapes from Russia but not sure if there's anything else.  Just so*

*you know ..."*

(bolding original; emphasis added).  The ABC news report also stated that "[t]he report and

footnote do not give information on Trump's response to Cohen's alleged briefing on the matter,

nor does it explain why Rtskhiladze wouldn't have told Cohen the tapes were fake."

46. Not surprisingly, ABC read the footnote precisely the way the prosecutors wanted the

media and the public to read it, *i.e.*, Trump associates were working with a foreign national—a

"Russian businessman"—to suppress salacious videos of Mr. Trump that are noted in the Steele

Dossier; and, further, that plaintiff knew the tapes were fake but did not disclose that information

to Mr. Cohen.

47. Another example of the defamatory press coverage related to Footnote 112 was a

monolog that aired on April 24, 2019 on MSNBC's Rachel Maddow show:

According to the Mueller Report, it turns out before the election and well

before any of the Steele Dossier or anything like that claim ever saw the light of

day, a guy Trump actually did know from Russian connections in the former

Soviet Union actually did get in touch with Michael Cohen to tell him to tell

Trump that he was stopping the flow of some tapes from Russia.  Person in

Moscow bragging "had tapes from Russia trip."  Oh, good, he stopped the tapes

from getting out of Russia.

And according to Mueller, Cohen then told Trump about that before the

election.  So that means Trump knew that somewhere in the former Soviet Union,

a business buddy of his had taken action to make sure tapes, supposedly from

Trump's trip to Russia, those tapes weren't getting out.  Don't worry, all taken

care of.  I took care of that for you, right?

48. The Maddow Show connected the defamatory statements about plaintiff in Footnote

112 to the Steele Dossier, just as the Special Counsel and his staff intended a reader to do.

49. Every major and many minor media outlets around the world released similar articles

based on the misleading footnote with devastating results for plaintiff personally, for his business

reputation, and for his family.  And, of course, once the information about such a high-profile

investigation is accessible on the internet the damage is done—the bell cannot be un-rung.  The

damage, however, can be mitigated by appropriate action by the Department of Justice to redact

references to plaintiff in Footnote 112.

### The Defamation Stigmatized Plaintiff, Causing a Tangible Change of Status.

#### The Defamation Destroyed Plaintiff's Ability to Function as a De Facto Emissary for Georgia-U.S. Relations.

50. Wrongfully tying plaintiff to the Steele Dossier, falsely identifying him as a

"Russian businessman," intentionally splicing and altering the text message, and then

speciously declaring that  plaintiff nefariously withheld  information that the tapes were

fake from Mr. Cohen has destroyed plaintiff's ability to continue his career.

51. The defamation in Footnote 112 destroyed plaintiff's ability to continue  as a

*de facto* ambassador for U.S.-Georgia relations.  The ability to function as a *de facto*

emissary for Georgia-U.S. relations depended upon the stellar reputation of plaintiff as an

honest businessman dedicated to enhancing the economic ties between the United States

and Georgia.  The publication of Footnote 112 destroyed plaintiff's personal and business

reputation and, hence, his ability to continue in that role.

### *Georgia Abandoned the Process of Bestowing the Status of "Honorary Consul" on Plaintiff.*

52. After the release of the Russian Interference Report, the Georgian

Government abandon the process that already was underway to bestow on plaintiff the

status of "Honorary Consul" for relations with the United States.

### *OPIC Canceled a Loan Agreement and Has Declined to Do Further Business with Plaintiff.*

53. On August 21, 2017, *The New Yorker* published a defamatory article about plaintiff

and the Silk Road Group.  In October 2017, the Silk Road Group provided *The New Yorker* with

a binder containing point-by-point refutations of the defamatory statements in the article.  No

retraction has been forthcoming; nor has *The New Yorker* responded.

54. In the spring of 2018, OPIC raised concerns with the Silk Road Group as a result of a

August 2017 article in *The New Yorker* and questioned whether it should cancel the $10 million

loan guarantee related to the construction of the Radisson Hotel in Tsinandali, Georgia.  One of

the investors in this project was Enverra.  Enverra is an investment banking, strategic-advisory,

and project-development firm that supports leading businesses and governments in their efforts

to drive innovation and create economic opportunity.

55. On May 18, 2018, Enverra's chairman, Wesley K. Clark, General, US Army (ret.),

wrote a letter to OPIC in support of the project.  General Clark explained that in 2013 he was

introduced to the Silk Road Group and its principals, plaintiff and George Ramishvili, and that

he believes they share Enverra's interest in developing projects to strengthen Georgia's economy

and enhance business and economic ties between the United States and Georgia.  General Clark

stated that the Silk Road Group is widely recognized as a leading business consortium in Georgia

and that over the past ten years has facilitated approximately $600 million of capital investment

in Georgia.  He noted that Enverra is engaged in several projects with the Silk Road Group and considers it to be an important local partner.

56. General Clark then stated that he understood OPIC was concerned about the August 2017 article in *The New Yorker*, which he characterized as grossly misleading.  He also stated that Enverra conducts due-diligence reviews of all of its local partners and that it had done so with respect to the Silk Road Group and found no issues that would give rise to concern with Enverra's ongoing business relationship.  General Clark noted that in January 2018—after publication of *The New Yorker* article—the Silk Road Group's SilkNet with the assistance of OPIC completed a $153 million acquisition of Georgia's second largest mobile telecom operator, Geocell.  General Clark emphasized that OPIC's participation in the SilkNet transaction required the Silk Road Group and its principals to successfully pass anti-money-laundering and know-your-customer (AML/KYC) reviews conducted by UBS and JPMorgan.  Lastly, General Clark urged OPIC to live up to its agreement.

57. On September 12, 2018, former Senator Trent Lott, then a partner at Squire Patton Boggs, sent a letter to OPIC on behalf of the Silk Road Group.  Senator Lott advised OPIC that unintended or otherwise, in the event OPIC withdrew its support for the transaction it would constitute a severe blow to the Silk Road Group and its reputation.  He observed that the hotel was scheduled to open on October 27, 2018 and that the grand opening was expected to draw a large crowd and receive significant international media attention.  On behalf of the Silk Road Group, Senator Lott urged OPIC to clarify to the public its concerns about the Silk Road Group.  OPIC never provided an explanation to the Silk Road Group—or anyone else—for its decision to withdraw from the funding agreement.

58. OPIC cancelled the loan agreement on March 13, 2019, just nine days before Special Counsel Mueller delivered the Russian Interference Report to Attorney General Barr.  Although the Mueller Report reportedly was provided to Attorney General Barr on March 22, 2019, Special Counsel Mueller was obligated to keep the Attorney General informed about the status of the investigation.

59. Because the OPIC agreement was abrogated apparently for political reasons, plaintiff contends upon information and belief that OPIC was advised of the contents of Footnote 112 before it was formally delivered to Attorney General Barr and, further, that OPIC's awareness of the content of Footnote 112 led to OPIC's decision on March 13, 2019 to formally cancel its loan agreement with the Silk Road Group.  The termination of the OPIC financing agreement caused significant financial and reputational harm to plaintiff and the Silk Road Group.

### The Defamation in the Mueller Report Caused Massive Financial and Emotional Harm.

60. Prior to the release of the Report, plaintiff's primary source of income came from working on commercial projects in Georgia with U.S. based companies.  Because of the defamation of plaintiff in Footnote 112, plaintiff has been stigmatized to the point that he can no longer pursue his chosen career of working to bolster the ties between his adoptive country, the United States, and his native country, Georgia.  This stigma has not only adversely affected his work to further the ties of the United States and Georgia, it has drammatically affected his ability to participate in commercial transactions in the United States, the former Soviet region, and elsewhere.  It also has destroyed plaintiff's ability to continue his engagement in philanthropic projects with the United States Government, U.S. foundatons, and the United Nations (including the clean supply-chain and human-trafficking initiatives), all of which benefitted Georgia.  Finally, it has taken an immesureable emotional toll on plaintiff.

61. As a direct and proximate result of Footnote 112, plaintiff has suffered dramatic emotional and financial harm.  Ways in which Footnote 112 has financially harmed plaintiff include the following, nonexhaustive, examples:

- At the time the Report was made public, plaintiff was involved in a $50 million transaction that was cancelled after its release, resulting in a $2.5 million loss to plaintiff.

- Plaintiff was facilitating a transaction to purchase a large mobile communications company.  The amount of the acquisition was up to $200 million and plaintiff was to be a member of the advisory group with a $200,000 annual income, plus three percent of the total value of the transaction as compensation for facilitating the transaction.  The Report was made public after the transaction closed.  As a result of the media storm caused by Footnote 112, plaintiff was forced to withdraw.

- Plaintiff was forced to abandon his involvement in raising hundreds of millions of dollars in Euro bonds from which he would have received three percent in compensation.

- Plaintiff's affiliation with a major financial institution as a highly paid strategic advisor was suspended.

- Plaintiff's agreement with a large energy corporation was not renewed after the Report was made public, resulting in a loss of hundreds of thousands of dollars annually.

- Plaintiff has been forced to forego numerous business opportunities because no bank, investment company, or other financial institutions will meet with him once they Google his name.

- Numerous other deals plaintiff started before the release of the Report continued afterwards without his participation because of the damage done by Footnote 112.

### Count I

**Deprivation of Liberty in Violation of the Due Process Clause of the Fifth Amendment to the Constitution of the United States**

62. Plaintiff incorporates herein paragraphs 1 through 61.

63. The publication of false, reckless, and misleading statements in Footnote 112 without providing plaintiff with an opportunity to be heard violated plaintiff's right to procedural due process guaranteed in the Fifth Amendment.

64. The false, reckless, and misleading statements about plaintiff in Footnote 112 have defamed, stigmatized, and tangibly altered plaintiff's personal and career status in the United States, Georgia, and worldwide.

65. They are a direct and proximate cause for:

- Plaintiff's inability to continue to function as a *de facto* emissary for Georgia and U.S. relations,

- Georgia's abandonment of the process underway at the time of the publication of Footnote 112 to designate plaintiff as an "Honorary Consul" for Georgia and U.S. relations,

- OPIC's abrogation of an executed loan-guarantee agreement related to economic development in Georgia,

- Plaintiff's inability to continue participation in economic transactions geared toward fostering Georgia and United States economic relations,

- Plaintiff's inability to continue to participate in international transactions generally, and

- Plaintiff's inability to continue to participate in philanthropic initiatives.

**Count II**

**Name-Clearing Claim**
**Declaratory and Injunctive Relief**
**Administrative Procedure Act, 5 U.S.C. § 706**
**Declaratory Judgment Act, 28 U.S.C. § 2201**

66. Plaintiff incorporates herein paragraphs 1 through 61.

67. The defamatory statements about plaintiff in Footnote 112 are arbitrary, capricious, an abuse of discretion, not otherwise in accordance with law, and unconstitutional.

*Prayer for relief,*

WHEREFORE, Plaintiff prays for relief as follows:

With respect to Count I, compensatory and exemplary damages in a total amount of $100,000,000.

With respect to Count II, a declaration that the language about plaintiff in Footnote 112 of the Russian Interference Report is defamatory and an injunction directing that the Department of Justice shall forthwith delete all references to plaintiff in Footnote 112.

With respect to Counts I and II, an award of attorney's fees and such damages or other and further relief as this Court deems just and proper.

A jury trial on Count I is demanded pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Respectfully submitted,
/s/ *Jerome A. Madden*
Jerome A. Madden
THE MADDEN LAW GROUP PLLC
1455 Pennsylvania Ave., NW, Suite 400
Washington, DC 20004
(202) 349-9836
JMadden@TheMaddenLawGroup.com
District of Columbia Bar No. 272260