# In the United States District Court
# for the District of Columbia

_____

)
GIORGI RTSKHILADZE,                    )
                                       )
                        *Plaintiff*,   )
                                       )
            v.                         )        **No. 20-cv-1591 (CRC)**
                                       )
ROBERT S. MUELLER, III,                )
                                       )
            and                        )
                                       )
UNITED STATES DEPARTMENT OF JUSTICE,   )
                                       )
                        *Defendants.*  )
_____ )

## PLAINTIFF'S RESPONSE IN OPPOSITION TO THE
## MOTION TO DISMISS OF THE DEPARTMENT OF JUSTICE

.      **JEROME A. MADDEN**
       **THE MADDEN LAW GROUP PLLC**
       **1455 Pennsylvania Ave., NW, Suite 400**
       **Washington, D.C. 20004**
       **(202) 349-9836**
       **JMadden@TheMaddenLawGroup.com**
       **District of Columbia Bar No. 272260**


       ***COUNSEL FOR GIORGI RTSKHILADZE***

# Table of Contents

Introduction ..................................................................................................................1

Summary of Argument .................................................................................................2

*DOJ's Subject Matter Jurisdiction Arguments* ...........................................................3

*DOJ's Arguments that Plaintiff is Not Entitled to Relief under the APA* .......................4

*DOJ's Argument that Plaintiff Is Not Entitled to Relief under the Privacy Act* ............4

*DOJ Does Not Address Plaintiff's Defamation-Plus Claim* .........................................6

*DOJ Does Not Address Plaintiff's Claim for Declaratory Relief* ..................................6

Factual Background ......................................................................................................6

*Plaintiff's Efforts to Foster Economic and Cultural Ties between
the Republic of Georgia and Other Countries in the Former Soviet Block* ....................6

*Mr. Mueller Is Appointed as Special Counsel to Investigate
the Nature and Extent of Russian Interference in the 2016 Presidential Election* .........9

*Plaintiff's Participation in the Russian Interference Investigation* ..............................9

*Special Counsel Mueller Delivers the Report to the
Attorney General and a Redacted Version Is Released to the Public* ..........................10

*Plaintiff Immediately Requested the Removal of False,
Reckless, and Misleading Statements about Him in Footnote 112* .............................12

*The Defamation in Footnote 112 Was Broadcast Worldwide and
Interpreted in the Manner Intended by the Special Counsel Team* ............................12

*The Intentionally False, Reckless, and Misleading
Statements in Footnote 112 Destroyed Plaintiff's Career* .........................................14

*The Defamation Stigmatized Plaintiff, Causing a Tangible Change of Status* .............18

*The Defamation Destroyed Plaintiff's Ability to
Function as a De Facto Emissary for Georgia-U.S. Relations* ...................................19

*The Defamation Caused Devastating Financial
Harm to Plaintiff's International Business Interests* .................................................19

Procedural Background ................................................................................21

Legal Standard ...........................................................................................22

      A.     Rule 12(b)(1) ...............................................................22

      B.     Rule 12(b)(6) ...............................................................23

Argument ...................................................................................................23

I.      Plaintiff Has Article III Standing ......................................................23

      A.     To the Extent the Court Believes the Allegations Are Insufficient to Support Jurisdiction, Plaintiff Submits His Declaration in Support of Jurisdiction ...........23

      B.     Plaintiff Has Adequately Alleged an "Injury in Fact" ...............................24

      C.     Plaintiff Has Plausibly Alleged that His Injuries Were Caused by the Actions of DOJ ...........................................................24

            1.     Plaintiff Has Plausibly Alleged that He Was Injured by the Attorney General's Decision Not to Delete the Defamatory Content of Footnote 112 ............................................24

            2.     Plaintiff Also Has Plausibly Alleged that His Injuries Were Caused by DOJ's Failure to Comply with the Clarity Provision of the Privacy Act before It Released Footnote 112 ............................................25

            3.     Although DOJ Has Not Moved to Dismiss Plaintiff's Reputation-Plus Claim, Plaintiff Has Plausibly Alleged that His Injuries Were Caused by the Violation of the Due Process Clause ............................................27

      D.     Plaintiff's Injury Will Likely Be Remedied by the Relief Plaintiff Seeks ...........27

            1.     Equitable Relief under the APA Based on the Attorney General's Failure to Redact Highly Defamatory Text from Footnote 112 Is Likely to Redress the Injury ............................................27

            2.     Equitable Relief under the APA for DOJ's Failure to Comply with the Clarity Requirements of 552a(g)(1)(C) of the Privacy Act Would Likely Redress the Injury ............................................29

            3.     An Award of Actual Damages under 552a(4)(A) of the Privacy Act Will Redress Actual Monetary Injury ............................................29

4.      An Award of Damages under Plaintiff's Reputation-Plus Claim Will Redress the Financial and Emotional Injury Sustained by Plaintiff ..........29

II.     Plaintiff's Equitable and Monetary Claims under the Privacy Act....................................30

    A.     The Equitable Provisions of the Administrative Procedure Act Apply to Plaintiff's 552a(g)(1)(C) Claim ............................................................................30

    B.     Plaintiff Has Adequately Alleged that He Suffered "Adverse Determinations" within the Meaning of Section 552a(g)(1)(C) ..........................30

         1.      An "Adverse Determination" Need Not Be Made by the Federal Agency Creating the Record or Another Agency Based upon It...............32

         2.      Plaintiff Has Adequately Alleged that the Inaccuracy in Footnote 112 Has Caused Plaintiff to Suffer Numerous "Adverse Determinations" by Private Parties ......................................................................32

    C.     Plaintiff Has Adequately Pled that the Violation of 552a(g)(1)(C) Was "Intentional or Willful" under the "Actual Damages" Provision of 552a(g)(4) ...34

III.    Plaintiff's Claim under the Administrative Procedure Act.................................................36

    A.     The Attorney General's Decision Not to Redact the Inaccuracies in Footnote 112 Was a "Final Agency Action" under 28 U.S.C. § 509 ....................36

    B.     The Decision Not to Redact Footnote 112 Was Not Committed to Agency Discretion by Law.............................................................................................38

IV.    Plaintiff's Reputation-Plus Claim under the Fifth Amendment .......................................39

V.     Plaintiff's Claim for Declaratory Relief under the Equitable Powers of the Court ..........40

Conclusion ....................................................................................................................................40

# Table of Authorities

**Cases**

*Aki v. Sebelius*, No. 08-cv-461, 2011 WL 13273368 (D.D.C. Jan. 13, 2011) .............................32

*Albright v. United States*, 732 F.2d 181 (D.C. Cir. 1984) ...........................................35

*Am. Nat'l Ins. v. FDIC*, 642 F.3d 1137 (D.C. Cir. 2011) .............................................22

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .............................................................23

*Attias CareFirst, Inc.*, 865 F.3d 620 (D.C. Cir. 2017) ................................................22

*Bell v. Hood*, 327 U.S. 678 (1948) .................................................................40

*Bennett v. Donovan,* 703 F.3d 582 (D.C. Cir. 2013) .................................................31

*Bennett v. Spear*, 520 U.S. 154 (1997) .............................................................37

*Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971) ..............................................40

*Brathwaite v. Xavier*, S. Ct. Civ. No. 2017-0037,
    2019 WL 3287069 (S. Ct. V. I. July 16, 2019) .....................................................35

*Carey v. Piphus*, 435 U.S. 247 (1978) .............................................................29

*Cumis Ins. Society Inc. v. Clark*, 318 F. Supp. 3d 199 (D.D.C. 2018) ....................................22

*Desert Palace, Inc. v. Costa*, 539 U.S. 901 (2005) ...................................................36

*Disner v. United States*, 888 F. Supp. 2d 83 (D.D.C. 2012) ...........................................22

*Doe v. Chao*, 540 U.S. 614 (2004) .................................................................30

*Doe v. DOJ*, 753 F.2d 1092 (D.C. Cir. 1985) .......................................................27,29

*Doe v. Herman*, 1998 WL 34194937 (W.D. Va. March 18, 1998) ......................................31

*Doe v. Tenenbaum*, 127 F. Supp.3d 426, 460 (D. Md. 2012) ...........................................38

*Doe v. Stephens*, 851 F.2d 1457 (D.C. Cir. 1988) ...................................................31

*Gonzalez Boisson v. Pompeo*, 2020 Slip Copy WL 4346913 (D.D.C. July 29, 2020) ...............31

*Haase v. Sessions*, 893 F.2d 370 (D.C. Cir. 1990) ...................................................31

*Heckler v. Chaney*, 470 U.S. 821, 830 (1985) ......................................................38

*Hobson v. Wilson,* 737 F.2d 1, 65-66 (D.C. Cir. 1984) ...........................................31

*Kartseva v. Dept. of State*, 37 F.3d 1524 (1994) ...............................................39

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ...........................................23

*Moskiewicz v. U.S. Dept. of Agriculture*, 791 F.2d 561 (7th Cir. 1986) .................35

*N. Air. Cargo v. U.S. Postal Serv.,* 674 F.3d 852 (D.C. Cir. 2012) .........................31

*Neu v. Corcoran*, 869 F.2d 662 (2d Cir. 1989) ...................................................39

*Parks v. United States Internal Revenue Serv.*, 618 F.2d 677 (10th Cir. 1980) ........35

*Rice v. United States*, 245 F.R.D. 3, 7 (D.D.C. 2007) ..........................................31

*Rogers v. Missouri Pacific R. Co.,* 352 U.S. 500 (1957) .......................................36

*Sackett v. EPA*, 566 U.S. 120 (2012) ...............................................................37

*Trifax Corp. v. District of Columbia*, 314 F.3d 641 (D.C. Cir. 2003) .....................39

*Zevallos v. Obama*, 793 F.3d 106 (D.C. Cir. 2015) .............................................31

**Statutes**

28 U.S.C. § 509..............................................................................9,37,38

28 U.S.C. § 510.................................................................................9,38

28 U.S.C. §§ 515-519 .......................................................................9,37,38

5 U.S.C. § 552a(g)(1)-(3) ....................................................................5,31

5 U.S.C. § 552a(g)(1)(A) ....................................................................5,30

5 U.S.C. § 552a(g)(1)(B) .......................................................................30

5 U.S.C. § 552a(g)(1)(C) ............................................................ 4,5,22,25,30,32,34,35

5 U.S.C. § 552a(g)(2)(A) ............................................................................. 5,30

5 U.S.C. § 552a(g)(3)(A) ................................................................................... 5

5 U.S.C. § 552a(g)(4)(A) ............................................................................. 34,35

5 U.S.C. § 702 ................................................................................................ 35

5 U.S.C. § 706 .................................................................................................. 4

**Regulations**

28 C.F.R. Part 600 ......................................................................................... 38

28 C.F.R. Part 600.1 ...................................................................................... 37

28 C.F.R. Part 608 ..................................................................................... 10,37

28 C.F.R. Part 600.9(c) ............................................................................. 10,37

**Treatise**

W. Page Keeton, *et al.*, *Prosser & Keeton on Torts* § 34, at 212 (5th ed. 1984) ..................... 35

**Introduction**

Plaintiff was born in the Republic of Georgia, then a captive of the Soviet Union.  Just

months before the collapse of the U.S.S.R., he emigrated to the United States at the age of

twenty-one by himself and with $50 to his name.  Over the succeeding thirty years, he became an

American success story.  He has dedicated his adult life to strengthening the ties between the

United States, his adoptive country, and his native country of Georgia—and other former Soviet

countries by expanding the U.S. business interests in Georgia and the region—to counter Russian

economic and ideological influence in the region.  In one of those projects, plaintiff convinced

Mr. Trump to expand the presence of his real estate brand into the former Soviet region by

building a Trump Residential Tower in the city of Batumi, Georgia.  That project did not come to

fruition only because of the election of Donald J. Trump to the presidency, leading to a mutual

dissolution of the agreement.

Plaintiff's reputation as a successful international businessman was severed when the

Department of Justice (DOJ) failed to redact false, reckless, and misleading statements about

plaintiff from Footnote 112 (Footnote 112, Vol. II of the Report on the Investigation into Russian

Interference in the 2016 Presidential Election (Mueller Report or Report)) before it was released

to the public.  Plaintiff was a peripheral witness to the Russian investigation and, yet, the Special

Counsel and his team of prosecutors—desperate to uncover evidence of collusion—crafted

Footnote 112 to give the reader the unmistakable impression that the prosecutors uncovered

considerable "smoke" of collusion even though the Report concluded there was no "fire."

Plaintiff's career was the price of that smoke.  The Mueller team weaponized plaintiff's

innocuous text exchanges in late October 2016 with Michael Cohen, then Candidate Trump's

personal lawyer, to draft a dark footnote suggesting that plaintiff participated in nefarious

activities with a Russian oligarch to suppress compromising but unverified tapes of President Trump made supposedly years before he decided to run for office. Footnote 112 is pure fantasy. The full exchange of texts and the circumstances that led to them—all known to the special prosecutors—demonstrate that there was nothing remarkable about the exchange.

In crafting Footnote 112, the prosecutors (i) altered the part of the exchange of texts that it included in Footnote 112, (ii) failed to include a contemporaneous follow-up text that explained that plaintiff did not know the content of the tapes, all he knew is that he was told by a friend that someone at a dinner party was bragging about compromising tapes, and that he was sure whatever the tapes were it was not a big deal, (iii) misrepresented plaintiff, an American citizen, as a "Russian businessman," (iv) tied plaintiff to the unverified and debunked Steel Dossier, and (v) accused plaintiff of knowing the content of the so called golden-rain tapes (sometimes referred to as the pee tapes) and then failing to disclose his knowledge to Mr. Cohen and then candidate Trump. Footnote 112 was understood by the worldwide media precisely as the Mueller team intended. The firestorm over Footnote 112 led to an abrupt end to plaintiff's international business career and caused millions of dollars in financial harm.

In filing this suit against DOJ, plaintiff seeks equitable relief under the Privacy Act, the Administrative Procedure Act (APA), and the general equity powers of the Court. Plaintiff seeks damages under the Privacy Act and the Fifth Amendment. DOJ's Motion to Dismiss should be denied.

## Summary of Argument

Through their motions to dismiss, defendants have placed plaintiff in a crossfire. Defendant Mueller argues that plaintiff's only remedy is under the Privacy Act. DOJ, in turn, agrees that plaintiff's only remedy is the Privacy Act but argues plaintiff cannot obtain relief

under the Act.  An attractive—but legally flawed—strategy.  DOJ makes several arguments, none of which have merit.

### *DOJ's Subject Matter Jurisdiction Arguments*

DOJ argues that plaintiff lacks Article III standing because, although it acknowledges a "slight misquote" in the text exchange between plaintiff and Mr. Cohen, plaintiff has failed to allege his injuries are causally connected to the inaccuracies in Footnote 112.  As will be made plain below, the career-ending defamation in Footnote 112 is not based solely upon a "slight misquote," although the Mueller team did misquote the only part of the exchange they chose to include.  Footnote 112 is intentionally or recklessly written in such a way as to make it appear that plaintiff, in effect, acted as a Russian agent with a Russian oligarch to suppress the infamous but unverified golden-rain tapes mentioned in the unverified Steele Dossier also discussed in Footnote 112.  The Amended Complaint ties its publication to immediate and intense worldwide coverage by the media.  The media took the bait and interpreted Footnote 112 precisely as the prosecutors had intended.

The Amended Complaint alleges five separate international business transactions that are causally related to Footnote 112.  Because of DOJ's jurisdictional challenge, plaintiff also submits in support of this Court's jurisdiction plaintiff's sworn declaration.  The Declaration provides even greater detail about the economic harm suffered by plaintiff as a direct and proximate result of the defamatory nature of Footnote 112.

DOJ argues that plaintiff lacks standing for equitable relief under the APA or the Privacy Act because he has not asserted an ongoing or threatened injury warranting injunctive relief.  It that were true then plaintiffs pursuing name-clearing claims would also lack standing.  Plaintiff seeks equitable relief to clear his name and his Declaration makes plain that he has been told by a

representative of the Georgian government and private businesses that evidence of a retraction
would allow them to resume their business relationships.

### *DOJ's Arguments that Plaintiff is Not Entitled to Relief under the APA*

DOJ argues that plaintiff is not entitled to APA relief because the drafting of the Mueller
Report was not a "final agency action." The flaw in this argument is that DOJ misidentifies the
agency action that forms the basis of this suit. The "final agency action" that forms the basis of
plaintiff's claims for equitable relief under the APA was the decision by Attorney General
William P. Barr not to redact the career-ending defamation in Footnote 112 before releasing the
Report to the public.

DOJ also argues that plaintiff's APA claim fails because the contents of the Report are
committed to agency discretion by law. But that argument misses the mark. Again, the "final
agency action" here is the Attorney General's decision to exercise his discretion to release the
otherwise confidential Report but not to redact the defamation from Footnote 112. That decision
can be analyzed under the abuse of discretion, not in accordance with law, or contrary to
constitutional rights prongs of section 706 of the APA. The clarity provision of the Privacy Act,
5 U.S.C. § 552a(g)(1)(C), requires that all records be maintained with sufficient accuracy and
completeness so as not to cause adverse determinations based upon such records. And
publication of Footnote 112 without providing plaintiff an opportunity to be heard violated his
liberty interest in his career under the Due Process Clause.

### *DOJ's Argument that Plaintiff Is Not Entitled to Relief under the Privacy Act*

DOJ argues that plaintiff is not entitled to relief under the clarity provision of the Privacy
Act—552a(g)(1)(C)—because he did not suffer an "adverse determination." This argument is
flawed because of DOJ's myopic interpretation of the statute. According to DOJ, an "adverse

4

determination" related to an unclear record must be made either by the agency that created the record or by another federal agency based upon the offending record. But just because the cases cited by DOJ were cases in which the record-originating federal agency made the adverse determination or another federal agency made such a determination based upon the record does not mean that 552a(g)(1)(C) does not apply to adverse determinations by third parties. The Amended Complaint—reinforced by plaintiff's Declaration—alleges numerous adverse determinations by third parties that were made based upon Footnote 112.

DOJ also argues that plaintiff did not adequately allege that the failure of Footnote 112 to comply with the clarity provision of the Privacy Act was "intentional or willful" and, therefore, plaintiff has not stated a claim for "actual damages" under 5 U.S.C. § 552a(g)(4)(A). That is not the case. The allegations in the Amended Complaint support a conclusion that, absent at least reckless indifference on the part of the Mueller team, the information known to the prosecutors should have precluded the drafting of a career-ending defamatory footnote about plaintiff. And the special prosecutors knew that Attorney General Barr was under great pressure to exercise his discretion to make the Report available to the public and intentionally or recklessly failed to advise the Attorney General that the defamatory statements in Footnote 112 should be redacted.

DOJ also appears to implicitly assume that 552a(g)(1)(C) cannot be enforced through equitable relief. To the extent DOJ takes that position, it too is wrong. Just because 552a(g)(2)(A) and 552a(g)(3)(A) provide for equitable relief pursuant to *de novo* review for violations relating to records held within a "system of records" does not mean that equitable relief is not available under the more agency-friendly APA for records *not* kept in a "system of records."

5

### *DOJ Does Not Address Plaintiff's Defamation-Plus Claim.*

DOJ has failed to address plaintiff's Fifth Amendment claim for damages.  Count I asserts that the false reckless and misleading statements in Footnote 112 without providing plaintiff with an opportunity to be heard violated plaintiff's right to procedural due process. Footnote 112 defamed, stigmatized, and tangibly altered plaintiff's career status in the United States, Georgia, and worldwide to the point that he can no longer pursue his chosen career.

### *DOJ Does Not Address Plaintiff's Claim for Declaratory Relief.*

The federal courts have broad equitable power to enjoin the violation of a plaintiff's constitutional rights.

## Factual Background

### *Plaintiff's Efforts to Foster Economic and Cultural Ties between the Republic of Georgia and Other Countries in the Former Soviet Block*

Plaintiff is a citizen of the United States who emigrated from the Republic of Georgia in 1991, just before the collapse of the Soviet Union.[1]  He now lives in Connecticut with his wife and three young children.  AC 7.  Prior to the release of the Mueller Report, plaintiff was a successful American businessman whose career had focused on business transactions between the United States and countries that formerly made up the Soviet Block.  AC 7-20.

Prior to the release of the Mueller Report, plaintiff was a strategic advisor in the United States for the Silk Road Group (also referred to as the SRG).  AC 13.  The Silk Road Group was founded in the mid-1990s soon after the collapse of the Soviet Union.[2]  Plaintiff has assisted

---

[1] Amended Complaint ¶¶ 3, 6 (format hereafter AC 3, 6).

[2] The Silk Road Group founders saw Georgia as a part of the great Silk Road—the geopolitical axis connecting Asia with the Western world.  SRG's core business was delivering oil and oil products originating in Central Asia to Western European markets utilizing Georgia's Black Sea ports. In the early 2000s, the SRG expanded into telecommunications, energy, real estate and

American-based businesses to expand their presence in Georgia, including General Electric, CNN, CNBC/NBC news channels, National Geographic, Phillip Morris, and Proctor & Gamble. AC 14.

To a significant degree, plaintiff worked to strengthen the strategically important relationship between the United States and his native country, the Republic of Georgia. AC 9-10. Plaintiff took these actions to counterbalance Russia's systematic aggression towards Georgia that was on vivid display during the 2008 conflict between the two countries that resulted in the unlawful takeover of Georgian territory. AC 9, 18. One of the efforts to strengthen ties between the United States and Georgia was plaintiff's work in establishing the United States-Georgia Economic Summit in New York and his annual hosting the United States-Georgia Legacy Foundation's economic, cultural, and philanthropic events in New York City. AC 10. One month after Russia invaded Georgian territory, plaintiff in conjunction with others established the Silk Road Trans-Atlantic Alliance (SRTA), a U.S.-based company. AC 11. The Georgian president attended the announcement in New York City. *Id.* Plaintiff assisted American-based businesses to expand their presence in Georgia. *Id.*

His efforts did not go unrecognized. In the summer and fall of 2017, plaintiff was under active consideration by the Georgian Government for bestowal of the title of "Honorary Consul." AC 17. Georgia initiated this action because of the many events plaintiff had hosted to promote the alliance between the United States and Georgia. *Id.* One such project was plaintiff's efforts to persuade the Trump Organization to build a Trump Tower in Georgia. AC 18. Just before the tower was to open, Mr. Trump was elected President of the United States and the parties

---

hospitality. SRG also is actively involved in social responsibility initiatives, charitable activities, and sport and culture affairs. Declaration of Plaintiff ¶ 7 (formatted Dec. 7 hereafter).

mutually decided to dissolve the agreement.  AC 19.  Because of plaintiff's knowledge of the former Soviet region, plaintiff worked Mr. Trump's lawyer, Michael Cohen, on several other Trump Tower licensing projects, although none of them reached fruition.  AC 20.

In 2018, the SRTA facilitated the signing of a letter of intent between Grace Farms Foundation (located in New Canaan, Connecticut), Georgia and the Unchained Project to work towards creating social and equitable supply-chain-transparency standards and eradicating modern-day slavery.  AC 13.  The signing in New York City was attended by the Georgian Prime Minister.  *Id.*

In 2017, the Silk Road Group with the assistance of plaintiff established a funding relationship with the Overseas Private Investment Corporation (OPIC), a federally chartered corporation.  AC 15.  OPIC agreed to guarantee a $10 million loan related to the construction of the Radisson BLU Tsinandali in Georgia.  AC 16.

In August 2017, *The New Yorker* published what the plaintiff and the Silk Road Group considered to be a defamatory article about the group.  AC 53.  In October 2017, the Silk Road Group responded with a point-by-point refutation of the article, but no retraction or even acknowledgement of receipt was forthcoming.  *Id.*  OPIC raised concerns about the article.  AC 54.  One of the investors in the project was Enverra, chaired by Wesley K. Clark, General, US Army (ret.) who wrote a letter to OPIC strongly supporting the Silk Road Group and plaintiff. *Id*.  General Clark noted that the Silk Road Group is widely recognized as a leading business consortium in Georgia and had facilitated approximately $600 million of capital investment in Georgia.  AC 55.  He characterized the article as grossly misleading and informed OPIC that Enverra had conducted its own due diligence.  AC 56.

Although OPIC cancelled the guarantee arrangement, that event did not derail plaintiff's career.  General Clark noted in his letter to OPIC that in January 2018—well after the publication of the article—the Silk Road Group's SilkNet with the assistance of OPIC completed a $153 million acquisition in Georgia of the second largest telecom operator, Geocell, which required the Silk Road Group to successfully pass anti-money laundering and know-your customer reviews by UBS and JPMorgan.  AC 56.

### Mr.  Mueller Is Appointed as Special Counsel to Investigate the Nature and Extent of Russian Interference in the 2016 Presidential Election

On May 17, 2017, pursuant to 28 U.S.C. § 509 and 28 C.F.R. Part 600.01, Deputy Assistant Attorney General Rod Rosenstein, through delegation from Attorney General William P. Barr, appointed attorney Robert S. Mueller, III, as a special counsel to investigate the nature and extent of Russian interference with the 2016 presidential election.[3]  AC 24.

### Plaintiff's Participation in the Russian Interference Investigation

In April 2018, two FBI agents showed up at plaintiff's residence in Connecticut unannounced and asked whether plaintiff would agree to answer a few questions related to the Russian interference investigation.  AC 25.  Plaintiff invited them in and cooperated fully.  *Id.* He was surprised when the agents showed him copies of an exchange of texts between Michael Cohen and plaintiff in late October 2016, just prior to the presidential election.  *Id.*, AC 21. Plaintiff had texted Cohen to give let him know that a friend had telephoned him at his home in

---

[3] 28 U.S.C. § 509 vests all functions, with a few exceptions not relevant here, of the Department of Justice in the Attorney General. *See also* 28 U.S.C. §§ 510, 515-519.  28 C.F.R. Part 600.1, in turn,  provides that the Attorney General … will appoint a Special Counsel when he … determines that criminal investigation of a person or matter is warranted and—(a) That investigation or prosecution of that person or matter by the United States Attorney's Office of litigating Division of the Department of Justice would present a conflict of interest; and (b) that under the circumstances, it would be in the public interest to appoint an outside Special Counsel to assume responsibility for the matter."

9

Connecticut about a conversation he overheard while attending a dinner party.  AC 21.  The friend told plaintiff that a person sitting at an adjacent table was bragging about having compromising tapes of then Candidate Trump.  AC 21.  The friend told plaintiff he was passing on what he heard because he knew plaintiff was involved in a business relationship with the Trump Organization about the project to build a tower in Georgia.  *Id.*  As the agents were leaving, they handed plaintiff a subpoena for testimony and documents in connection with the grand jury proceedings.  AC 25.

Plaintiff retained the legal services of Quin Emanuel Urquhart & Sullivan, LLP to assist in responding to the document request and in preparation for testifying before the grand jury. AC 26.  In all, plaintiff produced approximately 25,000 pages of documents to the grand jury at a cost of hundreds of thousands of dollars in legal fees.  *Id.*

 In early May 2018, plaintiff was questioned by the special prosecutors at the Department of Justice's Main Building, and on May 10, 2020 he testified before the grand jury.  AC 27. Later, in June and July 2018, plaintiff received several follow-up emails from the senior prosecutor to which plaintiff fully responded.  *Id.*  In all, plaintiff was questioned for approximately seventeen hours.  *Id.*  He was subsequently questioned for approximately eight hours before the House Intelligence Committee and answered a long list of questions from the Senate Intelligence Committee, both of which also resulted in large legal fees.  *Id.*

### *Special Counsel Mueller Delivers the Report to the Attorney General and a Redacted Version Is Released to the Public.*

On March 22, 2019, pursuant to 28 C.F.R. Part 600.8, Special Counsel Mueller concluded his investigation and "provide[d] the Attorney General with a confidential report explaining the prosecution or declination decision reached by the Special Counsel."  AC 28. Two days later, the Attorney General sent a four-page letter to the heads of the House and Senate

Judiciary Committees summarizing what the Attorney General considered the principal conclusions.  *Id*.  On March 24, 2019, the Attorney General sent a four-page letter to the heads of the House and Senate Judiciary Committees detailing what he stated were the Report's principal conclusions.  AC 28.

The Attorney General exercised his discretion under Part 600.9(c) and determined that release of the Report was in the public interest and would be made public after certain redactions were made.[4]  AC 28.  In discussing what parts of the Report would be redacted, the Attorney General stated he would redact derogatory information about people in private life who were scrutinized by the Department but not charged.[5]  "If you're not going to indict someone, then you don't stand up there and unload negative information about the person," the Attorney General stated.  *Id.*

On April 18, 2019, DOJ released to the public a two-volume redacted version of the Report.  AC 28.  Despite the Attorney General's proclamation that damaging information about people who were neither targets nor charged, Footnote 112, which is highly defamatory, was released unredacted.  Footnote 112 reads in relevant part:[6]

> … Comey's briefing included the Steele reporting's unverified allegation that the Russians had compromising tapes of the President involving conduct when he was a private citizen in a 2013 trip to Moscow for the Miss Universe Pageant. During the 2016 presidential campaign, a similar claim may have reached candidate Trump.  On October 30, 2016, Michael Cohen received a text from Russian businessman Giorgi Rtskhiladze that said, "Stopped flow of tapes from Russia but not sure if there's anything else.  Just so you know …."  10/30/16 Text

---

[4] 28 C.F.R. Part 600.9(c) provides that "[t]he Attorney General may determine to release of these reports would be in the public interest, to the extent release would comply with applicable legal restrictions."

[5] www.marketwatch.com/story/heres'what-attorney-general-is-redacting-from-the-Mueller-Report-2019-04-17.

[6] AC 29.

Message, Rtskhiladze to Cohen.  Rtskhiladze has said "tapes" referred to compromising tapes of Trump rumored to be held by persons associated with the Russian real estate conglomerate Crocus Group, which had helped host the 2013 Miss Universe Pageant in Russia.  Rtskhiladze 4/4/18 302, at 12.  Cohen said he spoke to Trump about the issue after receiving the texts from Rtskhiladze.  Cohen 9/12/18 302, at 13.  Rtskhiladze said he was told the tapes were fake, but he did not communicate that to Cohen.  Rtskhiladze 5/10/18 302, at 7.[7]

### Plaintiff Immediately Requested the Removal of False, Reckless, and Misleading Statements about Him in Footnote 112.

On April 23, 2019, plaintiff's counsel at Reed Smith in Washington, D.C., sent a letter to Attorney General Barr addressing the false, reckless, and misleading statements in Footnote 112 and demanding that all references to plaintiff be redacted from it.  AC 44.  The Department of Justice did not respond.  *Id.*  Had the Department of Justice given plaintiff a chance to review the contents of Footnote 112 prior to release—or even promptly provided plaintiff the opportunity after its release—the stigmatization of plaintiff could have been avoided.  AC 49.  As a direct and foreseeable consequence of Footnote 112 and the Department of Justice's failure to retract its defamatory language the damage to plaintiff's professional and personal life has been overwhelming.  AC 50-52.

### The Defamation in Footnote 112 Was Broadcast Worldwide and Interpreted in the Manner Intended by the Special Counsel Team.

Immediately following the release of the Mueller Report, the media in the United States and around the world took the bait, tied plaintiff to the Steele Dossier, and proceeded to

---

[7] *Rtskhiladze*: "Stopped flow of some tapes from Russia but not sure if there's anything else. Just so u know …"  *Cohen*: "Tapes of what?" *Rtskhiladze*: "Not sure of the content but person in Moscow was bragging had tapes from Russia trip.  Will try to dial you tomorrow but wanted to be aware.  I'm sure it's not a big deal but there are lots of stupid people."  *Cohen*: "You have no idea"  *Rtskhiladze:* "I do trust me."  AC 31.

broadcast false, reckless, and defamatory statements about him.  AC 43.  These reports uniformly asserted that plaintiff was a "Russian businessman" engaged in clandestine actions to support the Russian Government's agenda of interfering in the 2016 United States election to help Candidate Trump.  *Id.*  Footnote 112 and the subsequent feeding frenzy in the media delivered a catastrophic blow to plaintiff's well-earned reputation as an honest Georgia-American businessman.  *Id.*

For example, on May 1, 2019, ABC News published an article titled "*10 Best Footnotes of the Mueller Report*."  AC 45.  First on its list was Footnote 112:

> **1.  Those tapes: Footnote 112 (Volume II pg 27-28) describes conversations between Trump associates about rumored video recordings of the candidate in a Russian hotel room with prostitutes:** In 2016, a dossier compiled by former British intelligence officer Christopher Steele brought to light the possible existence of a Russian-recorded video of Trump during a 2013 visit to Moscow showing Trump cavorting with prostitutes in his suite at the Moscow Ritz hotel. A footnote in the Mueller Report discusses the unverified allegation, which Trump has maintained is false. Two weeks before the election, the report says Trump's personal attorney Michael Cohen received a text *from a Russian businessman Giorgi Rtskhiladze* that said, *"Stopped flow of tapes from Russia but not sure if there's anything else.  Just so you know ..."*

AC 45 (bolding original; emphasis added).  The ABC news article also stated that "[t]he report and footnote do not give information on Trump's response to Cohen's alleged briefing on the matter, nor does it explain why Rtskhiladze wouldn't have told Cohen the tapes were fake."  *Id.*

Not surprisingly, ABC read the footnote precisely the way the prosecutors wanted the media and the public to read it, *i.e.*, Trump associates were working with a foreign national—a "Russian businessman"—to suppress salacious videos of Mr. Trump that are noted in the Steele Dossier; and, further, that plaintiff knew the tapes were fake but did not disclose that information to Mr. Cohen.  AC 46.

13

Another example of the defamatory press coverage related to Footnote 112 was a monolog that aired on April 24, 2019 on MSNBC's Rachel Maddow show:

> According to the Mueller Report, it turns out before the election and well before any of the Steele Dossier or anything like that claim ever saw the light of day, a guy Trump actually did know from Russian connections in the former Soviet Union actually did get in touch with Michael Cohen to tell him to tell Trump that he was stopping the flow of some tapes from Russia. Person in Moscow bragging "had tapes from Russia trip." Oh, good, he stopped the tapes from getting out of Russia.
>
> And according to Mueller, Cohen then told Trump about that before the election. So that means Trump knew that somewhere in the former Soviet Union, a business buddy of his had taken action to make sure tapes, supposedly from Trump's trip to Russia, those tapes weren't getting out. Don't worry, all taken care of. I took care of that for you, right?

AC. 47. The Maddow Show too connected the defamatory statements about plaintiff in Footnote 112 to the Steele Dossier, just as the Special Counsel and his staff intended a reader to do. AC 48.

Every major and many minor media outlets around the world released similar articles based on the misleading footnote with devastating results for plaintiff personally, for his business reputation, and for his family. AC. 49. And, of course, once defamation about such a high-profile investigation is accessible on the internet the damage is done—the bell cannot be un-rung. *Id.* Even now, the damage can be mitigated by appropriate action by DOJ to redact references to plaintiff in Footnote 112. *Id.*

### *The Intentionally False, Reckless, and Misleading Statements in Footnote 112 Destroyed Plaintiff's Career.*

Once the Mueller Report was made public on April 18, 2019, plaintiff's life was upended because the intentionally false, reckless, and misleading statements about him in Footnote 112 of the Report. The worldwide attention Footnote 112 received in the media and the stigmatization that followed shattered plaintiff's good name as an honest American international businessman.

14

AC 51.  As a result, plaintiff suffered numerous adverse determinations related to his career to the point that he can no longer function as the international businessman he once was. AC 60, 61.

The defamation in Footnote 112 about plaintiff was no accident.  The pressure on the special prosecutors to uncover Russian collusion with the Trump campaign—which they concluded did not occur—led them nevertheless to create a counterfactual and wildly speculative footnote that leads the reader to believe there was collusion—but at the expense of plaintiff's career and wellbeing.  The Special Counsel and his team of prosecutors knew that the footnote was false and misleading for the following reasons:

- The introduction of Comey's briefing about the unverified Steele Dossier at the beginning of the footnote plants in the readers mind that what follows must have been about the same subject.  But the unverified Steele Dossier did not become public until January 2017, months after the exchange of texts between plaintiff and Candidate Trump's attorney, Michael Cohen.  AC 37.  What was public in October 2016 was an audio tape of Trump picked up on a hot mic on the set of Planet Hollywood in which he made offensive statements about women.  *Id.* After it was made public, there was much speculation by the media and the public about whether there were other embarrassing tapes of the same or similar nature. *Id.*

- They knew or recklessly disregarded plaintiff's rights when they misquoted the text and made the exchange highly misleading.  Plaintiff's text to Cohen states "Stopped flow of *some* tapes from Russia …." which places this awkward -- language—"Stopped flow of some tapes"—in a different context.  "Stopped flow

of tapes" implies familiarity with the content, while "Stopped flow of some tapes" implies a lack of familiarity. *Compare* AC 29 and 31. Had the prosecutors not intended to mislead the reader about plaintiff's familiarity with the tapes, they would have included the exchanges that immediately followed: Cohen: "Tapes of what?" and plaintiff's response: "Not sure of the content but person in Moscow was bragging had tapes from Russia trip. Will try to dial you tomorrow but wanted to be aware. I'm sure it's no big deal but there are lots of stupid people." AC 31. Had this follow-up exchange been included, the reader of Footnote 112 would have known immediately that plaintiff had no idea about the content of the tapes or even if they existed at all. The reader also would have known that plaintiff was just passing on what someone had said and that the texts did not stem from a conversation with a Russian oligarch that controls the Russian real-estate conglomerate Crocus Group, which is included after the quote and no doubt sourced from his testimony before the grand jury and, therefore, could not be verified by the reader. *Id.* Had the full exchange of texts been included the reader would have known that plaintiff had no reason to take the bragging seriously— "[n]ot sure of the content …." and "I'm sure it's not a big deal …." *Id.*

- They knew from the FBI interview, their own interviews, and his testimony before the grand jury that what plaintiff related to Cohen was based on a telephone call plaintiff received at his home in Connecticut from a friend telling plaintiff that he had overheard a person at a dinner party in Moscow—sitting at

another table—bragging about tapes of Candidate Trump.[8]  AC 21-22, 23.

Plaintiff's friend related this rumor to plaintiff because he knew plaintiff was

working to bring a Trump Tower to Georgia.

- They knew from the FBI interview, their own interviews, and his testimony

  before the grand jury that English was not plaintiff's first language and knew

  from seventeen hours of questioning that, although plaintiff's English is quite

  good, it is not perfect.  They had to know that plaintiff's attempts at slang, such as

  "Stopped flow of some tapes," could be awkward at times.  Particularly in text

  messages which are commonly cryptic, garbled, or sloppy for most people for

  whom English is their first language.

- They knew from the FBI interview, their own interviews, and his testimony

  before the grand jury that plaintiff is a citizen of the United States and has resided

  in the United States since 1991.

- They knew from the FBI interview, their own interviews, and his testimony

  before the grand jury that plaintiff was not—and never has been—a "Russian

  businessman."

- They knew from the FBI interview, their own interviews, and his testimony

  before the grand jury that plaintiff is a native of Georgia—not Russia.

---

[8] To prepare for DOJ's anticipated Motion to Dismiss, plaintiff requested the opportunity to review his grand jury testimony at a time and place of DOJ's choosing but received no reply, other than an acknowledgement of receipt.  *See In re Grand Jury*, 490 F.3d 978, 990 (D.C. Cir. 2007) (holding that grand jury witnesses have a right to review their testimony in private at the U.S. Attorney's Office or a place agreed by the parties or designated by the district court).

- They knew from the FBI interview, their own interviews, and his testimony before the grand jury that plaintiff has dedicated his adult life to fostering close economic and civic ties between the United States and Georgia.

- They knew that since the collapse of the Soviet Union in 1991 Georgia has been an independent country.

- They knew that Georgia has a strained relationship with Russia due to Russia's military invasion in 2008 and its unlawful occupation of twenty percent of Georgian territory.

- They knew that Georgia is and has been an important ally of the United States in countering Russian influence in the region.

- They knew that a Georgian native working to further the interest of the Russian government would be considered by Georgians as a betrayal of Georgia.

- They knew from the FBI interview, their own interviews, and his testimony before the grand jury that the suggestion that plaintiff cavorted with a Russian oligarch to assist Russia's agenda to interfere in the 2016 presidential election would disparage plaintiff's integrity, tarnish his reputation, and impede his ability to do business in his native country, the United States, and elsewhere.  AC 8-17.

 Had plaintiff taken some action to bury highly embarrassing tapes, one would have expected the team of special prosecutors—armed with abundant funds to conduct the investigation—to have uncovered evidence of such action.  AC 42.  They did not.  *Id.*

### *The Defamation Stigmatized Plaintiff, Causing a Tangible Change of Status.*

Wrongfully tying plaintiff to the Steele Dossier, falsely identifying him as a "Russian businessman," intentionally splicing and altering the text message, and then

speciously declaring that plaintiff nefariously withheld  information that the tapes were
fake from Mr. Cohen has destroyed plaintiff's ability to continue his career.

AC 43, 50-51.

### The Defamation Destroyed Plaintiff's Ability to<br>Function as a De Facto Emissary for Georgia-U.S. Relations.

The defamation in Footnote 112 destroyed plaintiff's ability to continue as a *de
facto* ambassador for U.S.-Georgia relations.  AC 52.  The ability to function as a *de facto*
emissary for Georgia-U.S. relations depended upon the stellar reputation of plaintiff as an
honest businessman dedicated to enhancing the economic ties between the United States
and Georgia.  The publication of Footnote 112 destroyed plaintiff's personal and business
reputation and, hence, his ability to continue in that role.  *Id.*

After the release of the Mueller Report, the Georgian Government abandon the
process that already was underway to bestow on plaintiff the status of "Honorary Consul"
in acknowledgement of his tireless efforts to foster stronger economic ties between
Georgia and the United States.  *Id.*

### The Defamation Caused Devastating Financial<br>Harm to Plaintiff's International Business Interests.

As a direct and proximate result of Footnote 112, plaintiff has suffered dramatic
emotional and financial harm.  AC 60.  Ways in which Footnote 112 has financially
harmed plaintiff include the following, non-exhaustive, examples:

- At the time the Report was made public, plaintiff was involved in a $50 million
  transaction that was cancelled after its release, resulting in a $2.5 million loss to
  plaintiff.

- Plaintiff was facilitating a transaction to purchase a large mobile communications company.  The amount of the acquisition was up to $200 million and plaintiff was to be a member of the advisory group with a $200,000 annual income, plus three percent of the total value of the transaction as compensation for facilitating the transaction.  The Report was made public after the transaction closed.  As a result of the media storm caused by Footnote 112, plaintiff was forced to withdraw.

- Plaintiff was forced to abandon his involvement in raising hundreds of millions of dollars in Euro bonds from which he would have received three percent in compensation.

- Plaintiff's affiliation with a major financial institution as a highly paid strategic advisor was suspended.

- Plaintiff's agreement with a large energy corporation was not renewed after the Report was made public, resulting in a loss of hundreds of thousands of dollars annually.

- Plaintiff has been forced to forego numerous business opportunities because no bank, investment company, or other financial institution will meet with him once they Google his name.

- Numerous other deals plaintiff started before the release of the Report continued afterwards without his participation because of the damage done by Footnote 112.

*Id.*  Plaintiff's Declaration adds more detail to these already detailed consequences of the publication of Footnote 112 unredacted.  Dec. 17-32.

**Procedural Background**

On May 12, 2020, counsel for plaintiff sent a letter to Attorney General Barr urging DOJ to address and ameliorate the massive emotional and financial harm that has been visited upon plaintiff and his family as a result of the Attorney General's decision to release a redacted version of the Mueller Report to the public but not to redact defamatory language in Footnote 112. The letter was a follow-up letter to a demand letter sent to the Attorney General on April 24, 2019—just five days after a redacted version of the Mueller Report was released to the public. The Attorney General did not respond to either letter.

On June 17, 2020, plaintiff filed this action. The Original Complaint contained two counts with Count I asserted a claim against DOJ and Special Counsel Mueller for deprivation of plaintiff's liberty interest in violation of the Due Process Clause. Count II asserted a name-clearing claim against DOJ under the APA.

On May 26, 2020, plaintiff through his counsel filed a Privacy Act Amendment Request with DOJ and on June 17, 2020, DOJ responded by letter stating it could not process the request because Footnote 112 was not contained in a system of records. On June 21, 2020, plaintiff through his attorney filed an administrative appeal making plain that plaintiff sought relief under 552a(g)(1)(C) of the Privacy Act to which the system of records qualification did not apply. On August 17, 2020, DOJ responded that plaintiff's 552a(g)(1)(C) claim was beyond the scope of DOJ's administrative review process.

On July 21, 2020, the Court issued a briefing schedule in accordance with the joint request of counsel, with defendants' motions to dismiss due on September 15, 2020 and plaintiff's responses due on October 6, 2020.

21

On August 5, 2020, plaintiff filed an unopposed motion to amend the complaint to add two additional counts.  Count III alleged that Footnote 112 as it pertains to plaintiff is not sufficiently accurate, relevant, timely, or complete as is necessary to assure fairness in determinations relating to plaintiff's qualifications, character, rights, opportunities, or benefits that may be made on the basis of Footnote 112 and has caused adverse determinations regarding plaintiff.  Count IV asserts a claim for "actual damages" under 552a(g)(4) related to DOJ's violation of the clarity requirements of 552a(g)(1)(C).

On August 31, 2020, the Court issued a minute order granting plaintiff's motion to amend/correct the record.

On September 15, DOJ and Special Counsel Mueller filed separate motions to dismiss.

**Legal Standard**

### A.      Rule 12(b)(1)

In ruling on a motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure, the court must construe the complaint in favor of the plaintiff and treat all well-pled factual allegations as true.  *See Attias CareFirst, Inc*., 865 F.3d 620, 627 (D.C. Cir. 2017).  In doing so, the  Court must provide a plaintiff the benefit of all reasonable inferences, but the Court "need not accept factual inferences drawn by plaintiffs if those inferences are not supported by facts alleged in the complaint," and the court need not accept legal conclusions.  *Disner v. United States*, 888 F. Supp. 2d 83, 87 (D.D.C. 2012).  Moreover, in determining whether plaintiffs have met the burden of establishing jurisdiction, the Court may consider materials beyond the pleadings where appropriate.  *Am. Nat'l Ins. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011); *Cumis Ins. Society Inc. v. Clark*, 318 F. Supp. 3d 199, 207 (D.D.C. 2018).

### B.      Rule 12(b)(6)

To survive a motion to dismiss, the complaint must contain sufficient factual

matter, accepted as true, to state a claim to relief that is plausible on its face.  A claim has "facial

plausibility" when plaintiff pleads factual content that allows a court to draw a reasonable

inference that defendant is liable for the misconduct alleged.  *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009).

### **Argument**

### I.      **Plaintiff Has Article III Standing.**

The Supreme Court has established that the irreducible constitutional minimum for

Article III standing has three elements: (1) the plaintiff must have suffered an "injury in fact"—

an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual

or imminent, not conjectural or hypothetical, (2) there must be a causal connection between the

injury and the conduct complained of—the injury has to be fairly traceable to the challenged

action of the defendant, and not the result of the independent action of some third party not

before the court, and (iii) it must be "likely," as opposed to merely "speculative," that the injury

will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-

61 (1992).

### A.      **To the Extent the Court Believes the Allegations Are Insufficient to Support Jurisdiction, Plaintiff Submits His Declaration in Support of Jurisdiction.**

DOJ challenges the allegations in the Amended Complaint arguing that they are

insufficient to support subject matter jurisdiction.  DOJ Br. at 7-10.  The argument is specious

but in an abundance of caution plaintiff has submitted his declaration describing in additional

detail the timing and circumstances of the abrupt end to his career including specifically tying

the termination of those engagements to Footnote 112.  GR Dec. 17-18, 19, 20-32.

23

**B.      Plaintiff Has Adequately Alleged an "Injury in Fact."**

Plaintiff alleges in the Amended Complaint in detail—supported by his Declaration submitted in support of jurisdiction—how the failure of the Attorney General to redact his name from the highly defamatory Footnote 112 led to a swift and devastating end to his career as an American businessman who had dedicated much of his adult life to fostering close economic, civic, and cultural ties between the United States, his adopted country, and Georgia, is native country.  He has alleged, supported by his Declaration, detailed examples of the worldwide attention Footnote 112 received immediately after the Report was made public.  AC 43-49.  He also has alleged how the publication of Footnote 112 immediately terminated his candidacy to have bestowed upon him the title of "Honorary Consul" by Georgia for his steadfast fostering of Georgian and U.S. relations.  AC 50-52; GR Dec. 19.  And he has listed the specific and massive harm the release of Footnote 112 has done to his ability to continue as a trusted American businessman involved in transactions between the United States and countries that were once part of the Soviet Union, in particular Georgia.  AC 60-61; GR Dec. 17-18, 20-32.

**C.      Plaintiff Has Plausibly Alleged that His Injuries Were Caused by the Actions of DOJ.**

**1.      Plaintiff Has Plausibly Alleged that He Was Injured by the Attorney General's Decision Not to Delete the Defamatory Content of Footnote 112.**

Plaintiff has sufficiently alleged, supported by plaintiff's Declaration, a causal link between the Attorney General's decision not to redact the intentional or reckless statements about him in Footnote 112 and the swift cessation of his career.  AC 60-61; GR Dec. 17-18, 20-32.  The Amended Complaint alleges media attention that immediately followed the release of Footnote 112.  AC 43-49.  The Amended Complaint, supported by plaintiff's Declaration, also lists specific ways in which Footnote 112 immediately stigmatized him thereby causing massive

24

financial losses and the abrupt end of his career, including (i) a $50 million transaction that was cancelled after the release of Footnote 112, resulting in a $2.5 million loss to plaintiff, (ii) loss of membership on an advisory group for a large mobile communications company with annual compensation of $200,000, plus three percent of the total value of the transaction for facilitating the transaction, (iii) his forced exile from a Euro bond transaction in which he stood to receive three percent in compensation, (iv) his affiliation with a large financial institution as a highly paid strategic advisor was suspended, (v) an agreement with a large energy company was not renewed resulting in the loss of hundreds of thousands of dollars annually, and more.  AC 61; GR Dec. 17-18, 20-32.  These catastrophic occurrences were contemporaneous with the release of Footnote and, therefore, are "fairly traceable" to the release of Footnote 112 to the public in April 2019.

> **2.**      **Plaintiff Also Has Plausibly Alleged that His Injuries Were Caused by DOJ's Failure to Comply with the Clarity Provision of the Privacy Act before It Released Footnote 112.**

Plaintiff has plausibly pled that his financial injuries are traceable to DOJ's failure to comply with its obligation under 552a(g)(1)(C) of the Privacy Act.  That section requires that any record concerning an individual be maintained with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determinations relating to the character, rights, or opportunities made on the basis of such a record.  DOJ did not assure that Footnote 112 complied with its statutory obligation.  That failure permitted Footnote 112 to:

(i) imply that the tapes mentioned in a brief text exchange with Michael Cohen related to the golden-rain tapes mentioned in the salacious but unverified Steele Dossier (mentioned at the beginning of Footnote 112) even though plaintiff had no way to be aware of such tapes as the Steele Dossier did not become public until months later,

(ii) convey the impression that plaintiff was aware of the content of the tapes when the very next text (not included in Footnote 112) makes patently clear that he was not—"Not sure of the content,"

(iii) convey the impression that plaintiff had some covert knowledge of compromising tapes when part of the exchange of text messages (not included in Footnote 112) made plain that his knowledge was based upon a "person in Moscow was bragging about tapes from Russian trip."  Also not included in Footnote 112 was what the prosecutors knew from interviews and his testimony that plaintiff learned of the rumored tapes when a friend called him at his home in Connecticut and told him he had attended a dinner party and overheard someone at an adjacent table who he did not know bragging about tapes from a Russia trip.  The prosecutors also knew from his interviews and testimony that this friend had called plaintiff to convey this information because he knew plaintiff was involved with the Trump Organization to bring a Trump Tower to Georgia and, therefore, would naturally be concerned about Trump's reputation.  AC 28-42.

(iv) mislead the reader when it states that "Rtskhiladze *has said* 'tapes' referred to compromising tapes of Trump rumored to be held by persons associated with the Russian real estate conglomerate Crocus Group, which helped host the 2013 Miss Universe Pageant in Russia." (emphasis added).  This statement also implies that plaintiff had some contact with the Crocus Group or had personal knowledge about the tapes when they knew there was nothing in plaintiff's interviews or testimony to support such an implication.

(v) imply that plaintiff was told by someone with personal knowledge that the tapes were fake but did not tell that to Cohen when the prosecutors knew from plaintiff's interviews and testimony that he had no way of knowing one way or the other whether the tapes were real, fake, or even existed.

26

Plaintiff sufficiently alleges that the failure of DOJ to assure that the content of Footnote 112 was accurate and complete caused numerous "adverse determinations" within the meaning of 552a(g)(1)(C).  AC 61; GR Dec. 17-18, 20-32.

> **3.      Although DOJ Has Not Moved to Dismiss Plaintiff's Reputation-Plus Claim, Plaintiff Has Plausibly Alleged that His Injuries Were Caused by the Violation of the Due Process Clause.**

Plaintiff alleges in detail how the publication of Footnote 112 without providing him an opportunity to be heard about its highly defamatory nature proximately terminated his career as an American businessman focused on fostering economic, civic, and cultural ties with Georgia and other countries formerly part of the Soviet Union.  *See* AC 50-52, 60; Declaration 17-32.

> **D.      Plaintiff's Injury Will Likely Be Remedied by the Relief Plaintiff Seeks.**

> **1.      Relief under the APA Based on the Attorney General's Failure to Redact Highly Defamatory Text from Footnote 112 Is Likely to Redress the Injury.**

DOJ's argument that the Court lacks jurisdiction because the injury is not readily redressable under the APA misses the mark.  DOJ asserts that plaintiff is not entitled to equitable relief under the APA or the Privacy Act because he has not asserted an ongoing or threatened injury warranting injunctive relief and such relief does not redress his alleged injuries.[9]  DOJ Br. at 9.  Injunctive or declaratory relief under the APA will serve the same purpose as a name clearing hearing in a defamation-plus case.  *See Doe v. DOJ*, 753 F.2d 1092, 1104 (D.C. Cir. 1985) (stating that the complaint in a defamation-plus case clearly demonstrated that Doe could

---

[9] DOJ also fails to address that the Court has broad equitable powers and, therefore, can declare under the Declaratory Judgment Act that DOJ violated plaintiff's liberty interest protected by the Due Process Clause.  Such relief would redress plaintiff's injury because it would serve the same purpose of a name-clearing claim.

prove a set of facts that would entitle her to some form of relief—namely a hearing to clear her name).

If name-clearing injunctive relief is available in a defamation-plus case, equitable relief is surely available to achieve the same purpose.  Moreover, if it were not clear enough from the Amended Complaint (which it is), plaintiff's Declaration avers that he was told directly by the Georgian government that it could no longer proceed with the bestowal upon him of the title Honorary Consul because of the negative publicity generated by Footnote 112.  Dec. 19.  The Declaration also states that he was told that a DOJ retraction would allow it to move forward.[10] Plaintiff was told the same thing by principals in the lucrative business transactions that were terminated soon after Footnote 112 was made public.[11]

An injunction or declaration based upon a holding that the Attorney General's decision to release the Mueller Report to the public but not to redact derogatory and defamatory statements about plaintiff in Footnote 112 was arbitrary or capricious, not in accordance with law, and/or in violation of plaintiff's constitutional rights would likely redress the injury suffered by plaintiff.[12]

---

[10] GR Dec. 19 (averring that plaintiff was told by the Prime Minister of Georgia's chief of staff that "it was very important to see the Attorney General's response [to plaintiff's request for a retraction sent five days after Footnote 112 was made public] and it was even more important that I obtain a retraction").

[11] GR Dec. 21 (plaintiff averring that the head of the Kazakhstan agency for strategic reform told him in a "candid a conversation that Mr. Kelimbetov … expressed his deep concerns about the fallout from Footnote 112 and told me that my new public image was a roadblock for any future collaboration" and "he hoped we could resume our collaboration once I was able to rectify the situation"); GR Dec. 29 (plaintiff averring that he was told by the chairman of the Silk Road Group that "there was no way forward but for me to pull out of all of our business ventures including the telecom deals until I was able to clear my name").

[12] Plaintiff does not address the fact that the courts possess broad equitable power to address constitutional violations.  *See Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 400 (1971) (Justice Harlan concurring, stating it must be presumed that the federal courts have the equitable power to enjoin the violation of constitutional rights) (citing *Bell v. Hood*, 327 U.S. 678, 684 (1948).

**2.     Equitable Relief under the APA for DOJ's Failure to Comply with the Clarity Requirements of 552a(g)(1)(C) of the Privacy Act Would Likely Redress the Injury.**

DOJ's failure to comply with the clarity requirements of 552a(g)(1)(C) would likely be redressed through the equitable provisions of the APA.  Injunctive or declaratory relief under the APA will serve the same purpose as a name clearing hearing in a defamation plus case.  *See Doe v. DOJ*, 753 F.2d at 1104 (stating that the complaint in a defamation-plus case clearly demonstrated that Doe could prove a set of facts that would entitle her to some form of relief—namely a hearing to clear her name).  Such relief would require DOJ either to delete all references to plaintiff in Footnote 112 or to modify it so that it complies with the clarity requirements of the Privacy Act.

**3.     An Award of "Actual Damages" under 552a(4) of the Privacy Act Will Redress Actual Monetary Injury.**

The injury alleged by plaintiff also is redressable because plaintiff seeks damages under 552a(g)(4) of the Privacy Act which permits the award of "actual damages" where the agency's violation of 552a(g)(1)(C) was "intentional or willful."  The very purpose of the award of "actual damages" is to redress the injury that was caused by DOJ's failure to comply with the clarity requirement of the Privacy Act.

**4.     An Award of Damages under Plaintiff's Reputation-Plus Claim Will Redress the Financial and Emotional Injury Sustained by Plaintiff.**

A damage award under the Fifth Amendment would redress plaintiff's injury to a greater extent than is available under the Privacy Act.  Unlike the award of "actual damages" in a Privacy Act case, damages for emotional and mental distress are awardable for a violation of due process.  *Carey v. Piphus*, 435 U.S. 247, 263-64 (1978).

II.     **Plaintiff's Equitable and Monetary Claims under the Privacy Act**

A.     **The Equitable Provisions of the Administrative Procedure Act Apply to Plaintiff's 552a(g)(1)(C) Claim.**

DOJ fails to recognize that plaintiff is entitled to equitable relief under the APA for DOJ's violation of the clarity subsection of the Privacy Act (552a(g)(1)(C)).[13] The Privacy Act allows for equitable relief for violations of 552a(g)(1)(A) (denial of a request to amend a record held within a "system of records") and 552a(g)(1)(B) (denial of a request to access a record held within a "system of records").  In reviews under these provisions the courts are granted *de novo* review, *i.e.*, the courts are free to develop the evidence through discovery or evidentiary hearings.[14]

Just because Congress did not grant the courts *de novo* review of cases involving an agency's failure to comply with the Privacy Act involving records held outside of a "system of records" (552a(g)(1)(C) & (D)) does not mean that Congress intended to preclude equitable review altogether.[15]  The equitable review provisions of the APA stand in the background of all

---

[13] The Privacy Act provides relief whenever a federal agency:

> …(C) fails to maintain any record concerning any individual with such
> accuracy, relevance, timeliness, and completeness as is necessary to assure
> fairness in any determination relating to the qualifications, character,
> rights, or opportunities of, or benefits to the individual that may be made
> on the basis of such record, and consequently a determination is made
> which is adverse to the individual.

[14] 552a(g)(2)(A) provides: "In any suit brought under the provisions of subsection (g)(1)(A) of this section, the court may order the agency to amend the individual's record ….  In such a case the court shall determine the matter de novo."  552a(g)(3)(A) provides: "In any suit brought under the provisions of (g)(1)(B) of this section, the court may enjoin the agency from withholding the records ….  In such a case the court shall determine the matter de novo …."

[15] In *Doe v. Chao*, 540 U.S. 614, 619 n.1 (2004), the Supreme Court stated, in the context of equitable relief under the APA for claims governed by the Privacy Act, that "[t]he Privacy Act says nothing about standards of proof governing equitable relief that may be open to victims of

statutes and the APA presumes that all "final agency actions" are reviewable.  In contrast to *de novo* review permitted by the Privacy Act for violations involving records within a "system of record," an APA review is not a *de novo* proceeding.[16]  Instead, the court acts in the role of an appellate court and reviews the administrative record provided by the agency.[17]

Simply put, there is nothing in 552a(g)(1)-(3) to indicate that Congress intended to displace APA review for violations of the Privacy Act for records not held within a "system of records."  This interpretation of 552a(g)(1)-(3) affords proper consideration to the APA which is intended by Congress to serve as the backdrop upon which virtually all decisions of federal administration are reached.  *See generally*, *Doe v. Herman*, 1998 WL 34194937 (W.D. Va. March 18, 1998).  A denial of APA review for violations of 552a(g)(1)(C) would permit an agency to publish career-ending, defamatory records and the affected person would have no

---

adverse determinations or effects, although it may be that this inattention is explained by the general provisions for equitable relief within the [APA]."  *See also Rice v. United States*, 245 F.R.D. 3, 7 (D.D.C. 2007) (noting that "there is some authority for awarding [declaratory] relief under the APA" for claims arising under the Privacy Act); *Haase v. Sessions*, 893 F.2d 370, 374 n.6 (D.C. Cir. 1990); *Doe v. Stephens*, 851 F.2d 1457, 1466-67 (D.C. Cir. 1988) (providing unsought equitable relief under the APA in Privacy Act case).  Moreover, the District of Columbia Circuit has held that a court may order equitable relief in the form of the expungement of records under the Privacy Act or the Constitution.  *See, e.g.,* Doe *v. Air Force*, 812 F.2d 738, 741 (D.C. Cir. 1987); *Smith v. Nixon*, 807 F.2d 197, 204 (D.C. Cir. 1986); *Hobson v. Wilson*, 737 F.2d 1, 65-66 (D.C. Cir.1984).

[16] The D.C. Circuit, however, has never held that *de novo* review is appropriate under the APA. *Gonzalez Boisson v. Pompeo*, 2020 Slip Copy WL 4346913 (D.D.C. July 29, 2020 *(stating that the D.C. Circuit has "*never applied de novo review in an APA case") (quoting  *Zevallos v. Obama*, 793 F.3d 106, 112 (D.C. Cir. 2015).

[17] In an APA case, the court acts in an appellate-court role reviewing the case based upon the administrative record.  *Bennett v. Donovan,* 703 F.3d 582, 589 (D.C. Cir. 2013) (stating that where a district court reviews agency action under the APA, it acts as an appellate tribunal, so the appropriate remedy for a violation is "simply to identify a legal error and then remand to the agency") (quoting *N. Air. Cargo v. U.S. Postal Serv.,* 674 F.3d 852, 861 (D.C. Cir. 2012)).

judicial recourse unless the person could demonstrate that the agency acted "intentionally or willfully" and, therefore, was entitled to "actual damages."  Congress could not have intended such an unsatisfactory result.

**B.      Plaintiff Has Adequately Alleged that He Suffered "Adverse Determinations" within the Meaning of Section 552a(g)(1)(C).**

**1.      An "Adverse Determination" Need Not Be Made by the Federal Agency Creating the Record or Another Agency Based upon It.**

DOJ argues that, even though it acknowledges that Footnote 112 was inaccurate, plaintiff is not entitled to relief under section 552a(g)(1)(C) because he did not suffer any "adverse determinations" as a result.  DOJ Br. at 19-22.  DOJ's argument is built upon a faulty premise.  DOJ argues that a plaintiff must have suffered "adverse determinations" at the hands of either DOJ, the creator of the inaccurate record, or at the hands of another federal agency.  That assertion is incorrect.

This question was correctly analyzed in *Aki v. Sebelius*, No. 08-cv-461, 2011 WL 13273368 (D.D.C. Jan. 13, 2011), where the district court "agree[d] with the plaintiff that the adverse determination remedied by section (g)(1)(C) may come from a private entity, as well as from an agency itself."  *Id.* at *4.  There, a doctor sued the Department of Health and Human Services because he was denied clinical privileges by Georgetown University Hospital based upon an inaccurate record created by HHS.  DOJ moved to dismiss arguing, as it does here, that the "adverse determination" must be made by a federal agency.  The court disagreed:

> While the language creating a civil remedy in section (g)(1)(C) closely resembles the duty-creating language of section (e)(5), there is a crucial difference between the two provisions as applied to this case.  Section (e)(5) applies only to "record *used by the agency*, while section (g)(1)(C) applies to "*any* record concerning *any* individual … to assure fairness in *any* determination …." [emphasis original].  Thus, unlike section (e)(5), the clear language of section (g)(1)(C) does not require that the entity

making the determination be the record keeping agency. … It only requires that, as a result of inaccurate records maintained by the agency "a determination is made which is adverse to the individual." *Id.* Therefore, the only way a claim brought pursuant to section (g)(1)(C) would require that the adverse determination be made by the record-keeping agency itself would be if (g)(1)(C) incorporates section (e)(5).

The D.C. Circuit has previously held that the civil remedy created in section (g)(1)(C) does not incorporate the obligations imposed on record-keeping agencies by section (e)(5). *Dickson v. OPM*, 828 F.2d 32, 38 (D.C. Cir. 1987). … [There] the Court reasoned that "the statute expressly limits the judicial remedies available under (g)(1)(A) and (B) to violations of other named sections of the Act. Section (C) also could have been so restricted," but it is not. *Id.* at 39.

A holding that the plaintiff must have suffered an "adverse determination" by the agency creating the record or another agency relying on it but not a non-government entity would make no sense. There is no reason to think Congress intended that an individual be able to require federal agencies to correct a record in a "system of records" that is causing adverse, career-ending consequences but to preclude relief where a third party is imposing "adverse determinations" based upon a same record not contained in a "system of records."

### 2. Plaintiff Has Adequately Alleged that the Inaccuracy in Footnote 112 Has Caused Plaintiff to Suffer Numerous "Adverse Determinations" by Private Parties.

As a direct and proximate result of Footnote 112, plaintiff sufficiently alleges that he has suffered dramatic emotional and financial harm. The Amended Complaint—supported by his Declaration—alleges the ways Footnote 112 has financially harmed plaintiff include the following, non-exhaustive, examples:

- At the time the Report was made public, plaintiff was involved in a $50 million transaction that was cancelled after its release, resulting in a $2.5 million loss to plaintiff.

- Plaintiff was facilitating a transaction to purchase a large mobile communications company. The amount of the acquisition was up to $200 million and plaintiff was

to be a member of the advisory group with a $200,000 annual income, plus three percent of the total value of the transaction as compensation for facilitating the transaction.  The Report was made public after the transaction closed.  As a result of the media storm caused by Footnote 112, plaintiff was forced to withdraw.

- Plaintiff was forced to abandon his involvement in raising hundreds of millions of dollars in Euro bonds from which he would have received three percent in compensation.

- Plaintiff's affiliation with a major financial institution as a highly paid strategic advisor was suspended.

- Plaintiff's agreement with a large energy corporation was not renewed after the Report was made public, resulting in a loss of hundreds of thousands of dollars annually.

- Plaintiff has been forced to forego numerous business opportunities because no bank, investment company, or other financial institutions will meet with him once they Google his name.

- Numerous other deals plaintiff started before the release of the Report continued afterwards without his participation because of the damage done by Footnote 112.

AC 61.  These detailed injuries are discussed in even greater detail in plaintiff's Declaration submitted in support of jurisdiction.  GR Dec. 17-18, 20-32.

    **C.**    **Plaintiff Has Adequately Pled that the Violation of 552a(g)(1)(C) Was "Intentional or Willful" under the "Actual Damages" Provision of 552a(g)(4).**

The D.C. Circuit and other circuit courts have interpreted "intentional or willful" to be met "by committing the act without grounds for believing it to be lawful, or by flagrantly

disregarding others' rights under the Act."[18]  In *Moskiewicz,* the Seventh Circuit cited to the

Act's legislative history:

> In a suit for damages, the [compromise] amendment reflects a belief that a
> finding of willful, arbitrary or capricious action is too harsh a standard of
> proof for an individual to exercise the rights granted by the legislation.
> Thus the standard for recovery of damages was reduced to "willful or
> intentional" action by an agency.  On a continuum between negligence and
> the very high standard of willful, arbitrary, or capricious conduct, this
> standard is viewed as only somewhat greater than gross negligence.

*Id.* at 563 (quoting *The Analysis of House and Senate Compromise Amendments to the Federal

Privacy Act*, 120 Cong. Rec. 40405, 40406 (1974)).  Therefore, Congress must have intended

that "intentional or willful" was an easier standard for recovery than "willful, arbitrary or

capricious action" as the bill read before it was amended.  This statement is consistent with the

majority view that "consider[s] that 'gross negligence' falls short of a reckless disregard of the

consequences and differs from ordinary negligence only in degree, and not in kind."  *Brathwaite

v. Xavier*, S. Ct. Civ. No. 2017-0037, 2019 WL 3287069, at *7 (S. Ct. V. I. July 16, 2019)

(quoting W. Page Keeton, et al., *Prosser & Keeton on Torts* § 34, at 212 (5th ed. 1984)).

Reckless conduct, therefore, is misconduct greater than gross negligence and falls within the

meaning of "intentional or willful" as used in 552a(g)(4).

Plaintiff sufficiently has pled conduct that is at least reckless.  Based on the information

in possession of the Mueller team, the way Footnote 112 is drafted demonstrates the intentional

or at the very least reckless disregard for plaintiff's rights under 552a(g)(1)(C).  The Mueller

---

[18] *Albright v. United States*, 732 F.2d 181, 189 (D.C. Cir. 19840); *Moskiewicz v. U.S. Dept. of
Agriculture*, 791 F.2d 561 (7th Cir. 1986) (holding that acts meeting greater than gross
negligence standard require evidence of "reckless behavior and/or knowing violations of the
Act); *Parks v. United States Internal Revenue Serv*., 618 F.2d 677 (10th Cir. 1980) (holding that
premeditated malice is not required to establish a willful or intentional violation of the Privacy
Act).

team knew that the Attorney General almost certainly would release the Report to the public.

They knew that because Footnote 112 mentions the unverified golden-rain tapes noted in the

unverified Steele Dossier that there was a high likelihood that Footnote 112 would receive

worldwide media attention.  Yet, the Mueller team intentionally or at the very least recklessly

failed to advise the Attorney General that Footnote 112 should be redacted.  Alternatively, the

Mueller team *did* recommend to the Attorney General that the footnote be redacted but the

Attorney General intentionally or recklessly decided not to make the recommended redaction.

Either way, the publication of Footnote 112 was released "intentionally or willfully."  And the

fact that the allegations are circumstantial in nature is not a weakness in the Amended

Complaint.  As the Supreme Court has observed on several occasions, circumstantial evidence is

often the best evidence—a statement any seasoned trial lawyer knows is correct.  *See Desert*

*Palace, Inc. v. Costa*, 539 U.S. 901 (2005) (quoting *Rogers v. Missouri Pacific R. Co.,* 352 U.S.

500, 508, n.17 (1957) ("Circumstantial evidence is not only sufficient, but may also

be more certain, satisfying and persuasive than direct evidence.").

## III.   Plaintiff's Claim under the Administrative Procedure Act.

### A.   The Attorney General's Decision Not to Redact the Inaccuracies in Footnote 112 Was a "Final Agency Action" under 28 U.S.C. § 509.

DOJ characterizes the "final agency action" at issue here to be the Mueller Report itself,

DOJ Br. 11, and then argues that the Report is not a "final agency action" within the meaning of

the APA.  But whether the Report itself constituted a "final agency action" is irrelevant because

the "final agency action" relevant here is the Attorney General's decision not to redact or make

more clear information in Footnote 112 about plaintiff before it was released to the public.

Under the APA, "final agency actions" are reviewable by a person who suffers a "legal

wrong" or who is "adversely affected or aggrieved."  5 U.S.C. § 702.  A "final agency action"

subject to review "must mark the consummation of [an] agency's decision-making process, rather than merely be tentative or interlocutory in nature, and the action must be one by which rights or obligations have been determined from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).  Final agency actions are presumptively reviewable. *Sackett v. EPA*, 566 U.S. 120, 128 (2012).

Under 28 U.S.C. § 509, "[a]ll functions of the Department of Justice and all functions of agencies and employees of the Department of Justice are vested in the Attorney General" with a few inapplicable exceptions.  *See also* 28 U.S.C. §§ 510, 515-519.  Under 28 C.F.R. Part 600.1, Attorney General Barr appointed Special Counsel Mueller to investigate the interference of Russia in the 2016 presidential election.  Pursuant to Part 600.8, Special Counsel Mueller at the conclusion of the investigation "provide[d] the Attorney General with a confidential report explaining the prosecution or declination decision reached by the Special Counsel."

Under Part 600.9(c), the Attorney General "may determine that public release of these reports would be in the public interest …."  The Attorney General exercised his discretion to order that the Report be released in the public interest but only after certain categories of information in the Report were redacted including derogatory information about people in private life who were scrutinized by DOJ but not charged.  When asked at a Senate hearing in April 2019 about his decision to redact harmful information about non-targets who are mentioned in the Report, the Attorney General stated: "I'm talking about people in private life …." and also that "[i]f you're not going to indict someone, then you don't stand up and unload negative information about the person," the Attorney General said.  "That's not the way the Department of Justice does business,"[19] he stated.

---

[19] *See* note 5, above.

The Attorney General's decision to release a redacted version of the Report but not to redact the defamatory text about plaintiff in Footnote 112 was a "final agency action." *Doe v. Tenenbaum*, 127 F. Supp.3d 426, 460 (D. Md. 2012) (a decision of the Consumer Product Safety Commission to publish an agency report constituted final agency action under the APA).

**B.**     **The Decision Not to Redact Footnote 112 Was Not Committed to Agency Discretion by Law.**

DOJ argues that plaintiff's APA action fails because it is committed to agency discretion by law.  DOJ Br. at 14-15.  DOJ's argument is off point because it misunderstands plaintiff's claim.  DOJ notes that the Mueller Report was not authorized by statute but by regulation (28 C.F.R. Part 600).  From this, DOJ argues that the regulation does not set out any meaningful standard for the Court to determine what facts or evidence are necessary to include in the Report to explain those decisions and, therefore, the matter is committed to agency discretion by law. *Id.* at 14.  But plaintiff's APA claim is based upon an entirely different "final agency action": The Attorney General's decision to release the Report but only after redacting parts that would be derogatory—which would include defamatory statements—of witnesses scrutinized but not indicted.

Although nothing under the Attorney General's statutory powers under 28 U.S.C. §§ 509, 510, 515-519 required the Attorney General to release the Mueller Report, the Report is a "record" within the meaning of the Privacy Act.  Because Footnote 112 is a "record" under the Privacy Act, DOJ was required by the Privacy Act to assure that it complied with the clarity requirements of 552a(g)(1)(C) which mandates that the record be sufficiently accurate, relevant, timely, or complete as is necessary to assure fairness in determinations relating to the plaintiff's qualifications, character, rights, or opportunities.  Whether DOJ met that statutory standard is plainly something that the Court may decide under the APA. *See Heckler v. Chaney*, 470 U.S.

821, 830 (1985) (holding that judicial review under the APA is precluded only where the statute in question is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion).

## IV.   Plaintiff's Reputation-Plus Claim under the Fifth Amendment

Again, although DOJ's Motion does not address plaintiff's reputation plus-claim, plaintiff's allegations are sufficient to state a claim upon which relief may be granted. The decision to publish the tangible, career-ending, and status changing Footnote 112 without redaction and without providing plaintiff with an opportunity to be heard deprived plaintiff of procedural due process. *See Trifax Corp. v. District of Columbia*, 314 F.3d 641, 643-45 (D.C. Cir. 2003) (stating that government stigmatization that broadly precludes individuals from a chosen trade or profession deprives them of liberty in violation of the Due Process Clause). Before the Attorney General decided to release Footnote 112 unredacted, plaintiff was entitled to be heard. Even after the release of Footnote 112, plaintiff asked to be heard when his counsel sent a letter to the Attorney General within days of the Report's release but, again, was not provided an opportunity to be heard.

Although such claims most often arise in the context of a federal employee being dismissed from employment in such a way as to foreclose future employment, that is not the only context in which a reputation plus claim may arise. *See Kartseva v. Dept. of State*, 37 F.3d 1524 (1994) (holding that the employee of a contractor with the government who was discharged because the Department of State considered her a security risk without an opportunity to be heard stated a claim against the Department for violation of her due process liberty interest); *cf. Neu v. Corcoran*, 869 F.2d 662 (2d Cir. 1989) (a 1983 case brought by the president of a motor club for career-ending defamation by officials of the New York Insurance Department).

## V.  Plaintiff's Claim for Declaratory Relief under the Equitable Powers of the Court

DOJ has not addressed plaintiffs claim for equitable relief under the broad equitable power of the Court to enjoin the violation of a plaintiff's constitutional rights.  *See Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 400 (1971) (Justice Harlan concurring, stating it must be presumed that the federal courts have the equitable power to enjoin the violation of constitutional rights) (citing *Bell v. Hood*, 327 U.S. 678, 684 (1948).  And if equitable relief is available for the violation of plaintiff's liberty interest guaranteed by the Due Process Clause then it must follow that under the Declaratory Judgment Act the Court has the power to declare that the tangible, career-ending, status-changing conduct of the Attorney General and the Special Counsel violated plaintiff's liberty interest under the Fifth Amendment.  Nothing precludes the Court from declaring that the Attorney General's release of  Footnote 112 unredacted violated plaintiff's liberty interest under the Due Process Clause and/or that the Special Counsel's failure to direct or advise the Attorney General to do so violated that same interest.

## Conclusion

For the foregoing reasons, DOJ's Motion to Dismiss should be denied.

Respectfully submitted,

/s/ *Jerome A. Madden*
Jerome A. Madden
THE MADDEN LAW GROUP PLLC
1455 Pennsylvania Ave., NW, Suite 400
Washington, DC 20004
(202) 349-9836
JMadden@TheMaddenLawGroup.com
District of Columbia Bar No. 272260

## **Certificate of Service**

On October 6, 2020, I certify that I caused to be served, by way of the CM ECF system, on counsel for Robert S. Mueller, III and the Department of Justice copies of the Plaintiff's Response in Opposition to the Motion to Dismiss of the Department of Justice.

/s/ *Jerome A. Madden*
Jerome A. Madden

41