**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **GIORGI RTSKHILADZE,**<br><br>Plaintiff,<br><br>v.<br><br>**ROBERT S. MUELLER III,**<br><br>and<br><br>**UNITED STATES DEPARTMENT OF JUSTICE,**<br><br>Defendants. | Case No. 20-cv-1591 (CRC) |

## <u>MEMORANDUM OPINION</u>

There's an old saying that reputation arrives on foot but leaves on horseback.  If that holds true in this case, the question is who opened the stable door.

Georgian-American businessman Georgi Rtskhiladze claims to have suffered reputational damage and lost business opportunities because of information published in a footnote to former Special Counsel Robert Mueller's April 2019 report on Russian interference in the 2016 presidential election.  The footnote recounts Rtskhiladze's pre-election contacts with Michael Cohen, then-candidate Donald Trump's lawyer, about the possible existence of compromising video tapes of Trump recorded in Russia.  Rtskhiladze acknowledges discussing the would-be tapes with Cohen.  He nonetheless complains that the footnote sullied his reputation as an upstanding businessman by falsely associating him with representatives of a shadowy Russian real estate conglomerate who were rumored to hold the tapes.  Riskhiladze has sued Mr. Mueller in his individual capacity for his role in drafting the report and the Department of Justice for its

role in publishing it.  He seeks $100 million in damages and a range of equitable relief including retraction and deletion of the offending footnote.

DOJ and Mr. Mueller have separately moved to dismiss the case.  DOJ principally argues that Rtskhiladze lacks standing because his alleged reputational injuries are not fairly traceable to any inaccuracies in Mr. Mueller's report and thus cannot be redressed by any ruling of this Court.  The Department contends that neither it nor Mr. Mueller opened the stable door, as it were, because Rtskhiladze's Russian business connections and his communications with Cohen about the rumored tapes are the subject of other widely-published reports, most notably an account by the Senate Select Committee on Intelligence whose accuracy Rtskhiladze does not challenge.   Mr. Mueller, for his part, argues that Rtskhiladze has failed to plead a cognizable individual-capacity claim against him and, in any case, that Rtskhiladze has conceded the motion to dismiss by not responding to that argument in his opposition brief.

Concurring with both defendants, the Court will grant their motions and dismiss the case.

I. **Background**

The Court draws the following background from Rtskhiladze's amended complaint and materials it references.  See Ward v. D.C. Dep't of Youth Rehab. Servs., 768 F. Supp. 2d 117, 119 (D.D.C. 2011) (citations omitted).  The Court must accept the complaint's allegations as true in deciding the motions to dismiss.  Id.

A. Rtskhiladze's activities prior to the publication of the Mueller Report

Giorgi Rtskhiladze was born in then-Soviet Georgia and immigrated to the United States in 1991, at the age of 21.  Professing affection for both his native and adopted lands, he claims to have devoted his career to "strengthening the bonds between the United States and Georgia." First Am. Compl. ("FAC") at ¶ 9.  To that end, Rtskhiladze has been involved in an array of

organizations at the intersection of investments, nonprofits, and foreign relations.  Id. at ¶¶ 9–17.
Most relevant here is Rtskhiladze's role as a "strategic advisor" to an investment company
known as the Silk Road Group.  Id. at ¶ 3.

      As part of his work for the Silk Road Group, from 2010 to 2015 Rtskhiladze cultivated a
relationship with then-businessman Donald Trump and his former attorney Michael Cohen.  Id.
at ¶¶ 18–20.  During that period, Trump pursued a number of real estate investments in Georgia,
most prominently a Trump Tower project planned for the coastal city of Batumi.  Id.
Rtskhiladze worked closely with the Trump Organization on a licensing arrangement for the
Batumi project and communicated with Cohen about "several other Trump Tower licensing
projects," including one in Moscow.  Id. at ¶¶ 18, 20.  Rtskhiladze and Cohen remained in touch
as Trump began his political career.  See id. at ¶¶ 20–21.

      1. *Rtskhiladze's correspondance with Cohen regarding certain "tapes" from
Russia*

      In October 2016, Rtskhiladze received a telephone call from an unnamed friend.  The
friend apparently had attended a dinner party the night before where he overheard someone
"bragging about some tapes related to a trip by Mr. Trump to Moscow."  Id. at ¶ 21.  The friend
knew that Rtskhiladze had worked with the Trump Organization and decided to pass along the
gossip.  Id.  The next day, Rtskhiladze texted Cohen that he had "[s]topped flow of some tapes
from Russia."  Id. at ¶ 31.  He indicated that he was "not sure if there's anything else[,]" but was
reaching out "[j]ust so u know . . . ."  Id.  Cohen asked, "[t]apes of what?"  Rtskhiladze replied,
"[n]ot sure of the content but person in Moscow was bragging had tapes from Russia trip."  Id.
He promised to "try to dial [Cohen] tomorrow but wanted [Cohen] to be aware[,]" adding, "I'm
sure it's not a big deal but there are lots of stupid people."  Id.  Cohen responded, "[y]ou have no
idea," and Rtskhiladze commiserated with a brief "I do[,] trust me."  Id.

This exchange came to the attention of former Special Counsel Robert Mueller during his investigation into potential Russian interference in the 2016 election.  See id. at ¶¶ 24–27.  Mr. Mueller's team interviewed Rtskhiladze several times in 2018, and he provided the investigation with various documents, including the text messages quoted above.  Id.

> 2.  *Press coverage of Rtskhiladze and the Silk Road Group prior to the publication of Footnote 112*

Rtskhiladze's representation of the Silk Road Group in its dealings with the Trump Organization also drew the attention of the press.  See id. at ¶ 53.  Most notably, this work was the subject of an August 2017 *New Yorker* article by Adam Davidson, entitled "Trump's Business of Corruption."  See id.  The article centered on the relationship between the Silk Road Group and then-President Trump in the years leading up to his election.  Adam Davidson, Trump's Business of Corruption, THE NEW YORKER, Aug. 14, 2017, https://www.newyorker.com/magazine/2017/08/21/trumps-business-of-corruption.  It discussed Trump Tower projects in Georgia, Moscow, and Kazakhstan and recounted large loans made to the Silk Road Group by a Kazakh bank that was embroiled in a money laundering scandal.  See id.  The article quoted Rtskhiladze extensively and described him as "broker[ing]" the relationship between the Silk Road Group and Trump.  Id.  The piece questioned the relationship between the Silk Road Group and Trump's businesses, noting potential money laundering risks.  Id.  It also described Rtskhiladze as playing a key role in the deal that brought a Trump Tower to Georgia, as well as facilitating meetings between Cohen and Kazakh government officials in 2011.  Id.  The magazine rebuffed the Silk Road Group's demand for a retraction.  See FAC at ¶ 53.

In the wake of the *New Yorker* article, and shortly before the Mueller Report was published, the Overseas Private Investment Corporation ("OPIC") cancelled a loan guarantee

with the Silk Road Group.  Id. at ¶¶ 54–58.  Rtskhiladze's complaint alleges "upon information

and belief that OPIC was advised of the contents of Footnote 112 before it was formally

delivered to Attorney General Barr, and further, that OPIC's awareness of the content of

Footnote 112 led to OPIC's decision on March 13, 2019 to formally cancel [the] loan

agreement."  Id. at ¶ 59.

     B.  The publication of the Mueller Report

     The Department of Justice released a redacted version of the Mueller Report to the public

in April 2019.  Id. at ¶ 28.  Rtskhiladze featured in several sections of the report describing his

work on the Trump Tower Moscow project as well as his connections with the Crocus Group, a

real estate firm owned by Russian billionaire Aras Agalarov.  See Special Counsel Robert S.

Mueller III, Report on the Investigation into Russian Interference in the 2016 Election, Vol. 1, at

70 (2019) ("Mueller Report").  Agalarov, in turn, was identified as having cohosted the 2013

Miss Universe pageant in Moscow with Trump and having engaged in negotiations with the

Trump Organization for the construction of a Trump Tower Moscow.  See, e.g., id. at 67.  The

report noted that Rtskhiladze had offered to arrange meetings between Trump and "the highest

level of the Russian Government" in order to garner "worldwide attention" for the Trump Tower

project.  Id. at 70.  And it recounted Rtskhiladze's extensive involvement in the project,

including his drafting of a letter to the mayor of Moscow touting the project's benefits.  Id.

     In these sections, the report variously describes Rtskhiladze as a "business executive," a

"U.S.-based executive of the Georgian company Silk Road Group," and an "[e]xecutive of the

Silk Road Transatlantic Alliance, LLC."  Id. at 70; Mueller Report, Vol. 2 at App. B-9.

     *1.  Footnote 112*

     In addition to the sections of the report describing Rtskhiladze's work on behalf of the

Silk Road Group and the Trump Tower Moscow project, Rtskhiladze features in Footnote 112 of

volume two of the Mueller Report.  That footnote appears in a section of the report describing

interactions between President Trump and former FBI Director James Comey regarding the

allegations contained in an investigation report prepared by former British intelligence official

Christopher Steele ("the Steele Dossier").  Mueller Report, Vol. 2 at 27–28 n.112.  The sentence

in the text corresponding to Footnote 112 states "Comey then briefed the President-Elect on the

sensitive material in the Steele reporting."  Id. at 27.  After citing the source material for that

statement, the footnote reads in full:

> Comey's briefing included the Steele reporting's unverified allegation that the
> Russians had compromising tapes of the President involving conduct when he
> was a private citizen during a 2013 trip to Moscow for the Miss Universe Pageant.
> During the 2016 presidential campaign, a similar claim may have reached
> candidate Trump. On October 30, 2016, Michael Cohen received a text from
> Russian businessman Giorgi Rtskhiladze that said, "Stopped flow of tapes from
> Russia but not sure if there's anything else. Just so you know . . . ." 10/30/16 Text
> Message, Rtskhiladze to Cohen. Rtskhiladze said "tapes" referred to
> compromising tapes of Trump rumored to be held by persons associated with the
> Russian real estate conglomerate Crocus Group, which had helped host the 2013
> Miss Universe Pageant in Russia. Rtskhiladze 4/4/18 302, at 12. Cohen said he
> spoke to Trump about the issue after receiving the texts from Rtskhiladze. Cohen
> 9/12/18 302, at 13. Rtskhiladze said he was told the tapes were fake, but he did
> not communicate that to Cohen. Rtskhiladze 5/10/18 302, at 7.

Id. at 27–28 n.112.

Rtskhiladze alleges that, in addition to conveying various negative implications discussed

below, the footnote both misquoted his exchange with Cohen—Rtskhiladze had used the

construction "some tapes" in his texts, rather than "tapes" as quoted—and erroneously described

him as "Russian" rather than Georgian.  FAC at ¶¶ 30, 33.  Because the tapes referenced in

Footnote 112 had already been the subject of media speculation, the report's descriptions of

Rtskhiladze's activities in connection with "compromising tapes"—as well as its characterization

of him as "Russian"—appeared in several press articles following the report's release.  Id. at ¶¶

29, 43–49.

Rtskhiladze alleges that he suffered numerous harms following the public disclosure and ensuing media coverage of the Mueller Report.  In particular, he claims that the Government of Georgia rescinded its offer of an "Honorary Consul" position.  Id. at ¶ 52.  And he identifies various business opportunities he claims to have lost due to allegedly false perceptions created by Footnote 112, namely:  (1) the cancellation of a $50 million transaction which was to generate $2.5 million in fees; (2) his "forced [] withdraw[al]" from a transaction to purchase a communications company which would have earned him $200,000 in "annual income" and a commission on the transaction; (3) his "forced [] abandon[ment]" of work involving "raising hundreds of millions of dollars in Euro bonds," for which he was to earn a cut of the transaction value; (4) the suspension of a "highly paid strategic advisor" role with a "major financial institution"; (5) the non-renewal of an agreement with a "large energy corporation" that had earned Rtskhiladze "hundreds of thousands of dollars annually"; and (6) "[n]umerous [other] business opportunities because no . . . financial institutions will meet with him once they Google his name."  Id. at ¶¶ 60, 61.

C. The current suit

Following the publication of the Mueller Report, Rtskhiladze submitted a Privacy Act request to the Department of Justice demanding that it amend the report to delete all references to him.  Id. at ¶¶ 62–65.  The Department denied the request in June 2020 on the ground that the report was not maintained in a system of records from which information is retrieved using a personal identifier, as required for a Privacy Act claim.  See Id. at ¶ 65.  Rtskhiladze filed an administrative appeal of this determination, arguing that the Privacy Act's system-of-records requirement did not apply to his request.  Id. at ¶ 66.  Receiving no response, Rtskhiladze filed this suit in June 2020.  See id. at ¶ 66–67.  He amended his complaint in August 2020.

The amended complaint advances four claims:  *first*, a Fifth Amendment claim alleging government defamation, which seeks damages against Mr. Mueller in his individual capacity on the grounds that the "publication of false, reckless, and misleading statements in Footnote 112 without providing plaintiff with an opportunity to be heard" violated Rtskhiladze's procedural due process rights, id. at ¶¶ 1, 70; *second*, a "name-clearing" claim under the Administrative Procedure Act ("APA") and the Declaratory Judgment Act on the grounds that the statements in Footnote 112 were "defamatory . . . arbitrary, capricious, an abuse of discretion, not otherwise in accordance with law, and unconstitutional," id. at ¶¶ 1, 74; *third*, a claim under the Privacy Act seeking an amendment of Footnote 112 due to alleged inaccuracies that have caused Rtskhiladze to suffer "adverse determinations," id. at ¶ 76; and *fourth*, a claim under the Privacy Act seeking damages against DOJ for "intentional or willful" failures to comply with the statute, id. at ¶¶ 78–79.

### D.  The Senate Select Committee on Intelligence Report

After Rtskhiladze filed this suit but before DOJ and Mr. Mueller moved to dismiss, the Senate Select Committee on Intelligence released Volume V of its report on "Russian Active Measures Campaigns and Interference in the 2016 Election."  S. Rep. No. 116-290, Vol. 5 (2020) ("Senate Report").  This volume discusses the same contacts between Rtskhiladze and Cohen discussed in Footnote 112 of the Mueller Report.  In a section on "[a]llegations, and [p]otential [m]isinformation, [a]bout [c]ompromising [i]nformation," the Senate Report states that the committee's investigation was prompted by "[a]llegations that the Russian government had compromising information on then-candidate Trump," which "emerged in 2016, and were more fully made public in early 2017, through memos produced by Christopher Steele," as well as certain allegations that "in some cases predated both Steele's memos and the 2016 U.S.

presidential campaign." Id. at 636.  The Senate Report discusses Rtskhiladze's activities at length in the course of its heavily redacted discussion of the various allegations.

The Senate Report first identifies Rtskhiladze's contacts with Cohen as part of "three general sets of allegations" regarding "Russian government collected *kompromat* on Trump" that were "[s]eparate from Steele's memos." Id. at 638.  Discussing those allegations, the report indicates that "Cohen has testified that he became aware of allegations about a tape of compromising information in late 2013 or early 2014 . . . related to Trump and prostitutes." Id. at 658.  As a result, Cohen "asked a friend, Giorgi Rtskhiladze, to see if Rtskhiladze could find out if the tape was real." Id.  It adds that "Cohen . . . would have been willing to pay . . . to suppress the information if it could be verified." Id.  The Senate Report then summarizes a response offered by Rtskhiladze to the Select Committee in 2019:

> During an October 2015 phone call that Mr. Rtskhiladze had with his friend and former business associate, Sergei Khokhlov, Mr. Khokhlov stated that while having dinner at a restaurant, Mr. Khokhlov overheard a stranger at a table next to him discuss tapes from Donald Trump's visit to Russia. The overheard dinner conversation was not important to Mr. Rtskhiladze and Mr. Khokhlov so they did not discuss this matter again. Mr. Khokhlov was aware that Mr. Rtskhiladze and his Georgian partners were in business with the Trump Organization. Due to the news about the Access Hollywood tapes and its potential impact on Mr. Trump's reputation, Mr. Rtskhiladze sent a text message to Mr. Cohen to inform him that an individual was overheard discussing sensitive tapes of Mr. Trump's trip to Russia.

Id. at 659.

The Senate Report proceeds to quote the full exchange of texts between Rtskhiladze and Cohen from October 2016, including those recounted above, and indicates that the two also had a "telephone conversation, possibly the following day, regarding the alleged tape." Id. at 660. While the report does state that "Rtskhiladze has said that Khokhlov subsequently called and stated that the tapes were fake," it goes on to note that "Rtskhiladze said this information was not

conveyed to Cohen." Id.  The Senate Report also quotes an email dated the day after the Steele

Dossier allegations were published in 2017, in which Rtskhiladze wrote to a publicist that he had

"told [Cohen] there was something there b 4 election," adding, "well that's what happens when

you visit crocus I guess." Id. at 660.  The report concludes its discussion of Rtskhiladze's

involvement with the rumored tapes by stating, "[t]hough Rtskhiladze did not have personal

insight into the matter, he assessed that if compromising material existed, Crocus Group would

likely be responsible." Id.  Other sections of the Senate Report note that "Rtskhiladze . . . [has]

contacts connected to the Kremlin, particularly the office of Dimitri Peskov," whom the report

alternatively describes as "a senior Kremlin official and key advisor to [Russian President

Vladimir] Putin," "spokesperson for the Kremlin," and "Putin's press secretary." Id. at 283,

408, 422.  Rtskhiladze told Cohen that Peskov was his "good friend." Id. at 422.

## II.   Legal Standards

DOJ and former Special Counsel Mueller have moved to dismiss Rtskhiladze's claims for

lack of standing under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim

under Rule 12(b)(6).

### A.  Motions to Dismiss for lack of standing under 12(b)(1)

Standing is a jurisdictional matter.  As such, a complaint may be dismissed for lack of

standing under Federal Rule of Civil Procedure 12(b)(1).  See, e.g., Kareem v. Haspel, 986 F.3d

859, 865, 866 n.7 (D.C. Cir. 2021).  As with other jurisdictional issues, the plaintiff bears the

burden of establishing standing by a preponderance of the evidence at the motion to dismiss

stage.  Whiteru v. Wash. Metro. Area Transit Auth., 258 F. Supp. 3d 175, 182 (D.D.C. 2017)

(citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992)).  The Court must "treat the

complaint's factual allegations as true and must grant plaintiff the benefit of all inferences that

can be derived from the facts alleged." Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113

(D.C. Cir. 2000) (internal citations omitted).  However, a court ruling on a 12(b)(1) motion

should give "closer scrutiny" to the factual allegations and may look to documents outside the

complaint to determine if jurisdiction exists.  Delta Air Lines Inc. v. Export-Import Bank of U.S.,

85 F. Supp. 3d 250, 259 (D.D.C. 2015).  "[T]hreadbare recitals of the elements of [standing],

supported by mere conclusory statements, do not suffice."  Arpaio v. Obama, 797 F.3d 11, 19

(D.C. Cir. 2015) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)) (second alteration in

original).  Neither do "inferences that are unsupported by the facts set out in the complaint."

Islamic Am. Relief Agency v. Gonzales, 477 F.3d 728, 732 (D.C. Cir. 2007).

A plaintiff establishes Article III standing by showing that he has "(1) suffered an injury in

fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to

be redressed by a favorable judicial decision."  Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547

(2016).  "[A] plaintiff must demonstrate standing for each claim he seeks to press and for each

form of relief that is sought."  Davis v. Fed. Election Comm'n, 554 U.S. 724, 734 (2008) (internal

quotation marks omitted).  Because Rtskhiladze's complaint "seeks prospective declaratory and

injunctive relief," he cannot "rest on past injury" but instead "must establish an ongoing or future

injury."  Arpaio, 797 F.3d at 19 (citing Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013)).

The standing inquiry is "especially rigorous when reaching the merits of the dispute would force

[a court] to decide whether an action taken by one of the other two branches of the Federal

Government was unconstitutional," particularly "in the fields of intelligence gathering and foreign

affairs."  Clapper, 568 U.S. at 408–09 (internal quotations omitted); see also Kareem, 986 F.3d at

865–66.

B.  Motions to Dismiss under 12(b)(6)

In analyzing a motion to dismiss under Rule 12(b)(6), the Court must determine whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is "facial[ly] plausib[le] when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  A court must "treat the complaint's factual allegations as true [and] must grant plaintiff the benefit of all reasonable inferences from the facts alleged."  Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (citation omitted) (alteration in original).

### III.  Analysis

Rtskhiladze's suit centers on what he alleges are defamatory statements and implications contained in Footnote 112 of the Mueller Report.  In particular, Rtskhiladze takes issue with the portions of Footnote 112 that discuss his 2016 communications with the Trump campaign regarding rumors of salacious videos of then-candidate Trump taken during Trump's travels to Russia.  Rtskhiladze admits he had contacts in 2016 with the Trump campaign and that those contacts included text messages with Trump's then-attorney, Michael Cohen, in which Rtskhiladze indicated that he had stopped the "flow of some tapes from Russia."  He nonetheless contends that Footnote 112 misquoted some of his statements and falsely implied that he was both closely connected with the alleged purveyors of the supposed tapes and aware of their contents.  He claims that these misrepresentations, amplified by the prominence of the Special Counsel's investigation, have caused him harms ranging from the loss of business opportunities to the denial of honorary awards by the Georgian government.  His amended complaint seeks damages under the Privacy Act and the Fifth Amendment, and equitable relief under the

Administrative Procedure Act, the Declaratory Judgment Act, and the Fifth Amendment to redress his allegedly ongoing reputational injuries.  DOJ and Mr. Mueller have moved to dismiss Rtskhiladze's complaint.  The Court will grant the defendants' motions for three related reasons.

*First*, with respect to his requests for injunctive and declaratory relief, Rtskhiladze has not established standing.  A plaintiff lacks standing to bring claims for prospective injunctive and declaratory relief if the requested relief would not redress an ongoing harm.  Here, Rtskhiladze cannot show that the equitable relief he seeks—a "name-clearing" hearing under the Privacy Act and retraction and deletion of Footnote 112—will redress his alleged injuries given the publication of Volume V of the Senate Select Committee on Intelligence's report on Russian interference in the 2016 election.  The Senate Report contains essentially the same material and implications as Footnote 112 yet was derived from an independent investigation.  To the extent that there are any differences between Footnote 112 and the Senate Report, these distinctions could not plausibly have caused any of Rtskhiladze's purported injuries.  The disputed material in Footnote 112 will thus remain in the public record and bear the imprimatur of an official federal investigation regardless of any relief ordered here, making Rtskhiladze's asserted injuries not redressable by the equitable relief he requests in this case.

*Second*, with respect to his claim for damages under the Privacy Act, Rtskhiladze must plausibly allege that the publication of the allegedly incorrect material was intentional or willful. He has not done so.  The Senate Report contains essentially the same information as Footnote 112 and thus similarly implicates Rtskhiladze's reputation.  Rtskhiladze's entire claim of willfulness rests on the argument that the material in Footnote 112 was so nakedly defamatory that it could only have been included intentionally or willfully.  That inference is not plausible, however, given the Senate Report's publication of largely the same information, and

Rtskhiladze's concession that the material contained in the Senate Report is accurate.  The Court will therefore dismiss Rtskhiladze's claim for damages under the Privacy Act for failing to plausibly allege that the publication of the allegedly false information in Footnote 112 was done intentionally or willfully.

*Finally*, Rtskhiladze's argument in his briefing that he is entitled to damages against DOJ under the Fifth Amendment fails because he did not include that claim in his amended complaint. And his damages claim against Special Counsel Mueller fails because he has conceded Mr. Mueller's arguments against it.

The Court elaborates below.

A.  Standing

The precise beefs that Rtskhiladze has with Footnote 112 bear repeating.  The amended complaint alleges that Footnote 112:  (1) "wrongfully [tied] [Rtskhiladze] to the Steele Dossier," including by falsely implying that he knew that the tapes he was discussing with Cohen were the same as those mentioned in the Steele Dossier; (2) "falsely identif[ied] him as a 'Russian Businessman'"; (3) omitted the modifier "some" prior to "tapes" in its quotation of one of his texts with Cohen; (4) wrongfully implied that he had contacts with the Russian real estate conglomerate "Crocus Group"; and (5) "speciously declar[ed] that [he] . . . withheld information that the tapes were fake from Mr. Cohen."  FAC at ¶¶ 33, 36, 50.  These purported misstatements and implications, Rtskhiladze alleges, caused him a variety of financial and reputational harms.

The parties appear to agree that Rtskhiladze's alleged financial and reputational injuries are sufficiently concrete to satisfy standing.  They spar, however, over whether Rtskhiladze's alleged injuries are "fairly traceable" to the publication of Footnote 112 and whether they can be redressed by a ruling in his favor.

Rtskhiladze's injuries and requested relief fall into two categories—past injuries which would be redressed by an award of damages, and ongoing injuries which would be redressed by injunctive or declaratory relief.

As explained below, Rtskhiladze has established standing to bring the first category of claims by plausibly alleging that at least some of the harms to his business opportunities and reputation prior to September 2020 are fairly traceable to the publication of Footnote 112. Damages, where available, are an adequate remedy for such harms.  See City of Los Angeles v. Lyons, 461 U.S. 95, 109 (1983).  Although the Court will dismiss Rtskhiladze's damages claims for other reasons, they do not fail for lack of standing.

The Court reaches a different result on Rtskhiladze's claims for declaratory and injunctive relief.  In his telling, Rtskhiladze's ongoing injuries derive from the continued public availability of the allegedly material facts and implications contained in Footnote 112.  See Pl.'s Resp. to DOJ Mot. to Dismiss at 18–20.  Rtskhiladze thus must show that his ongoing injuries are fairly traceable to Footnote 112 and would be redressed by the equitable remedy of declaring it defamatory and (somehow) deleting it from existing and future versions of the Mueller Report. See Lyons, 461 U.S. at 108–09; Arpaio, 797 F.3d at 19.  He can do neither because the Senate Select Committee on Intelligence Report, published in August 2020, is an independent and unchallenged source of these same facts and implications that would not be affected by a decision in Rtskhiladze's favor in this case.

      1.  *Causation and redressability of injuries for which Rtskhiladze seeks damages*

Rtskhiladze asks for damages to redress his past economic and reputational injuries.  DOJ organizes Rtskhiladze's injuries into three categories and contends that none of them are properly attributable to Footnote 112: (1) harms caused by negative press Rtskhiladze received prior to the release of the Mueller Report, (2) harms caused by Rtskhiladze's voluntary choices,

and (3) harms that are not plausibly related to the disclosures contained in Footnote 112.  See

DOJ Mot. to Dismiss at 7–9, 13.  Rtskhiladze links all three categories to Footnote 112 and has

submitted a declaration detailing the alleged harms and their causes.  See Pl.'s Decl.  While the

Court agrees with DOJ that some alleged harms which occurred prior to the publication of

Footnote 112 are not fairly traceable to that footnote, it finds that Rtskhiladze has plausibly

alleged that at least some business and reputational harms he purportedly suffered between the

releases of the Mueller Report in April 2019 and the Senate Report in August 2020 are fairly

traceable to Footnote 112.

a.   <u>Harms prior to the publication of Footnote 112</u>

Beginning with the alleged harms stemming from the negative press regarding

Rtskhiladze's relationship with the Silk Road Group prior to the publication of Footnote 112, the

Court concludes DOJ is correct that at least one alleged harm—OPIC's cancellation of a loan

guarantee—is not fairly traceable to Footnote 112.  As noted previously, Rtskhiladze featured

prominently in the 2017 New Yorker article on the Silk Road Group's legally suspect dealings

with the Trump Organization.  See Adam Davidson, Trump's Business of Corruption, THE NEW

YORKER, August 14, 2017.  Although the Silk Road Group protested purported inaccuracies in

the article, The New Yorker declined to issue a retraction.  FAC at ¶ 53.  Prior to the publication

of the Mueller Report, the Silk Road Group had investment support from OPIC, including a $10

million loan guarantee for a hotel project in Georgia.  Id. at ¶¶ 53–56.  The amended complaint

alleges that OPIC canceled the loan guarantee on March 13, 2019—weeks prior to the public

release of the Mueller Report.  See id. at ¶¶ 53–59.

DOJ argues that, because the cancellation of the loan guarantee occurred prior to the

publication of the disputed material, the cancellation cannot have been caused by the Mueller

16

Report's publication and is more accurately explained by the prior publication of negative facts in *The New Yorker* and other press outlets.  See DOJ Mot. at 7, 20.  Rtskhiladze responds by pointing to the allegation in the Amended Complaint that "upon information and belief [] OPIC was advised of the contents of Footnote 112 before it was formally delivered to Attorney General Barr."  FAC at ¶ 59.  His theory, then, is that someone leaked a draft of the Mueller Report to OPIC prior to its communication to the Attorney General or the public, and that OPIC relied on Footnote 112 to cancel the loan guarantee.

DOJ has the better of the argument.  Where a plaintiff's theory of harm relies on implausible causal linkages substantiated only "upon information and belief," a court may be justified in rejecting the linkage even at the motion to dismiss stage.  See Tooley v. Napolitano, 586 F.3d 1006, 1007–1010 (D.C. Cir. 2009).  Although "information and belief" pleading remains permissible post-Twombly, the "belief" still must be "based on factual information that makes the inference of culpability plausible."  Evangelou v. Dist. of Columbia, 901 F. Supp. 2d 159, 170 (D.D.C. 2012) (quoting Arista Records LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010)).  Here, Rtskhiladze's allegation lacks any factual information from which to infer that someone leaked the content of Footnote 112 to OPIC.  He posits only that "the OPIC agreement was abrogated apparently for political reasons."  FAC at ¶ 59.  But an allegation that a government actor "apparently" acted for "political" purposes does not support a plausible inference that that action was based on the intentional leaking of an internal DOJ report.  See Twombly, 550 U.S. at 551, 565–67 (rejecting as insufficient an allegation of a "contract, combination or conspiracy" based only "upon information and belief"); Kareem, 986 F.3d at 865–69 (finding no standing for suit challenging plaintiff's inclusion on a U.S. target list where the plaintiff had been present during several missile attacks but allegation of inclusion on target

list was based solely upon "information and belief").  Accordingly, Rtskhiladze has not carried

his burden to show that OPIC's cancellation of its agreement with the Silk Road Group was

"fairly traceable" to Footnote 112.

b.  Harms caused by Rtskhiladze's voluntary conduct

A plaintiff may not base standing on a self-inflicted injury.  Food & Water Watch, Inc. v.

Vilsack, 808 F.3d 905, 919 (D.C. Cir. 2015).  DOJ argues that several of Rtskhiladze's injuries

were caused by his own decision to withdraw from various ventures following the publication of

Footnote 112.  See DOJ Mot. at 7–8.  In particular, DOJ casts as voluntary Rtskhiladze's

withdrawal from a telecommunications agreement and certain Eurobond transactions.  See, e.g.,

FAC at ¶ 61; Pl.'s Decl. at ¶ 29 (explaining that Rtskhiladze and Silk Road's chairman had

"agreed" that he would "pull out of all our business ventures").  In most cases, however,

Rtskhiladze's complaint or subsequent declaration avers either that he was "forced" by a

counterparty to withdraw from a proposed transaction, or that the loss of business resulted from

unilateral action by another party.  See, e.g., FAC at ¶ 61; Pl.'s Decl. at ¶¶ 18, 23.  As such, these

alleged injuries do not constitute self-inflicted harms.

c.  Harms not plausibly related to Footnote 112's disclosures

DOJ further argues (1) that it is broadly implausible that the alleged inaccuracies in

Footnote 112 would have caused anyone to have a negative view of Rtskhiladze and (2) that

other discussions in the Mueller Report of his activities undermine the conclusion that the

footnote's specific representations caused him harm.  See DOJ Mot. at 7–9.

At points in his complaint, Rtskhiladze specifically alleges that his reputation has

suffered due to Footnote 112's misidentification of his nationality as "Russian" (rather than

Georgian) and the omission of "some" before "tapes" in the footnote's quotation of his texts with

Cohen. FAC at ¶¶ 33, 50. As to these two alleged misrepresentations, the Court agrees with DOJ; it is simply not plausible that anyone would have ended a business relationship with Rtskhiladze over what appears to be simply an error regarding his nationality. To the extent Rtskhiladze's nationality was material to any business relationship or honorary awards, his U.S. residency and Georgian background were hardly a secret. Indeed, other portions of the Mueller Report accurately refer to him as a "U.S.-based executive of [a] Georgian company." See Mueller Report, Vol. 1 at 70 n.313. And his associates in the business community or in the Georgian government surely would have been aware of his citizenship from their dealings with him and his extensive public presence. It is also implausible that the omission of "some" before "tapes" in Footnote 112 gave any reader the wrong impression regarding Rtskhiladze's knowledge of the tapes' content. The presence or absence of "some" prior to "tapes" reveals nothing about the state of Rtskhiladze's knowledge of what the tapes may have depicted.

Rtskhiladze's complaint is not limited to these specific errors, however. As explained elsewhere, Rtskhiladze's argument is less focused on these particular inaccuracies than the overall impression that the footnote conveys—namely, that Rtskhiladze was generally aware of salacious tapes involving Trump, that he was connected with the alleged purveyors of those tapes, and that he hid his knowledge of the veracity of the tapes from Cohen.[1] See, e.g., FAC at ¶ 50. Because the tapes received extensive media coverage, Rtskhiladze argues that his appearance in the footnote subjected him to unique harm. While it is a close call, the Court agrees with Rtskhiladze that it is at least plausible that such implications could cause him reputational harm.

_____

[1] Again, the Court at this stage must accept Rtskhiladze's allegations that all of these implications are false.

To begin, none of the other references to Rtskhiladze in the Mueller Report deal with the tapes discussed in Footnote 112, undermining DOJ's argument that these other references may have been the source of any harm.  This is particularly true in light of the media attention the tapes received.  That being said, the unchallenged sections of the Mueller Report describe Cohen as originally speaking with Rtskhiladze regarding the proposed Trump Tower Moscow "in part because Rtskhiladze had pursued business ventures in Moscow, including a licensing deal with the Agalarov-owned Crocus Group."  Mueller Report, Vol. 1 at 70.  Although Rtskhiladze's complaint mostly objects to Footnote 112's suggestion that he dealt with the Crocus Group regarding the rumored tapes, the presence of other passages tying Rtskhiladze to the Crocus Group reduces the plausibility that the discussion of the Crocus Group in Footnote 112 caused him any harm.  Still, because his theory of causation centers on the connection drawn in the footnote between himself, Crocus, and the tapes, the Court finds it plausible that Footnote 112 is the sole source of that connection in the Mueller Report.  Moreover, assuming that the implications contained in the footnote were false, Rtskhiladze's portrayal in the footnote could have given associates and potential partners a negative impression of his character due to his close contact with a high-profile scandal.  The Court thus finds that Rtskhiladze has plausibly alleged that the harms to his business and reputation are fairly traceable to the presence of these implications in the footnote.

But these conclusions only take Rtskhiladze so far.  As explained below, Rtskhiladze has only shown causation for harms that occurred prior to the release of the Senate Select Committee on Intelligence Report in August 2020.  Thus, the injuries identified above as fairly traceable to Footnote 112 can only be used to substantiate his claims for retrospective monetary relief, and only for the period between the publication of Footnote 112 and the publication of the Senate

Report in 2020.  Anything else is either not fairly traceable to the publication of Footnote 112 or not redressable by any action this Court could take.  These harms thus provide no basis for standing.  See Lujan, 504 U.S. at 560–61.  Nonetheless, as to the claimed business and reputational injuries during the relevant time period, the Court finds that Rtskhiladze has plausibly alleged that these harms are fairly traceable to the allegedly false representations contained in the footnote.  Rtskhiladze thus has standing to seek damages to redress those injuries.  Lyons, 461 U.S. at 108–09.

### 2.  *Causation and redressability of Rtskhiladze's ongoing injuries*

Again, to establish standing a plaintiff must show that the requested relief is likely to redress the injury in question.  Davis, 554 U.S. at 733.  And he must do so for each form of relief requested.  Id. at 734.  Standing "requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court."  Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 41–42 (1976).  The line between the causation and redressability prongs of standing can become blurred in cases where an ongoing harm has multiple sufficient and independent sources, only some of which would be redressed by the court's ruling.

Starting with causation, because Rtskhiladze seeks forward-looking injunctive and declaratory relief, "past injuries alone are insufficient to establish standing."  Dearth v. Holder, 641 F.3d 499, 501 (D.C. Cir. 2011); see also Arpaio, 797 F.3d at 19.  He instead must show that he "suffer[s] an ongoing injury or faces an immediate threat of injury."  Dearth, 641 F.3d at 501.  "[I]f the injury complained of is 'the result of the independent action of some third party not before the court,'" the causal link between the alleged harm and the challenged conduct may be too attenuated for standing purposes.  Bennett v. Spear, 520 U.S. 154, 169 (1997) (quoting Lujan, 504 U.S. at 560–61) (internal citations and alterations omitted).  Similarly, the

"redressability" prong requires a showing that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Lujan, 504 U.S. at 561 (internal quotation marks omitted). But a plaintiff obviously cannot make this showing when the source of the claimed harm is not before the court or within its remedial powers.

While the Court has found that Rtskhiladze has shouldered his burden with respect to some of his damages claims, it reaches a different conclusion on his requests for declaratory and injunctive relief to redress his alleged ongoing reputational injuries. As he describes them, Rtskhiladze's ongoing injuries derive from the continued availability of false statements generated and endorsed by a high-profile federal investigation. Rtskhiladze takes specific issue with the implications that he was aware of the tapes referred to in the Steele Dossier, that he had a connection to the Crocus Group, and that he had a reputation as someone who would be familiar with those matters. See, e.g., FAC at ¶ 36, 50. He argues that these implications combined to paint him as a figure "engaged in shadowy conspiratorial and/covert activities," which raised a red flag for potential business partners. Id. at ¶ 36. In Rtskhiladze's view, because these implications appeared in a prominent governmental investigation, the damage to his reputation is ongoing as long as they remain uncontroverted. See id. at ¶ 49 (stating "once the information about such a high-profile investigation is accessible on the internet the damage is done—the bell cannot be un-rung"). Rtskhiladze must show that these ongoing injuries are fairly traceable to, and would be redressed by correcting, Footnote 112.

A fatal flaw in Rtskhiladze's argument on both points is that Volume V of the Senate Select Committee Report, released in 2020, comes with all the same official attributes of the Mueller Report and equally implicates Rtskhiladze in the imbroglio surrounding the Russian government's rumored possession of compromising tapes of Trump. What's more, in an effort

to contrast the Senate Report with his portrayal in Footnote 112, Rtskhiladze concedes the accuracy of the former.  See, e.g., Pl.'s Sur Reply at 6 (noting that "[t]he Senate Report—unlike Footnote 112—provides the overall context related to the purported tapes of Mr. Trump . . ."). As an independent, sufficient, unchallenged, and admittedly accurate source of those same injuries that would not be affected by any decision or relief ordered in this matter, the Senate Report defeats Rtskhiladze's claim for prospective equitable relief.  The Court elaborates below.

a.  <u>The Senate Report contains substantially the same—and in some cases worse—information about Rtskhiladze's activities</u>

First, the section of the Senate Report discussing Rtskhiladze's contacts with Cohen is expressly concerned with evaluating various claims that compromising tapes of Trump existed and played a factor in the 2016 election.  That section introduces Rtskhiladze by noting that "Cohen . . . in 2014 or 2015 [] asked a friend, Giorgi Rtskhiladze, to see if Rtskhiladze could find out if the tape was real."  <u>Senate Report</u> at 658.  That rumored "tape" apparently "related to Trump and prostitutes."  <u>Id.</u>  This clearly identifies Rtskhiladze as someone who Cohen believed would know about any such tapes and directly connects Rtskhiladze to tapes rumored to portray Trump liaising with prostitutes, the same subject as the tapes mentioned in the Steele Dossier and Footnote 112.  <u>See</u> FAC at ¶ 45 (quoting media coverage which states "Footnote 112 . . . describes conversations between Trump associates about rumored video recordings of the candidate in a Russian hotel room with prostitutes . . .").  One of Rtskhiladze's main complaints about Footnote 112 is the false implication that he knew or at least suspected that the tapes were salacious.  <u>See, e.g.</u>, FAC at 4.  The Senate Report's direct connection of Rtskhiladze to tapes involving "Trump and prostitutes" and its statement that Cohen asked him to investigate the rumors, <u>Senate Report</u> at 658, necessarily undermines any inference that Footnote 112 uniquely implies his connection with such matters.

Second, the Senate Report makes clear that Rtskhiladze did, in fact, suspect that the rumored Steele Dossier tapes were the same tapes discussed in his October 2016 text conversation with Cohen.  The Report quotes an exchange from the day after the Steele Dossier was made public in which Rtskhiladze stated that he had "told [Cohen] there was something there b 4 election," adding "that's what happens when you visit crocus I guess."  Id. at 660. Rtskhiladze protests that "it is beyond credulity to suggest—as Footnote 112 does—that [he] was referring to the tapes mentioned in the Steele Dossier" in his texts with Cohen.  FAC at ¶ 37. But the Senate Report demonstrates that Rtskhiladze himself suggested that very thing, in writing, just the day after the Steele Dossier was made public.  Senate Report at 660. Rtskhiladze's own words as reproduced in the Senate Report show that he, at the very least, suspected in 2017 that the tapes referred to in his texts with Cohen and the tapes mentioned in the Steele Dossier were one and the same.  Id.

Third, Rtskhiladze's statement "that's what happens when you visit crocus I guess," id., in the exchange noted above demonstrates that any implied linkage between him and the Crocus Group in relation to the rumored tapes is not unique to Footnote 112.  Indeed, the Senate Report goes on to note that "[t]hough Rtskhiladze did not have personal insight into the matter, he assessed that if compromising material existed, Crocus Group would likely be responsible."  Id. This closely resembles Footnote 112's statement that "Rtskhiladze said 'tapes' referred to compromising tapes of Trump rumored to be held by persons associated with the Russian real estate conglomerate Crocus Group[.]"  See Mueller Report, Vol. 2 at 27–28 n.112.  While the Senate Report includes a caveat that "Rtskhiladze did not have personal insight into the matter," Senate Report at 660, the use of the word "rumored" in Footnote 112 when discussing the

Crocus Group conveys the same impression regarding Rtskhiladze's degree of knowledge about the group's involvement, Mueller Report, Vol. 2 at 27–28 n.112.

Fourth, and more prosaically, the Senate Report quotes the exact same text messages between Cohen and Rtskhiladze that the Mueller Report does.  See Senate Report at 660.  And while the Senate Report includes further text messages that Rtskhiladze claims are necessary to provide full context, it also includes other communications by Rtskhiladze that, as discussed above, further implicate him in the affair surrounding the tapes to the same, or greater, extent as Footnote 112.  See id.  The Senate Report also goes much further than Footnote 112 in describing Rtskhiladze's relationships with Kremlin insiders, including Vladimir Putin's press secretary.  Id. at 422.  These allegations do more to connect Rtskhiladze to prominent members of the Russian government than the relatively weak tea of Footnote 112.

In fact, reading the two reports in concert gives a consistent, rather than discordant, view of Rtskhiladze's activities.  Both discussions link Rtskhiladze's text conversation with Cohen to efforts to suppress tapes involving alleged sexual escapades on the part of the former President; both link this conversation to the Steele Dossier; both suggest that Rtskhiladze suspected that the Crocus Group was behind any tapes; and both rely on substantially the same source material in doing so.  While the Senate Report offers more detail regarding Rtskhiladze's activities, those activities are entirely consistent with the picture painted by Footnote 112.  If anything, the Senate Report is significantly more inculpatory as to Rtskhiladze's knowledge of and involvement with the tapes, including a direct quotation from Rtskhiladze at the time of the Steele Dossier's disclosures acknowledging having "told [Cohen] there was something there b 4 election." Senate Report at 660.  Rtskhiladze thus cannot show that any ongoing reputational harm from these implications is traceable to Footnote 112 rather than to the Senate Report.

Rtskhiladze's responses to these points are unpersuasive.  He argues that the Senate Report, unlike Footnote 112, shows that he was unaware of the contents of the tapes mentioned in his texts with Cohen.  And he insists that the Senate Report uniquely suggests that his contact with Cohen was motivated by a concern that the tapes in question could have a similar effect as the then-recent "Access Hollywood" tape, released in October 2016.  See Pl.'s Sur Reply at 7–8.  While it is true that the Senate Report describes Rtskhiladze's contact with Cohen as arising contemporaneously with the release of the Access Hollywood tape, Senate Report at 659, that description is not at all inconsistent with the tapes having potentially scandalous contents along the lines suggested in the Steele Dossier.  Indeed, according to the Senate Report, the tapes discussed in his texts with Cohen "related to Trump and prostitutes" and only presented an issue to the extent they were scandalous.  Id. at 658.  As the Senate Report notes, Cohen had been motivated to contact Rtskhiladze because he believed Rtskhiladze would be able to share information regarding potentially scandalous tapes involving Trump.  Id.  That Cohen reached out specifically to Rtskhiladze to investigate their existence and that, as the Senate Report says, Cohen was prepared to work to suppress any and all tapes that Rtskhiladze identified, further implies that the tapes were at least potentially scandalous and that Rtskhiladze knew as much.  See id.

Finally, Rtskhiladze argues that the Senate Report, unlike Footnote 112, did not imply that he had contacts with the Crocus Group and clearly indicated that he thought the rumored tapes were fake.  However, the Senate Report's statements regarding the Crocus Group and Rtskhiladze are nearly identical to Footnote 112—both mention the organization as a possible source of compromising material.  Compare id. at 660 ("Though Rtskhiladze did not have personal insight into the matter, he assessed that if compromising material existed, Crocus Group

would likely be responsible . . . ."), with Mueller Report, Vol. 2 at 27 n.112 ("Rtskhiladze said 'tapes' referred to compromising tapes of Trump rumored to be held by persons associated with the Russian real estate conglomerate Crocus Group . . . ."). As for Rtskhiladze's professed belief that the tapes were fake, that suggestion is somewhat undercut by Rtskhiladze's statement, only present in the Senate Report, suggesting that the tapes may have been real, and that they were "what happens when you visit crocus I guess."[2]  Senate Report at 660.

Footnote 112, even if read in the light least charitable to Rtskhiladze, contains no information that is not similarly contained in the Senate Report. As a result, Rtskhiladze cannot show that his ongoing injuries are caused by Footnote 112 or that they would be remedied by an injunction or declaratory relief aimed only at that footnote. He has therefore failed to carry his burden to show both causation and redressability for his claims seeking prospective equitable relief. The Court therefore will dismiss these claims.

B.  Rtskhiladze's claim for damages under the Privacy Act

For similar reasons, Rtskhiladze cannot maintain his action for damages under the Privacy Act. The Privacy Act authorizes monetary damages when an agency "fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications,

---

[2] Rtskhiladze's declaration recounts at least one instance in which he was told that "obtain[ing] a retraction" from the Attorney General was central to restoring his reputation, and, as a result, business or honorary relationships going forward. Pl.'s Decl. at ¶ 19. However, the declaration describes this harm as resulting from "[b]eing labeled as a 'Russian businessman' working with a Russian oligarch to tamper with compromising tapes of the sitting U.S. President." Id. While the Senate Report does not misidentify Rtskhiladze's nationality, the Senate Report contains that same implications regarding Rtskhiladze's activities. The statements recounted in the declaration thus do not defeat the Court's conclusion that the unchallenged Senate Report is an ongoing source of his claimed injuries.

character, rights, or opportunities of, or benefits to the individual that may be made on the basis

of such record, and consequently a determination is made which is adverse to the individual." 5

U.S.C. § 552a(g)(1)(C).  To receive damages under the Privacy Act, a plaintiff must plead and

prove facts showing that "that the agency acted in a manner which was intentional or willful"

and that, as a result, the plaintiff suffered "actual damages." 5 U.S.C. § 552a(g)(4).  An agency's

conduct "must be so patently egregious and unlawful that anyone undertaking the conduct should

have known it unlawful."  Laningham v. U.S. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987)

(internal quotation marks omitted).  Satisfying this standard requires a showing "somewhat

greater than gross negligence, or, an act committed without grounds for believing it to be lawful,

or by flagrantly disregarding others' rights under the Act."  Waters v. Thornburgh, 888 F.2d 870,

875 (D.C. Cir. 1989), abrogated on other grounds by Doe v. Chao, 540 U.S. 614 (2004) (internal

citation omitted).  The intent element is "a high hurdle to clear."  Hurt v. D.C. Ct. Servs. &

Offender Supervision Agency, 827 F. Supp. 2d 16, 20 (D.D.C. 2011).  Here, Rtskhiladze has not

plausibly alleged that anyone involved with Footnote 112 acted with the requisite state of mind

to intentionally deprive him of his rights under the Privacy Act. [3]

　　　To begin, Rtskhiladze admits the accuracy of the Senate Report's recounting of his

conduct.  See Pl.'s Sur Reply at 6–10 (describing the Senate Report as "wholly consistent with

the allegations in the Amended Complaint . . .").  This admission dooms any plausible inference

of intentional disregard of his rights on behalf of the author(s) of Footnote 112.  As discussed

---

[3] In its motion to dismiss, DOJ vigorously contests all elements of Rtskhiladze's Privacy
Act claims, both equitable and legal.  Because the Court holds that Rtskhiladze cannot make out
a claim for equitable relief, and that Rtskhiladze's claim for damages under the Privacy Act does
not plausibly allege willfulness, it need not reach these other arguments.

above, the Senate Report contains the same (and in some cases substantially worse) facts and implications regarding Rtskhiladze's conduct surrounding the tapes.  Even if some sliver of daylight exists between the two descriptions <u>and</u> this difference caused Rtskhiladze to suffer an "adverse determination" within the meaning of the Privacy Act, 5 U.S.C § 552a(g)(1)(C), the fact that he concedes the accuracy of the Senate Report shows that any miniscule differences in content are not plausibly attributable to a culpable mental state "somewhat greater than gross negligence," <u>Waters</u>, 888 F.2d at 875.  Taken as a whole, Rtskhiladze's position is at most consistent with some careless drafting by the author(s) of Footnote 112.  But given the almost complete overlap between the footnote and Senate Report, Rtskhiladze has failed to plausibly allege facts supporting any intentional or willful disregard of his rights under the Act.[4]

The only clear factual errors uniquely present in the text of Footnote 112—the misidentification of Rtskhiladze as "Russian" rather than Georgian, and the omission of the word "some" before "tapes" in the quoted texts between Rtskhiladze and Cohen—are similarly not plausibly chalked up to intentional malfeasance on behalf of DOJ or Special Counsel Mueller's team.  The much more obvious explanation is a mere drafting error.  And, as the Court has already explained, these specific errors would not plausibly result in the claimed harm.  <u>See</u> <u>supra</u> at III.A.1.c.

---

[4] Given Rtskhiladze's acceptance of the Senate Report's accuracy, he would be hard pressed to show the level of falsity of Footnote 112 necessary to support his claims.  The Court need not decide this point, however, given its conclusions regarding standing (<u>supra</u> at III.A.2) and intent (<u>supra</u> at III.B).

### C.  Rtskhiladze's remaining claims for damages

#### 1.  *Claims against former Special Counsel Mueller*

Count I of Rtskhiladze's amended complaint states that he seeks an "award of compensatory and exemplary damages" against former Special Counsel Mueller "for the violation of procedural guarantees in the Due Process Clause of the Fifth Amendment." FAC at 29; id. at ¶¶ 1, 70.  In other words, he seeks money damages against a federal officer acting under color of law for the denial of a constitutional right, as permitted by the Supreme Court in Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971). Mr. Mueller moved to dismiss this claim on the grounds that, *inter alia*, this suit did not fall into one of the existing Bivens causes of action and that special factors counseled against extending Bivens to this new context.  Mueller Mot. to Dismiss at 5–17.  In his opposition to the motion, Rtskhiladze shifts gears, indicating that he is not in fact bringing a damages claim against Mr. Mueller, but rather seeks "a name-clearing hearing in Count II under the Declaratory Judgment Act."  Pl.'s Reply to Mueller Mot. at 1–2.[5]  The Court has rejected Rtskhiladze's request for such prospective, equitable relief.  See supra at III.A.2.  And, "[i]t is 'axiomatic' that a party may not amend his complaint through an opposition brief."  Singh v. Dist. of Columbia, 55 F. Supp. 3d 55, 70 (D.D.C. 2014); see also, e.g., Morgan Distrib. Co. v. Unidynamic Corp., 868 F.2d 992,

---

[5] Such a hearing is typically the equitable remedy ordered as redress for a so-called "stigma-plus" or "reputation-plus" claim brought under the Fifth Amendment to challenge government defamation in conjunction with termination from federal employment.  See Peter B. v. CIA, 620 F. Supp. 2d 58, 70–71 (D.D.C. 2009) (identifying "name-clearing hearing" as "well-settled remedy" for both claims (quoting Doe v. DOJ, 753 F.2d 1092, 1102 (D.C. Cir. 1985)).

995 (8th Cir. 1989); Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1107 (7th Cir. 1984).[6]
The Court will thus reject Rtskhiladze's attempt to recast his complaint through briefing.

Considering just the claims that are present in the amended complaint, Count I asserts a
claim for damages against Mr. Mueller in his personal capacity under the Fifth Amendment.
However, "[i]t is well understood in this Circuit that when a plaintiff files an opposition to a
dispositive motion and addresses only certain arguments raised by the defendant, a court may
treat those arguments that the plaintiff failed to address as conceded." Hopkins v. Women's
Div., Gen. Bd. of Glob. Ministries, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) aff'd sub nom.
Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries, United Methodist Church, 98 F. App'x
8 (D.C. Cir. 2004). Rtskhiladze has waived any objection to the dismissal of his purported
Bivens claim in Count I by failing to oppose the arguments for dismissal offered by Mr. Mueller.
As Count I is the only claim in the amended complaint asserted against Mr. Mueller, the Court
will dismiss Rtskhiladze's suit against him in its entirety.[7]

> 2. *Claims against DOJ*

For similar reasons, the Court will dismiss Rtskhiladze's remaining claims for damages
against DOJ. In his amended complaint, Rtskhiladze's only request for damages against DOJ, in
Count IV, arises under the Privacy Act. See FAC at ¶ 78; id. at 29. The Court dealt with this

---

[6] Even if the Court were to accept Rtskhiladze's belated reframing of his claims against
Mr. Mueller, it would still dismiss all claims against him because the "name-clearing" claim in
Count II seeks relief only against DOJ, not Mr. Mueller.

[7] Mr. Mueller has also, understandably, moved to dismiss on the grounds that he is
entitled to absolute or qualified immunity. See Mueller Mot. at 18–24. The Court reecognizes
that these defenses likely have merit. See Buckley v. Fitzsimmons, 509 U.S. 259, 273–74 (1993)
(outlining standards for absolute prosecutorial immunity); Ashcroft v. al-Kidd, 563 U.S. 731,
735 (2011) (explaining that plaintiffs must allege facts showing violations of clearly established
constitutional rights). But the Court does not reach them because it dismisses all the claims
against Mr. Mueller on other grounds.

claim above.  See supra at III.A.2.  However, in his reply to Mr. Mueller's motion to dismiss, Rtskhiladze claims that he has "assert[ed] *two* damages claims against DOJ," his claim under the Privacy Act, and "a defamation-plus claim (Count I)."  Pl.'s Reply to Mueller Mot. at 1–2 & 1 n.1 (emphasis added).  Count I is the Bivens claim, which the Court found above was brought solely against Mr. Mueller.  Again, Rtskhiladze cannot amend his complaint through briefing. See, e.g., Singh, 55 F. Supp. 3d at 70.

More generally, Rtskhiladze's arguments on these last two claims appear to be attempts to duck and weave around the defendants' briefing.  The Court rejects these efforts, holds Rtskhiladze to his amended complaint, and will thus dismiss his claims.

## IV.   Conclusion

For the foregoing reasons, the Court will grant Defendants' Motions to Dismiss Rtskhiladze's Amended Complaint.  A separate Order shall accompany this Memorandum Opinion.


_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  September 1, 2021