# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| GIORGI RTSKHILADZE, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | No. 20-cv-1591 (CRC) |
| | ) | |
| ROBERT S. MUELLER, III, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| U.S. DEPARTMENT OF JUSTICE. | ) | |
| | ) | |
| | ) | |
| *Defendants.* | ) | |

_____


## PLAINTIFF'S RESPONSE IN OPPOSITION TO
## THE DEPARTMENT OF JUSTICE'S RENEWED MOTION TO DISMISS


JEROME A. MADDEN

**The Madden Law Group PLLC**

1455 Pennsylvania Ave., N.W., STE 400

Washington, D.C. 20004

JMadden@TheMaddenLawGroup.com

(202) 349-9836

District of Columbia Bar No. 272260


**January 31, 2025**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 6

*Plaintiff's Efforts to Foster Ties between the
United States and Former Soviet Bloc Countries.* ...................................... 6

*Footnote 112 of the Mueller Report Defamed Plaintiff* ............................... 7

*Footnote 112 Abruptly Ended Plaintiff's Career.* ....................................... 9

*A Subsequent Senate Report Was Both Accurate and Complete.* .............. 11

*District Court Procedural History* ............................................................. 14

*The Decision of the District Court* ............................................................. 14

*The Decision of the Circuit Court* .............................................................. 16

  *Equitable Claim* ................................................................................. 16

  *Damages Claim* .................................................................................. 16

ARGUMENT ...................................................................................................... 17

I. Plaintiff Is Entitled to Equitable Relief through a Name-Clearing Hearing. ................. 17

 A. Plaintiff Is Entitled to a Hearing under Either a Stigma-Plus or
  Reputation-Plus Theory. .............................................................. 17

 B. The Loss of Government Employment Need Not Be the Adverse
  Government Action Underlying the Claim. ................................... 20

 C. The District Court Has Discretion in Determining the Scope of the Hearing. .... 21

II. Regardless of Whether a Defamatory Record Is Contained in a "System of
 Records," the Privacy Act Provides Equitable Jurisdiction. ....................... 21

 A. Section 552a(g)(1)(C) Provides for Equitable Jurisdiction Where the
  Inaccurate Record Has Caused Adverse Determinations. .............. 21

I

B.     An "Adverse Determination" Need Not Be a Determination of the Agency Creating the Record or Another Agency. ...........................................22

C.     Plaintiff Has Plausibly Alleged that He Suffered "Adverse Determinations" as a Result of Footnote 112. ..................................................23

D.     Absent Equitable Relief under Section 552a(g)(1)(A), Section 552a(g)(1)(C) Would Be Plaintiff's Only Equitable Relief Avenue under the Privacy Act. ......23

III.    *On the Record before the Court*, DOJ Has Failed to Establish that Plaintiff Is Not Entitled to an Amendment under Section 552a(g)(1)(A). ................................25

IV.    Alternatively, Plaintiff Is Entitled to Equitable Relief under the APA Based on DOJ's Failure to Comply with Section 552a(g)(1)(C) of the Privacy Act. ...................30

A.     The APA Provides an Equitable Remedy When No Other Adequate Judicial Remedy Is Available. ...................................................................................30

B.     The Attorney General's Decision Not to Redact the Defamation in Footnote 112 Was a "Final Agency Action." .................................................31

C.     The Attorney General's Decision Not to Redact Footnote 112 Was Not Committed to Agency Discretion by Law. .................................................... 32

1.     DOJ Focuses on the Wrong Final Agency Decision—the Mueller Report—Instead of the AG's Decision Not to Redact the Footnote. .......32

2.     The AG's Decision Is Not Committed by Law to DOJ's Discretion Because It Is Reviewable under Section 552a(g)(1)(C) of the Privacy Act .......................................................................................................33

CONCLUSION ............................................................................................................34

## TABLE OF AUTHORITIES

### Cases

*Abbot FTC v. Standard Oil Co.*, 449 U.S. 232 (1980) ..........................................................31

*Abdelfattah v. U.S. Dept. of Homeland Security*, 787 F.3d 524 (D.C. Cir. 2015) ....................17

*Aki v. Sebelius*, No. 08-cv-461, 2011 WL 13273368 (D.D.C. Jan. 13, 2011) ......................22,23

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................................................15

*Bartel v. F.A.A.*, 755 F.2d 1403 (D.C. Cir. 1984) .................................................................29

*Behrens v. Regier,* 422 F.3d 1255 (11th Cir. 2005) ..............................................................20

*Bennett v. Spear*, 520 U.S. 154 (1997) .................................................................................31

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) .........................................................15

*Bell v. Hood*, 327 U.S. 678 (1948) .......................................................................................17

*Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971) .................................................17

*Campbell v. District of Columbia*, 824 F.3d 339 (D.C. Cir. 2018) .....................................17,19

*Chang v. Dept. of the Navy*, 314 D. Supp. 2d 35 (D.D.C. 2004) .......................................28,29

*Cohen v. United States,* 650 F.3d 717 (D.C. Cir. 2011) .......................................................30

*Doe v. Tenenbaum*, 127 F. Supp.3d 426 (D. Md. 2012) .......................................................32

*Doe v. U.S. Dept. of Justice*, 753 F.2d 1092 (D.C. Cir. 1985) ..............................................21

*Greene v. McElroy*, 360 U.S. 474 (1959) ..............................................................................17

*Haymon v. Dist. of Columbia*, 610 F. Supp. 3d 101 (D.D.C. 2022) .......................................18

*Heckler v. Chaney*, 470 U.S. 821 (1985) ............................................................................33,34

*Henke v. U.S. Dept. of Commerce*, 83 F.3d 1453 (D.C. Cir. 1996) .....................................33,34

*Jacobs v. National Drug Intelligence Center*, 423 F.3d 512 (5th Cir. 2005) ...........................28

*Jefferson v. Harris*, 170 F. Supp. 3d 194 (D.D.C. 2016) .......................................................18

*Lamb v. Millennium Challenge Corp.* 498 F. Supp. 3d 104 (D.D.C. 2020) ........................18,20

*Lyons v. Barrett*, 851 F.2d 406 (D.C. Cir. 1988) ...................................................21

*Mathews v. Eldridge*, 424 U.S. 319 (1976) .........................................................21

*Maydak v. United States*, 363 F.3d 512 (D.C. Cir. 2004) .......................................26

*O'Donnell v. Barry*, 148 F.3d 1126 (D.C. Cir. 1998) .........................................18

*Paul v. Davis*, 424 U.S 693 (1976) .................................................................18

*Peter B. v. C.I.A.*, 174 F. Supp. 3d 308 (D.D.C. 2016) .......................................20

*Rtskhiladze v. Mueller*, 110 F.4th 273 (D.C. Cir. 2024) .................................2,17

*Sackett v. EPA*, 566 U.S. 120 (2012) ..............................................................33

*Sadallah v. City of Utica*, 383 F.3d 34 (2d Cir. 2004) .........................................20

*Vega v. Lantz*, 596 F.3d 77 (2d Cir. 2010) ........................................................20

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Service*, 586 U.S. 9, 23 (2018) ...........................33

*Williams v. Dept. of Veterans Affairs*, 104 F.3d 670 (4th Cir. 1997) ............................ 27,28,29

**Statutes**

Administrative Procedure Act, 5 U.S.C. §§ 551*et seq.* (1946) ...................................... 4

Privacy Act, 5 U.S.C. § 552a (1974) ................................................................ 3

5 U.S.C. § 552a(d)(2) .........................................................................21,25,26

5 U.S.C. § 552a(d)(3) ............................................................................. 25,26

5 U.S.C. § 552a(g)(1)(A) ....................................................................3,21,22,25,26

5 U.S.C. § 552a(g)(1)(C) .................................................... 3,5,14,22,25,30,33,34

5 U.S.C. § 552a(g)(4) .............................................................................14,22

5 U.S.C. § 702..........................................................................................31

5 U.S.C. § 704..........................................................................................30

5 U.S.C. § 706 .................................................................................................30,31

28 U.S.C. § 509 ...............................................................................................31,34

28 U.S.C. § 510 ...............................................................................................32,34

28 U.S.C. § 515 ...............................................................................................32,34

28 U.S.C. § 519 .............................................................................................. 32,34

28 U.S.C. § 2106 ................................................................................................. 2

## **Regulations**

28 C.F.R. Part 600 ............................................................................................ 32

28 C.F.R. Part 600.1 ......................................................................................... 32

28 C.R.R. Part 600.9(c) .................................................................................... 32

## PLAINTIFF'S RESPONSE IN OPPOSITION TO
## THE DEPARTMENT OF JUSTICE'S RENEWED MOTION TO DISMISS

## INTRODUCTION

On August 5, 2020, Plaintiff Giorgi Rtskhiladze filed his Amended Complaint alleging that Footnote 112, Vol. II, of the Report on the Investigation into Russian Interference in the 2016 Presidential Election (Mueller Report or Report) so defamed him that it destroyed his ability to continue his successful career which had been dedicated to strengthening the commercial and cultural ties between the United States—his adoptive country—and the Republic of Georgia—his native country—as well as other former Soviet Bloc countries.[1]  The Second Amended Complaint (SAC), like the Amended Complaint, alleged that (i) the defamation so stigmatized plaintiff that it caused a tangible change in status by destroying his ability to continue to function as a *de facto* emissary for Georgia-U.S. relations,[2] (ii) resulted in Georgia abandoning the process of bestowing on him the high diplomatic status of "Honorary Consul,"[3] and (iii) caused massive financial and emotional harm.[4] Taken together, Plaintiff alleged that the defamation in Footnote 112 deprived him of liberty in violation of the Fifth Amendment.[5]

On September 1, 2021, the Court dismissed both of Plaintiff Giorgi Rtskhiladze's equitable claims—his claim under the Fifth Amendment and his Privacy Act claim.[6] It concluded that it

---

[1] Electronic Case File (ECF) 19-1, (Amended Complaint (AC) ¶¶ 6-20). On January 28, 2025, Plaintiff filed an unopposed motion to file the Second Amended Complaint (SAC) to correct a technical error in Count II. The Court granted the motion on January 30, 2025. ECF 56.

[2] *Id*. at 8-11, SAC ¶¶ 50-51.

[3] *Id*. at 21, SAC ¶ 52.

[4] *Id*., SAC ¶¶ 60-61.

[5] *Id*. at 27-28, SAC ¶¶ 69-72.

[6] ECF 31-32 (Order on MTD and Memo. & Opinion). The Court specifically noted that Count II sought relief against the Department of Justice: "[T]he 'name-clearing' claim in Count II seeks relief only against the DOJ, not Mr. Mueller."  Mem. Op. 31 n.6. "The Court has rejected Rtskhiladze's request [in Count II] for such prospective relief, equitable relief. *See supra* at III.A.2." Mem. Op. 30.

lacked subject matter jurisdiction over claims for prospective relief because a subsequent Senate Report that did not defame him erased the traceability element of jurisdiction.[7] For the same reason, the Court limited Plaintiff's damage-claim window from the date the Mueller Report was made public to the date the Senate Report was released. On August 9, 2025, however, the court of appeals rejected the relevance of the subsequent Senate Report to the traceability analysis. Accordingly, the court of appeals remanded the case for the Court consider the merits of the "equitable claims [plural] dismissed for lack of standing."[8]

On December 12, 2024, the Department of Justice filed a Renewed Motion to Dismiss the Amended Complaint.[9] In the government's telling, it can publish official speech worldwide so defamatory to instantly destroy a person's livelihood and personal reputation and then blithely assert that the law provides absolutely no remedy. That simply cannot be—and is not—right.

This is not a case about a record created by the government that although inaccurate or incomplete cannot possibly cause harm because it is either so unimportant it is not preserved in a system of records or is buried in a system of records but no one could or likely would retrieve it. In that case, the purposes of the Privacy Act are not offended because the record cannot cause harm. Here, the record was broadcast worldwide to an awaiting global audience primed to hear what an ultra-high-profile special prosecutor would say about a sensational and salacious rumor about whether the president of the United States was compromised by Russia. The worldwide media

---

[7] Senate Select Committee on Intelligence Report on Russian Active Measures Campaigns and Interference in the 2016 Election, Vol. V, S. Rep. No. 116-290, Vol. 5 (2020).

[8] *Rtskhiladze v. Mueller*, 110 F.4th 273, 275 (D.C. Cir. 2024) (Emphasis added). The court of appeals affirmed the dismissal of Plaintiff's claim for damages under the Privacy Act in Count IV. *Id*. at 278-79. On January 14, 2025, Plaintiff filed a petition for a writ of certiorari asking the Supreme Court to review the decision of the court of appeals on damages or, alternatively, to summarily grant, vacate, and remand the damages judgment under 28 U.S.C. § 2106.

[9] Plaintiff proposes and assumes that the motion will be treated as on to dismiss the SAC.

seized upon Footnote 112 of the Mueller Report and instantly understood its defamatory implications. The Renewed Motion continues the government's cavalier approach.

*First*, *the Renewed Motion does not even bother to a*ddress Count II which seeks a name-clearing hearing under the Fifth Amendment. For that reason alone, the Motion is DOA.

*Second*, although DOJ addresses Plaintiff's claim under Count III for prospective relief under the Privacy Act, 5 U.S.C. § 552a, it addresses only equitable relief under section 552a(g)(1)(A) and ignores prospective relief available under section 552a(g)(1)(C). Under 552a(g)(1)(A), an individual has an absolute right to require the government to amend a retrievable record held within a system of records that is inaccurate or incomplete, regardless of whether the record has harmed the individual. Unlike section 552a(g)(1)(A), under section 552a(g)(1)(C) how the record is held by the government is irrelevant. Section 552a(g)(1)(C) provides that an affected person can seek equitable relief to require the government to amend an errant record. *But there is one added requirement*. To obtain equitable relief under section 552a(g)(1)(C), a plaintiff is entitled to equitable relief only where it is shown that the errant record caused an "adverse determination" with respect to the claimant's "character, rights, or opportunities." The SAC alleges facts sufficient to meet the "adverse determination" element.

*Third*, although DOJ addresses Plaintiff's claim under Count III for prospective relief under section 552a(g)(1)(A), DOJ until last month has argued that Plaintiff cannot obtain relief under section 552a(g)(1)(A) because the "Mueller Report is not maintained in a "system of records." Only records that are maintained within a "system of records" are subject to amendment claims under the Privacy Act." Ren. Mot. Mem. at 15. On December 20, 2024, years into this case, DOJ filed a Notice of Clarification where, for the first time, it implicitly acknowledged that the Mueller Report, after all, is contained in a system of records. Nevertheless, it continues to argue that the amendment

3

provisions of the Act do not apply—now because the Mueller Report is not retrievable by reference to Plaintiff's name or some other personal identifier. That argument borders on specious and, as noted below, short-circuits the proper analysis. Given the search engine technology at its fingertips in today's world, the idea that DOJ would not use—and has not used—that technology to gather information about any person mentioned in a report of investigation, like the Mueller Report, is highly suspect, absent a fulsome explanation of the nature of the system and its search capabilities and uses, something DOJ has failed to do.

For one, a full understanding of the DOJ's filing systems might reveal that even if information about a witness in the Mueller Report itself is not retrievable by the witnesses name or a personal identifier, the same information is contained in another DOJ system of records where such information is retrievable (and thus subject to the Privacy Act), as the D.C. Circuit, the Fourth Circuit, and a decision by another judge in this district have noted.  To be sure, it is probable that the Mueller Report references to Plaintiff were created using the same information about Plaintiff contained in another system where such information is retrievable by Plaintiff's name of other personal identifier.

**Fourth**, to the extent equitable relief is not available either under the Fifth Amendment or the Privacy Act, the Administrative Procedure Act (APA), 5 U.S.C. §§ 551 *et seq.*, provides a generic cause of action.  The APA provides a backstop when a person has been aggrieved by a final agency action and there is no other legal remedy.  DOJ misapprehends Plaintiff's alternative request for equitable relief by focusing on the wrong final decision of DOJ, *i.e.*, the Mueller Report, instead of the Attorney General's decision not to redact Footnote 112 before it was released to the public. Nor is the Attorney General's decision to release Footnote 112 without redactions unreachable because of having been committed to DOJ's discretion as a matter of law. All final agency actions

are presumed to be reviewable. The decision to release Footnote 112 without redaction can be judged under the mandate of section 552a(g)(1)(C), which requires that the government records be accurate and complete to avoid adverse determinations related to an individual's "character, rights, or opportunities."

For these reasons, as explained more fully below, the Renewed Motion should be denied.

## BACKGROUND

### *Plaintiff's Efforts to Foster Ties between the United States and Former Soviet Bloc Countries*

This case is about the needless destruction of the business and personal reputation of an American businessman, a resident of Connecticut, a husband and a father of three young children unlucky enough to be caught in a crossfire between two titanic American political forces—Donald Trump and Hillary Clinton.[10]  The source of this enduring harm is Footnote 112, Vol. II, of Special Counsel Robert S. Mueller III's Report on the Investigation into Russian Interference in the 2016 Presidential Election (Mueller Report or Report).[11] Footnote 112 addressed the Steele Dossier and Plaintiff's purported connection to the purported scandalous video recordings.

Plaintiff—a naturalized citizen of the United States—emigrated to the United States in 1991 from the Republic of Georgia, shortly before the Soviet Union collapsed.[12] Upon arrival in the United States, Plaintiff dedicated his career to fostering closer commercial and cultural ties between

---

[10] ECF 19-1, SAC ¶¶ 6-7.

[11] The redacted Mueller Report was released on April 18, 2019. Report on the Investigation into Russian Interference in the 2016 Presidential Election (Mueller Report) - Content Details - (govinfo.gov).

[12] ECF 19-1, SAC ¶¶ 3, 6.  Plaintiff's life in Soviet Georgia was one of resolute resistance to Soviet Russian suppression.  *Id.* at ¶ 8. Several of his childhood friends were executed for trying to leave the Soviet Union without permission and his uncle spent twelve years in the Soviet gulag solely because of his political convictions. *Id.*

the United States—his adoptive country—and former Soviet Bloc countries.[13] At the time the Mueller Report was released, Plaintiff was under consideration for bestowal of the title "Honorary Consul" by the Republic of Georgia for his efforts in this regard and was involved in numerous worthwhile and profitable business undertakings furthering those efforts.[14] Just before the 2016 presidential election, he succeeded in persuading Mr. Trump to build a Trump Tower in Batumi, Republic of Georgia.[15] The project was abandoned after Donald Trump won the election.[16]

In early October 2016, the unflattering *Access Hollywood* audio tapes of Mr. Trump were released to the public.[17] The release of the tapes triggered a telephone call to Plaintiff from an acquaintance, Sergey Khokhlov, who lives in Moscow.[18] Mr. Khokhlov told him that, while he was dining out, he overheard a person at an adjacent table bragging about some tapes of Mr. Trump from a trip to Russia.[19] Mr. Khokhlov passed this rumor along to Plaintiff because he knew Plaintiff was involved in efforts to have a Trump Tower built in Batumi.[20]

After the call, Plaintiff was naturally concerned about the image of the Trump brand.  Just days before the presidential election, therefore, Plaintiff initiated a brief series of text exchanges on October 30, 2016, with Trump lawyer Michael Cohen, the point person for the Trump Tower Batumi project with whom Plaintiff had been working with from the project's inception.[21] The relevant transcript of a somewhat awkward exchange of text messages reads:

---

[13] *Id.* at ¶¶ 9-10.
[14] *Id.* at ¶ 17.
[15] *Id.* at ¶¶ 18-19.
[16] *Id.* at ¶ 19.
[17] *Id.* at ¶¶ 37-38.
[18] *Id.* at ¶ 41; *see also* Senate Report, *infra*.
[19] *Id.*; *see also* Report of the Select Committee on Intelligence U.S. Senate on Russian Active Measures Campaigns in the 2016 Election, Vol. 5: Counterintelligence Threats and Vulnerabilities (Link: Report_volume5.pdf) at 639, 659.
[20] *Id.* at 659.
[21] ECF 19-1, SAC ¶ 31.

- Rtskhiladze: "Stopped flow of some tapes from Russia but not sure if there's anything else.  Just so u know …"

- Cohen: "Tapes of what?"

- Rtskhiladze: "Not sure of the content but person in Moscow was bragging had tapes from Russia trip. Will try to dial you tomorrow but wanted to be aware.  I'm sure it's not a big deal but there are lots of stupid people."

- Cohen: "You have no idea"

- Rtskhiladze: "I do trust me."

(ellipsis original).[22]

### Footnote 112 of the Mueller Report Defamed Plaintiff

In May 2017, Robert S. Mueller III was appointed as special counsel to investigate whether Russia actively interfered in the 2016 presidential election.[23] In April 2018, two FBI agents appeared unannounced at Plaintiff's home and asked if he would answer a few questions.[24] He invited them in. During the visit, they handed him a copy of the text exchange. Plaintiff explained that a call from a friend in Moscow triggered the text exchanges.[25] As they were leaving, the agents served Plaintiff with a grand jury subpoena for documents and testimony.[26] In response, Plaintiff produced approximately 25,000 pages of documents and testified before the grand jury a month later in May 2018.[27]

---

[22] *Id.*
[23] *Id.* at ¶ 24.
[24] *Id.* at ¶ 25.
[25] *Id.*
[26] *Id*.
[27] *Id.* at ¶¶ 26, 27.

Almost a year later, Special Counsel Mueller in March 2019 sent a two-volume report to Attorney General Barr.[28] The Attorney General informed the public that information in the Report that could harm the reputation of "peripheral third parties" would be redacted before release.[29] *Plaintiff was never a target of the investigation.* On April 18, 2019, the Department of Justice made public a redacted Mueller Report.[30] Footnote 112 of Volume II, however, was not redacted. The footnote was tied to a sentence reading: "Comey [FBI Director] then briefed the President-Elect on the sensitive material in the Steele Dossier":

> … Comey's briefing included the Steele reporting's unverified allegation that the Russians had compromising tapes of the President involving conduct when he was a private citizen during a 2013 trip to Moscow for the Miss Universe Pageant. During the 2016 presidential campaign, a similar claim may have reached candidate Trump. On October 16, 2016, Michael Cohen received a text from Russian businessman Giorgi Rtskhiladze that said, "Stopped flow of tapes from Russia but not sure if there's anything else. Just so you know …." 10/30/16 Text Message, Rtskhiladze to Cohen.  Rtskhiladze said "tapes" referred to compromising tapes of Trump rumored to be held by persons associated with the Russian real estate conglomerate Crocus Group, which had helped host the 2013 Miss Universe Pageant in Russia. 4/4/18 302, at 12. Cohen said he spoke to Trump about the issue after receiving the texts from Rtskhiladze. Cohen 9/12/18 302, at 13. Rtskhiladze said he was told the tapes were fake, but he did not communicate that to Cohen.  Rtskhiladze 5/10/18 302, at 7.[31]

Footnote 112 defamed Plaintiff by (i) characterizing him pejoratively as a "Russian businessman," given that Plaintiff's native country is the Republic of Georgia and Russia invaded Georgia in 2008, and still occupies about twenty percent of the country with resulting hostility,[32] (ii) misquoting the text exchange, changing "stopped the flow of some tapes" to "stopped the flow

---

[28] *Id.* at ¶ 28.
[29] What's being redacted from the Mueller report, and why | PBS News (Attorney General Barr told Congress that information potentially damning to "peripheral third parties" would be redacted.).
[30] ECF 19-1, SAC ¶ 28.
[31] *Id.* at ¶ 29.
[32] Marking 16 Years Since Russia's Invasion of Georgia - United States Department of State

of tapes," (iii) omitting parts of the exchange showing context, (iv) implying that he had first-hand

information about the content of the purported salacious tapes, (v) implying that he took active steps

to suppress them in Russia before the election so as not to harm then Mr. Trump's election

prospects, and (vi) wrongly stating that he was told the tapes were fake but did not tell Mr. Cohen.

### *Footnote 112 Abruptly Ended Plaintiff's Career*

The media immediately seized upon Footnote 112 and broadcast its defamatory implications

worldwide. For example, ABC news published an article titled the "10 Best Footnotes in the

Mueller Report."[33] The first footnote the article discussed was Footnote 112:

> **1. Those tapes: Footnote 112 (Volume II pg 27-28) describes conversations between Trump associates about rumored video recordings of the candidate in a Russian hotel room with prostitutes:**
>
> In 2016, a dossier compiled by former British intelligence officer Christopher Steele brought to light the possible existence of a Russian-recorded video of Trump during a 2013 visit to Moscow showing Trump cavorting with prostitutes in his suite at a Moscow Ritz hotel. A footnote in the Mueller Report discusses the unverified allegation, which Trump maintains is false.
> Two weeks before the election, the report says that Trump's personal attorney Michael Cohen received text *from a Russian businessman Giorgi Rtskhiladze that said, "Stopped flow of tapes from Russia but not sure if there's anything else. Just so you know ...."*

(Bolding original; Emphasis added.).[34] The ABC report also stated that "[t]he report and footnote

do not give information on Trump's response to Cohen's alleged briefing on the matter, nor does it

explain why Rtskhiladze wouldn't have told Cohen the tapes were fake."[35]

Another example of the media coverage of Footnote 112 was a monolog that aired

on MSNBC's *Rachel Maddow Show* on April 24, 2019:

---

[33] ECF 19-1, SAC ¶ 45; *see also id.* ¶¶ 43-44, 49.

[34] *Id.* at ¶ 45.

[35] *Id.*

According to the Mueller Report, it turns out before the election and well before any Steele Dossier or anything like that claim ever saw the light of day, a guy Trump actually did know from Russian connections in the former Soviet Union actually did get in touch with Michael Cohen to tell him to tell Trump that he was stopping flow of some tapes from Russia. Person in Moscow bragging "had tapes of Russia trip." Oh, good, he stopped the tapes from getting out of Russia.

And according to Mueller, Cohen then told Trump about that before the election. *So that means Trump knew that somewhere in the former Soviet Union, a business buddy of his [Plaintiff] had taken action to make sure tapes, supposedly from Trump's trip to Russia, those tapes weren't going out. Don't worry, all taken care of, I took care of that for you, right?*[36]

ABC News and the *Rachel Maddow Show* on MSNBC read Footnote 112 precisely the way the senior prosecutor wanted the media and the public at large to read it, *i.e.*, an associate of Mr. Trump worked with a foreign national—a "Russian businessman"—to suppress salacious videos of Mr. Trump that are noted in the Steele Dossier; and, further, that plaintiff knew the tapes were fake and did not disclose that information to Mr. Cohen.[37] The misquotes, omissions and blatant implications in Footnote 112 led the public to believe that the assertion in the unverified and later debunked Steele Dossier that Russia held compromising salacious tapes of Mr. Trump was credible.

The negative impact of Footnote 112 on Plaintiff's personal and business reputation was immediate and severe. Aside from the enormous impact on his family, the footnote destroyed Plaintiff's ability to continue his efforts to increase commercial and cultural ties between the United States and former Soviet Bloc countries, including Georgia.[38] The Republic of Georgia abruptly abandoned the process of bestowing the status of "Honorary Consul" on Plaintiff and, as cataloged

---

[36] *Id.* at ¶ 47 (Emphasis added.).
[37] *Id.* at ¶ 46.
[38] *Id*. at ¶¶ 50-51, 60-61.

in the Amended Complaint, numerous ongoing or planned business ventures were cancelled or indefinitely postponed.[39]

### A Subsequent Senate Report Was Both Accurate and Complete

Unlike Footnote 112, a subsequent Senate Report—published long after Footnote 112 destroyed Plaintiff's livelihood and personal reputation—accurately reported that Plaintiff had no actual knowledge about the purported salacious tapes and certainly, therefore, could not have taken steps to suppress them before the election.

In August 2020—nearly a year and a half after the release of Footnote 112—the Senate Select Committee on Russian Active Measures Campaigns and Interference in the 2016 U.S. Elections issued a redacted version of its Report.[40] The Senate Report received much less media attention than Footnote 112 of the Mueller Report. And the Senate Report provided the overall context related to the purported tapes, noting that Mr. Cohen routinely heard rumors about compromising and shocking tapes related to a trip of Mr. Trump to Russia in 2013. Mr. Cohen said that over the course of several years a number of people contacted him about compromising tapes but that he could not corroborate any of the rumors.[41]

The Senate Report explained that "[s]eparate from *Steele's memos, which the Committee did not use for support,* the Committee became aware of three general sets of allegations:"[42]

(i) a person named David Geovanis who was reported to have "information about Trump's relationship with women in Moscow,"[43]

---

[39] *Id*. at ¶ 52; *see also id*. ¶¶ 50-51, 60-61.
[40] *Report of the Select Committee on Intelligence U.S. Senate on Russian Active Measures Campaign and Interference in the 2016 Election, Vol. 5 (Counterintelligence Threats and Vulnerabilities) (Senate Report)* (Report_volume5.pdf (senate.gov)).
[41] *Id*. at 638, 639, 658-59.
[42] *Id*. at 638 (Emphasis added.).
[43] *Id*.

11

(ii) *a rumor Giorgi Rtskhiladze heard about during a telephone call at his home in Connecticut from a friend in Moscow*,[44] and

(iii) an individual who was an executive with Marriott International who purportedly overheard two other Marriott executives in an elevator at the Ritz Carlton Moscow discussing how to handle a tape of Trump with women.[45]

Unlike Footnote 112, the Senate Report accurately identified Plaintiff as "a U.S. businessman originally from the country of Georgia …"[46] The Report also stated accurately that the only source of Plaintiff's information was from a telephone call he received at his home in Connecticut from a friend in Moscow:[47]

> The second set of allegations relate to a Moscow-based businessman, Sergey Khokhlov, who overheard two people in Moscow, in October 2015 [sic] [2016], discussing sensitive tapes of a Trump visit to Russia. He relayed what he heard to Giorgi Rtskhiladze, a friend and business associate of Michael Cohen. In October 2016, Rtskhiladze informed Cohen of the alleged tapes in Moscow, and Cohen informed Trump and several others. Cohen has said that there was no additional action taken, and that he had been aware of other similar allegations that began shortly after Trump's travel to Moscow in 2013, none of which Cohen was able to corroborate.[48]

The Senate Report also included Plaintiff's recollection of the call:

> During an October 2015 [sic] [2016] phone call that Mr. Rtskhiladze had with a friend and former business associate, Sergei Khokhlov, Mr. Khokhlov stated that while having dinner in a restaurant, Mr. Khokhlov overheard a stranger at a table next to him discuss tapes from Donald Trump's visit to Russia. The overheard dinner conversation was not important to Mr. Rtskhiladze and Mr. Khokhlov so he did not discuss this matter again. Mr. Khokhlov was aware that Mr. Rtskhiladze and his Georgian partners were in business with the Trump Organization.[49]

---

[44] *Id.* at 639, 659 (Emphasis added).

[45] *Id.* at 639.

[46] *Id*. at 658 n.4271.

[47] *Id*. at 639, 659.

[48] *Id.*

[49] *Id*. at 659.

Unlike Footnote 112, the Senate Report faithfully included the full exchange of texts which reveals the innocuous context.[50] The Report also noted that Plaintiff—like the public at large—was unaware in late October of 2016 of the existence of the Steele Dossier—and the disturbing but unverified tapes mentioned in it. The Report explained, therefore, that Plaintiff's text was related to the intense, worldwide media coverage during the first part of October related to unflattering tapes of Mr. Trump while on the set of *Access Hollywood*:

> Due to the news about the *Access Hollywood* tapes and its potential impact on Mr. Trump's reputation, Rtskhiladze sent a text message to Mr. Cohen to inform him that an individual was overheard discussing sensitive tapes of Mr. Trump's trip to Russia.[51]

The Senate Report explained that although Rtskhiladze did not have personal insight into the matter, he assessed that if compromising material existed the Crocus Group—which sponsored the 2013 Miss Universe Pageant in Moscow—would likely be responsible.[52] The Report stated that Plaintiff did not pass along subsequent speculation that the tapes were fake because he knew that Mr. Cohen regularly heard unverified rumors of compromising tapes for years but could not confirm them.[53]

The Senate Report noted that the day after the Steele Dossier was published, Plaintiff texted his publicist. The text confirms that he had no tangible information about the purported tapes and obviously, therefore, could not have taken action to suppress them: "told MC [Michael Cohen] there was something there b 4 election."[54] This text message is wholly inconsistent with the implication in Footnote 112 that Plaintiff had personal knowledge that tapes existed and took active steps to

---

[50] *Id.* at 660.
[51] *Id.* (Emphasis added).
[52] *Id.*
[53] *Id.* at 658.
[54] *Id.* at 660.

13

suppress them before the 2016 election. The publicist responded, "I recall" to which Plaintiff replied, "well that's what happens when you visit crocus I guess."[55] This statement also demonstrates that Plaintiff was not involved in any efforts to suppress the purported tapes—"I guess" can only be interpreted to mean that Plaintiff was simply speculating.[56]

### District Court Procedural History

In August 2020, the Court granted Plaintiff's unopposed motion to amend the Complaint.[57] As relevant here, Count II sought prospective relief through a name-clearing hearing because of the stigma imposed on him by Footnote 112 and its career ending impact. Count III of the Amended Complaint sought equitable relief under the Privacy Act.[58] And Count IV asserted a claim for "actual damages" under 5 U.S.C. § 552a(g)(4) of the Privacy Act for violation of section 552a(g)(1)(C), alleging that the defamation and defamatory implications of Footnote 112 was "intentional or willful."[59]

In September 2020, the Department of Justice and Special Counsel Mueller filed separate motions to dismiss and in October 2020, Plaintiff filed a response in opposition to them. Plaintiff's request for oral argument was denied.[60] One year later, on September 1, 2021, the Court dismissed the case.[61]

### The Decision of the District Court

In deciding the motions to dismiss, the Court was required to determine whether the Amended Complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief

---

[55] *Id.*
[56] *Id*.
[57] ECF 19.
[58] ECF 19-1, SAC ¶¶ 75-76.
[59] *Id*. at ¶¶ 77-79.
[60] ECF 24.
[61] ECF 32.

that is plausible on its face.'"[62] The Court began by accurately noting that the substance of Plaintiff's claim was that he was defamed by Footnote 112:

> Rtskhiladze's ongoing injuries derive from the continued availability of false statements generated and endorsed by a high-profile federal investigation. Rtskhiladze takes specific issue with the implications that he was aware of the tapes referred to in the Steele Dossier, that he had a connection with the Crocus Group, and that he had a reputation as someone who would be familiar with those matters. *See, e.g.*, FAC at § 36-40. He argues that these implications combined to paint him as a figure 'engaged in shadowy conspiratorial and covert activities' which raised red flags for potential business partners.[63]

The Court then concluded that Plaintiff plausibly pled that his harm stemmed from Footnote 112 and that the harm was fairly traceable and redressable:

> [B]ecause his theory of causation centers on the connection drawn in the footnote between himself, the Crocus Group, and the tapes, the Court finds it plausible that Footnote 112 is the sole source of that connection in the Mueller Report. Moreover, assuming that the implications contained in the footnote were false, Rtskhiladze's portrayal in the footnote could have given associates and potential partners a negative impression of his character due to his close contact with a high-profile scandal. The Court thus finds that Rtsdkhiladze has plausibly alleged that the harms to his business and reputation are fairly traceable to the presence of these implications in the footnote.[64]

The Court then concluded, however, that the issuance of a Senate Report on the same subject nearly a year and a half later meant that Plaintiff "ha[d] only shown causation for harms that occurred prior to the release of the Senate Select Committee on Intelligence in August 2020."[65] The Court then held that equitable relief was no longer available after the issuance of the Senate Report.[66]

---

[62] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570(2007)).
[63] ECF 32 at 22; 2021 WL 3912157, at *10.
[64] ECF 31 at 20; 2021 WL 3912157, at *9.
[65] *Id.*; 2021 WL 3912157, at *10.
[66] *Id.;* 2021 WL 3912157, at *7, *11.

The Court also limited his damage claim to the period from the date of the publication of Footnote 112 to the date the Senate Report was released. It reasoned that Plaintiff's claim that the material in Footnote 112 was "so nakedly defamatory that it could only have been included intentionally and willfully … is not plausible given the Senate Report's publication of largely the same information, and his concession that the material contained in the Senate Report is accurate."[67]

### The Decision of the Circuit Court

*Equitable Claims*. The court of appeals reversed and remanded the Court's jurisdictional holding on prospective relief and held Plaintiff has standing to pursue such relief. After noting that the government does not challenge the allegations of the harm inflicted upon Plaintiff by Footnote 112, the circuit court rejected the conclusion of the Court that the "(accurate) Senate Report eliminated the ongoing effects of the (inaccurate) Mueller Report."[68] It explained that "the Senate cannot retract a report issued by DOJ, nor did the Senate Report purport to do so" and that "[a] government report (like the Senate Report) does not extinguish the harm from the earlier government report (like the Mueller Report) 'where reputational injury derives directly from an unexpired and unretracted government action.'"[69]

*Damages Claim*. For the same reason, the circuit court rejected the Court's holding that the jurisdictional window on damages was limited to the period between the release of Footnote112 and the Senate Report: "Like the district court, we hold that Rtskhiladze has standing to seek damages for injuries that DOJ allegedly inflicted **before** the Senate Report's release. Unlike the

---

[67] ECF at 13-14; 2021 WL 3912157, at *7.
[68] 110 F.4th 273, 277 (D.C. Cir. 2024).
[69] *Id*.

district court, we hold that Rtskhiladze also has standing to seek damages for injuries inflicted *after* that point."[70]

## ARGUMENT

**I.      Plaintiff Is Entitled to Equitable Relief through a Name-Clearing Hearing.**

> **A.      Plaintiff Is Entitled to a Hearing under Either a Stigma-Plus or Reputation-Plus Theory.**

"The government violates an individual's constitutional due-process interest if it deprives [that person] of a liberty or property interest without providing sufficient procedural protections." *Campbell v. District of Columbia*, 824 F.3d 339, 288 (D.C. Cir. 2018) (citing *Abdelfattah v. U.S. Dept. of Homeland Security*, 787 F.3d 524, 538 (D.C. Cir. 2015)).[71] "One of the liberty interests protected by the Fifth Amendment is the right to 'follow a chosen profession free from unreasonable government interference.'" *Id.* (quoting *Greene v. McElroy*, 360 U.S. 474, 492 (1959)).

In *Campbell*, plaintiff pursued two due-process claims: a "reputation-plus" claim and a "stigma-plus" claim. The court of appeals explained that:

> A plaintiff makes out a reputation-plus claim when the government takes certain adverse actions *and* defames the plaintiff …. A plaintiff makes out a stigma-plus claim when the government takes certain adverse actions *and* those actions create "a stigma or other disability that foreclosed [the plaintiff's] freedom to take advantage of other employment opportunities," ….

---

[70] 110 F.4th at 278 (Emphasis original). Then, however, the court of appeals held that Plaintiff forfeited his damage claim. *Id.* at 279.

[71] DOJ argues that Plaintiff's claim for relief under the Declaratory Judgment Act fails because the Act does not create a stand-alone cause of action. Ren. Mot. Mem. at 13. But Plaintiff seeks relief under the broad equitable power of the Court to enjoin the violation of a plaintiff's constitutional rights. *See Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 400 (1971) (Justice Harlan concurring, stating it must be presumed that the federal courts have the equitable power to enjoin the violation of constitutional rights) (citing *Bell v. Hood*, 327 U.S. 678, 684 (1948)).

*Id.* at 284 (Emphasis original and citations omitted). As the district court explained more fully in

*Jefferson v. Harris*, 170 F. Supp. 3d 194, 205 (D.D.C. 2016) (Boasberg, J.):

> In this circuit, a plaintiff may avail himself of two different legal theories to establish a reputation-based due process violation. … The first commonly called a "reputation-plus" claim, requires, "the conjunction of official defamation and [an] adverse employment action. … To plead such a claim, the plaintiff must meet three requirements. First, he must allege "that the government's defamation resulted in a harm to some interest beyond reputation," such as a "loss of present … government employment," … or a demotion in rank and pay. … Second, he must "allege that the government actually stigmatized his or her reputation by, for example, charging [him] with dishonesty" or "unprofessional conduct," … Third, he must plead facts indicating "that the stigma has hampered future employment prospects.
>
> His second option is to pursue what is known as a "stigma plus" theory. This theory "differs from the [reputation plus theory] in that it does not depend on official *speech*, but on a continuing stigma or disability arising from official *action*." … In other words, where a "reputation plus" theory requires some form of defamatory or stigmatizing speech by the government, the latter depends only on governmental imposition of "a continuing stigma or other disability arising from official action" that "foreclosed the plaintiff's freedom to take advantage of other employment opportunities."

*Id.* at 205 (Emphasis original and citations omitted). More recently, the district court in *Haymon v.*

*Dist. of Columbia*, 610 F. Supp. 3d 101 (D.D.C. 2022) (Moss, J.) summarized the law in this

Circuit:[72]

> The D.C. Circuit recognizes liberty interest procedural due process claims under two distinct, albeit overlapping, legal theories. The first theory, known as "reputation-plus," requires a showing of "the conjunction of official defamation and adverse employment action. *O'Donnell v. Barry*, 148 F.3d 1126, 1140 (D.C. Cir. 1998). Although government defamation alone is not actionable under this theory, defamation in the course of an adverse employment action is actionable, at least at times. *Id.* (citing *Paul v. Davis*, 424 U.S 693, 710 (1976)). The second theory, known as "stigma-plus," requires "the combination of an adverse employment action and 'a stigma or other disability that foreclosed [the plaintiff's] freedom to take advantage of other employment opportunities.'" *Id.* (quoting *Roth*,

---

[72] *See also Lamb v. Millennium Challenge Corp.* 498 F. Supp. 3d 104, 113 (D.D.C. 2020).

408 U.S. at 573)).  A stigma-plus claim differs from a reputation-plus claim in that the former "does not depend on official speech, but on a continuing stigma or disability arising from official action." *Id.*

Plaintiff is entitled to a name-clearing hearing under either theory. In the typical reputation-plus case, the government both takes adverse action—in *Campbell* it was the termination of employment—and engages in official (albeit defamatory) speech—in *Campbell* it was leaking untrue statements to the press. *Campbell*, 894 F.3d at 284. Here, the decision to publish Footnote 112 without redactions was both an official act and official speech. In other words, two of the elements of a reputation-plus claim are folded into one. Indeed, there is no question at the pleading stage that the government's official action—the publication of Footnote 112—defamed plaintiff.[73] And as pled in the Amended Complaint, the publication of the footnote both stigmatized his reputation and made it impossible for plaintiff to continue his chosen career of fostering closer commercial and cultural ties between the United States, Georgia, and former Soviet Bloc satellites. The defamatory implications of Footnote 112 caused the Republic of Georgia, for example, to halt the process of granting plaintiff the diplomatic title (an akin to an ambassador-at-large) of "Honorary Consul" in recognition for those efforts. And the publication caused numerous projects to be cancelled, postponed, and or required plaintiff's disassociation.

Under a stigma-plus theory, the stigma imposed on Plaintiff's career arose from official government action—the publication of Footnote 112—which effected a tangible change in plaintiff's status as a de facto ambassador advocating for closer commercial and cultural ties between the United States and former Soviet Bloc countries. The fact that the official government action also involved speech (the defamation in the footnote) does not change plaintiff's entitlement to a name-clearing hearing under the stigma-plus theory. The official action of the government

---

[73] *See* Background, above, at 7-9.

19

changed plaintiff's career status, *i.e.*, the government imposed a continuing stigma on his career and, thereby, deprived plaintiff of his liberty interest in his chosen career without providing his constitutional right to be heard guaranteed by the Fifth Amendment.

> **B.    The Loss of Government Employment Need Not Be the Adverse Government Action Underlying the Claim.**

Although these types of case typically arise when a federal employee is fired, loss of federal employment is not a necessary element of the claims.  In *Peter B. v. C.I.A.*, 174 F. Supp. 3d 308, 317 (D.D.C. 2016), the court stated that employment status was irrelevant:

> As a preliminary matter, whether Plaintiff was a contract employee or a staff officer at the time his employment was terminated has nothing to do with whether or not he has a protectable liberty interest.  Whatever his employment status, the change in status that forms the basis for his due process claim is the termination of his employment.

*See also Lamb v. Millennium Challenge Corp.,* 498 F. Supp. 3d at 114 (concluding that a former employee of a government contractor plausibly pled a stigma-plus due process claim); *Vega v. Lantz*, 596 F.3d 77, 82 (2d Cir. 2010) (dismissing a state prisoner's stigma-plus claimed  because the prisoner's SOTN (sex offender treatment needs) score was insufficient to support the claim, not because he was not a government employee); *Behrens v. Regier*, 422 F.3d 1255, 1261-62 (11th Cir. 2005) (dismissing a stigma-plus claim of a prospective adoptive parent because plaintiff could not establish elements of the claim, not because she was not a current of former government employee); and *Sadallah v. City of Utica*, 383 F.3d 34 (2d Cir. 2004) (dismissing a stigma-plus claim of a business owner for failure to demonstrate sufficient change in employment status, not because he was not a government employee) (Sotomayor, J.).

20

**C.**     **The District Court Has Discretion in Determining the Scope of the Hearing.**

When the government has infringed upon a person's protected liberty interest under either

test, the person has a due process right to notice and an opportunity to be heard. *Doe v. U.S. Dept.*

*of Justice*, 753 F.2d 1092, 1102 (D.C. Cir. 1985). The Court is charged with determining the precise

nature of the name-clearing hearing that the government must provide. *Lyons v. Barrett*, 851 F.2d

406 (D.C. Cir. 1988). But the standard for due process that is due must be guided by *Mathews v.*

*Eldridge*, 424 U.S. 319 (1976). Plaintiff suggests that the Court direct the parties to meet and confer

about what procedure is due in this circumstance and advise the Court of the results, followed by

an order of the Court setting out the procedure to be followed.

**II.     Regardless of Whether a Defamatory Record Is Contained in a "System of Records,"**
**the Privacy Act Provides Equitable Jurisdiction.**

**A.     Section 552a(g)(1)(C) Provides for Equitable Jurisdiction Where the**
**Inaccurate Record Has Caused Adverse Determinations.**

DOJ argues that the only equitable avenue under the Privacy Act that provides for equitable

relief is the provision that gives a person a right in section 552a(d)(2) to request that a record

contained in a government maintained "system of records" and which is incomplete or inaccurate

be amended. Where the request is denied and an administrative appeal is unsuccessful, the Act

provides in 552a(g)(1)(A) that the person may pursue amendment in federal district court.

But there is another provision of the Privacy Act that provides for equitable jurisdiction,

albeit one that requires a showing of an "adverse determination" because of an incomplete or

inaccurate record, something section 552a(g)(1)(A) does not require:

Whenever any agency
…

(C) fails to maintain any record concerning any individual with such accuracy,
relevance, timeliness, and completeness as is necessary to assure fairness in any
determination relating to the qualifications, character, rights, or opportunities

21

> of, or benefits to the individual that may be made on the basis of such record,
> and consequently a determination is made which is adverse to the individual …
>
> the individual may bring a civil action against the agency, and the district courts of
> the United States shall have jurisdiction in the matters under the provisions of this
> statute.

5 U.S.C. § 552a(g)(1)(C). The distinction between relief under section 552a(g)(1)(A) and section 552a(g)(1)(C) is material. Unlike section 552a(g)(1)(A), section 552a(g)(1)(C) does not provide for amendment simply because the record is inaccurate or incomplete. It requires something more. A court may not grant equitable relief unless the record in addition to being inaccurate and incomplete has led to adverse determinations affecting the plaintiff. *Whether the record is contained in a "system of records" is irrelevant.* And to be sure, that section 552a(g)(4) provides that where a violation of section 552a(g)(1)(C) is shown to be "intentional or willful" the affected person may obtain "actual damages" does not affect the equitable jurisdiction conferred by section 552a(g)(1)(C).

### B.    An "Adverse Determination" Need Not Be a Determination of the Agency Creating the Record or Another Agency.

DOJ argued in connection with its original Motion to Dismiss that, even though it acknowledges that Footnote 112 was inaccurate, plaintiff is not entitled to relief under section 552a(g)(1)(C) because he did not suffer any "adverse determinations" because of any action by a federal agency. DOJ Br. at 19-22. That assertion is incorrect. This question was correctly analyzed in *Aki v. Sebelius*, No. 08-cv-461, 2011 WL 13273368 (D.D.C. Jan. 13, 2011), where the district court "agree[d] with the plaintiff that the adverse determination remedied by section (g)(1)(C) may come from a private entity, as well as from an agency itself." *Id.* at *4.

In *Aki v. Sebelius*, a doctor sued the Department of Health and Human Services because he was denied clinical privileges by Georgetown University Hospital based upon an inaccurate record

created by HHS.  DOJ moved to dismiss arguing that the "adverse determination" must be made by a federal agency.  The court disagreed:

> While the language creating a civil remedy in section (g)(1)(C) closely resembles the duty-creating language of section (e)(5), there is a crucial difference between the two provisions as applied to this case.  Section (e)(5) applies only to "record *used by the agency*, while section (g)(1)(C) applies to "*any* record concerning *any* individual … to assure fairness in *any* determination …." [emphasis original].  Thus, unlike section (e)(5), the clear language of section (g)(1)(C) does not require that the entity making the determination be the record keeping agency. … It only requires that, as a result of inaccurate records maintained by the agency "a determination is made which is adverse to the individual." *Id.*  Therefore, the only way a claim brought pursuant to section (g)(1)(C) would require that the adverse determination be made by the record-keeping agency itself would be if (g)(1)(C) incorporates section (e)(5).

*Id*. at *3.  But section 552a(g)(a)(C) does not incorporate section 552a(e)(5). There is no reason to think Congress intended that an individual be able to require a federal agency to correct an errant record where it causes adverse determinations by a government agency but at the same time preclude relief where a person suffers "adverse determinations" by a non-government entity based on the same errant record.

### C.    Plaintiff Has Plausibly Alleged that He Suffered "Adverse Determinations" as a Result of Footnote 112.

As a direct and proximate result of Footnote 112, plaintiff plausibly alleges that he has suffered dramatic and tangible career-changing harm as well as substantial emotional. In addition to alleging that the footnote caused the Republic of Georgia to cease preparations to bestow the title of Honorary Consul on Plaintiff, the SAC ¶ 61—supported by his Declaration (ECF 22-1)—alleges some of the ways Footnote 112 has tangibly affected Plaintiff's chosen career:

- At the time the Report was made public, plaintiff was involved in a $50 million transaction that was cancelled after its release, resulting in a $2.5 million loss to plaintiff.

- Plaintiff was facilitating a transaction to purchase a large mobile communications company. The amount of the acquisition was up to $200 million, and plaintiff was to be a member of the advisory group with a $200,000 annual income, plus three percent of the total value of the transaction as compensation for facilitating the transaction. The Report was made public after the transaction closed. As a result of the media storm caused by Footnote 112, plaintiff was forced to withdraw.

- Plaintiff was forced to abandon his involvement in raising hundreds of millions of dollars in Euro bonds from which he would have received three percent in compensation.

- Plaintiff's affiliation with a major financial institution as a highly paid strategic advisor was suspended.

- Plaintiff's agreement with a large energy corporation was not renewed after the Report was made public, resulting in a loss of hundreds of thousands of dollars annually.

- Plaintiff has been forced to forgo numerous business opportunities because no bank, investment company, or other financial institutions will meet with him once they google his name.

- Numerous other deals plaintiff started before the release of the Report continued afterwards without his participation because of the damage done by Footnote 112.

24

These detailed injuries are discussed in even greater detail in plaintiff's Declaration submitted in support of jurisdiction.

**D.    Absent Equitable Relief under Section 552a(g)(1)(A), Section 552a(g)(1)(C) Would Be Plaintiff's Only Equitable Relief Avenue under the Privacy Act.**

DOJ argues that although it now acknowledges that the Mueller Report is contained in a system of records, Plaintiff still may not obtain equitable relief under section 552a(g)(1)(A) because information about Plaintiff in the pertinent system(s) of records is not retrievable by his name or personal identifier.  As discussed below, there is no information before the Court upon which it could rule on that issue. But if now or after the record is more fully developed the Court agrees with DOJ, then section 552a(g)(1)(C) would provide Plaintiff's sole avenue to obtaining equitable relief under the Privacy Act.

**III.    *On the Record before the Court*, DOJ Has Failed to Establish that Plaintiff Is Not Entitled to an Amendment under Section 552a(g)(1)(A).**

In addition to equitable relief under section 552a(g)(1)(C), Plaintiff is also entitled to equitable relief under Section 552a(g)(1)(A). Section 552a(d)(2) provides that an agency "shall … permit the individual to request amendment of a record pertaining to him …" Further, under section 552a(d)(3), where an agency fails to amend a record at the request of an individual that individual may file an administrative appeal and then may file a civil action pursuant to section 552a(g)(1)(A): "Whenever any agency (A) makes a determination under subsection (d)(3) not to amend an individual's record in accordance with his request, or fails to make such review in conformity with this subsection … the individual may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection."

Plaintiff complied with the administrative requirements of 552a(d)(3) but its request and appeal were denied on the ground that the Mueller Report "is not maintained in a system of records

from which information is retrieved using a personal identifier."[74]  DOJ continued to represent that Mueller Report was not contained in a system of records until it filed its clarification in late December 2024. DOJ now argues that Plaintiff is still not entitled to the protections of the amendment provisions of section 552a(d)(2)-(3) and section 552a(g)(1)(A) because, although the Report is maintained within a system of records, the agency does not retrieve information from the system of records by Plaintiff's name or other personal identifiers.

DOJ's bare statement, however, will not suffice, more information is needed.  In *Henke v. U.S. Dept. of Commerce*, 83 F.3d 1453, 1461 (D.C. Cir. 1996), the court of appeals held that a system of records did not exist where information about individuals was only being gathered as an administrative adjunct to a grant-making program but noted that "if there is evidence that an agency *in practice* retrieves information about individuals by reference to their names, the mere fact that the agency has not acknowledged that it operates a system of records will not protect it from statutory consequences of its action.") (Emphasis original.).  Here, evidence that DOJ—even if only on a few occasions—has retrieved information in the applicable system of records by name or personal identifier would be sufficient to require DOJ to amend Footnote 112.

In *Maydak v. United States*, 363 F.3d 512 (D.C. Cir. 2004), the court of appeals remanded the case for further development of the evidence, noting that "where an agency compiles information about individuals for investigatory purposes, 'Privacy Act concerns are at their zeniths, and if there is evidence of even a few retrievals of information keyed to [personal identifies], it may

---

[74] In its Renewed Motion, DOJ again represented that the Mueller Report is not contained within a system of records: "The amendment claim fails because the Mueller Report is not maintained in a 'system of records.'" Ren. Mot. Mem. at 15. A week later, however, DOJ filed a Notice of Clarification. Now, DOJ acknowledges that the Mueller Report is indeed maintained in a system of records but continues to decline Plaintiff's amendment request because the Report is not contained in a system of records "retrievable by Mr. Rtskhiladze's name. *Id.* at 1.

well be the case that the agency is maintaining a system of records.'" *Id.* at 520 (quoting *Henke*, 83 F.3d at 1461. For our purposes, because Privacy Act concerns also are at their zenith here, it may well be that there may have been at least a few retrievals of information keyed to the personal identifiers of non-target witnesses, like Plaintiff, which would permit Plaintiff to require DOJ to amend Footnote 112. The court of appeals remanded with instructions.

Perhaps more on point is the Fourth Circuit's decision in *Williams v. Dept. of Veterans Affairs*, 104 F.3d 670, 676 (4th Cir. 1997) in which the court of appeals distinguished *Henke* and remanded the case for further factual development:

> It is also questionable whether an agency that assigns individuals client identification numbers, as the DVA did for Appellant Williams here, would not have for its only method of retrievability "alphabetically by name." Yet notwithstanding this, it is undisputed that the filename of the draft ROC [Record of Contact] by Dr. Williams was "228.ROC". This filename is thus directly accessible by neither Appellant Williams's name nor client number. Nevertheless, common computer utility programs exist that can locate the occurrence of names or client numbers even if not contained in the filename.

The Fourth Circuit then addressed the D.C. Circuit's decision in *Henke*:

> We find the narrow *Henke* rationale—that since this document was not in practice actually retrieved "by the name of the individual or by some identifying number," 5 U.S.C. 552a(5), it cannot be a record within a "system of records"—unconvincing in these circumstances **where there appears to exist already a formal system of records** of which the ROC may be a part; where it appears that the published characteristics of the agency's formal system of records have not kept current with advances in and typical uses of computer technology, even by government standards; and where, in general, the record we review is poorly developed at this point.

*Id*. (Emphasis added.).

The Fourth Circuit observed that it is important not to lose sight of the purpose of the Privacy Act and remanded for a more fulsome development of the record:

> Instead, we believe it is more important in this posture to be animated by the spirit of the Privacy Act. The foresight exhibited in the Act's *raison d'etre*, to provide protection against possible abuses of governmental power to affect an individual's privacy and confidential information, has become only more manifest as our society enmeshes itself ever more deeply into the Information Age. Thus because the ROC *can be* retrieved by Appellant Williams's client number, and may in fact have been so, we vacate the judgment of the district court and remand.

*Id.* (Emphasis original). So too here. If Footnote 112 can be retrieved by Plaintiff's name or some personal identifier it should be considered retrievable in furtherance of the Privacy Act's remedial purposes.

Importantly, the *Williams* decision was careful to state that it did not disagree with the holding in *Henke*:

> We express no opinion on the *Henke* court's rationale when applied to circumstances where a plaintiff seeks to use retrieval capability to transform a group of records into a 'system of records,' as in *Henke* itself, when no formally-designated system of records exists. We thus do not necessarily disagree with the *Henke* court but decide only that its rationale should not be extended to the incomplete record before us.

*Id*. at 676 n.4. So too here. Just as the issue in *Williams* was whether a record contained within an established system of records fell within the meaning of retrievable under the Act and further factual development of the record on that issue was necessary, the same rationale applies in this case: Further development of the record is required to determine the nature of the retrievable system at issue in this case.

What is more, the facts in this case might well match the fact pattern in *Jacobs v. National Drug Intelligence Center*, 423 F.3d 512 (5th Cir. 2005) and *Chang v. Dept. of the Navy*, 314 F. Supp. 2d 35 (D.D.C. 2004). In *Jacobs*, plaintiff was defamed when a summary of a government report was leaked to the press. The summary accused the plaintiff, a long-time bank executive, of being involved in money laundering related to illicit drugs. Jacobs sued under the Privacy Act. *Id.*

at 516. The district court dismissed based on the government's argument that the executive summary was not contained in a system of records. The Fifth Circuit reversed holding that the information in the executive summary may have derived from information about the plaintiff contained in another system of records from which information about the plaintiff could be retrieved by personal identifier. *Id.* at 516-17. The same may be the case here. Even if the Mueller Report cannot be retrieved by Plaintiff's name or personal identifier from the system of records containing the Report itself, it may be—indeed it seems probable—that the information about Plaintiff in the Mueller Report was derived from and based on information about Plaintiff in another system of records that was searchable (and was searched) by name or personal identifier.

The court in *Chang* employed the same analysis:

> The conclusion that the documents at issue were not themselves retrieved from a system of records does not end the analysis. Plaintiff asserts that underlying documents, from which the documents were complied, were contained with a system of records—namely, plaintiff's Official Military Personnel File and the record of his NJP hearing. … In such, circumstances, the court of appeals has concluded that an improper disclosure has occurred. *See Bartel v. F.A.A.*, 755 F.2d [1403,] at 1409 [(D.C. Cir. 1984)].

*Chang v. Dept. of the Navy*, 314 F. Supp. 2d at 41.

DOJ's argument that information about individuals named in the Mueller Report is not retrievable by name or a personal identifier appears to mock the Privacy Act. We are now a quarter century after the Fourth Circuit in *Williams* noted the rapid development of information-access technology. It defies all common sense that DOJ can refuse to amend a defamatory record that it broadcast to the world because it claims the system of records in which the information is located is not searchable by a person's name or other personal identifier.

For starters, DOJ does not even identify which of the many systems of records DOJ maintains the Mueller Report resides.[75] In addition to identifying the system of records, DOJ needs to identify (i) what information is contained in the system, (ii) the purpose of maintaining the system, (iii) the technology available to DOJ to retrieve information and whether the technology permits searches by name or other personal identifier, and (iv) the types of searches that are conducted, including responding to Congressional inquiries.  And under the reasoning in *Jacobs*, DOJ needs to disclose whether the information contained in Footnote 112 exists in another system of records where that information can be searched by name or personal identifiers (Are the underlying work-product and results of the investigation maintained in a separate system of records?).

**IV.    Alternatively, Plaintiff Is Entitled to Equitable Relief under the APA Based on DOJ's Failure to Comply with Section 552a(g)(1)(C) of the Privacy Act.**

 **A.    The APA Provides an Equitable Remedy When No Other Adequate Judicial Remedy Is Available.**

Whenever an individual suffers a legal wrong due to agency actions, the APA provides an equitable remedy where there is no other adequate remedy.  5 U.S.C. § 704. The Act is intended as a fallback mechanism only when no other adequate judicial remedy is available.  *Cohen v. United States*, 650 F.3d 717, 732 (D.C. Cir. 2011) (holding that a suit against IRS was available under the APA because there was no other remedy available to challenge the refund mechanism established by the agency).  To the extent the Court holds that equitable relief is not available under the Fifth Amendment or the Privacy Act, section 706 of the APA provides a generic cause of action

---

[75] Office of Privacy and Civil Liberties | DOJ Systems of Records

permitting Plaintiff to challenge the publication of the unredacted Footnote 112 as arbitrary, capricious, contrary to law, or unconstitutional.  5 U.S.C. § 706(2)(A)-(B).[76]

**B.    The Attorney General's Decision Not to Redact the Defamation in Footnote 112 Was a "Final Agency Action."**

DOJ characterizes the "final agency action" at issue here to be the Mueller Report itself (Ren. Mot. Mem. at 6) and then argues that the Report is not a "final agency action" within the meaning of the APA.  But whether the Report itself constituted a "final agency action" is irrelevant because the "final agency action" relevant here is the Attorney General's decision not to redact or make more clear information in Footnote 112 about plaintiff before it was released to the public.

Under the APA, "final agency actions" are reviewable by a person who suffers a "legal wrong" or who is "adversely affected or aggrieved." 5 U.S.C. § 702. A "final agency action" subject to review "must mark the consummation of [an] agency's decision-making process, rather than merely be tentative or interlocutory in nature, and the action must be one by which rights or obligations have been determined from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). An agency action creates consequences when the decision has a sufficiently direct and immediate impact on the aggrieved party's day-to-day business by altering rights, *i.e.*, Plaintiff's liberty rights under the Fifth Amendment. *Abbot FTC v. Standard Oil Co*., 449 U.S. 232, 239 (1980) (stating that legal consequences flow when the agency action has a direct and immediate impact on the plaintiff's business interests); *see* subpart I, above.

Under 28 U.S.C. § 509, "[a]ll functions of the Department of Justice and all functions of agencies and employees of the Department of Justice are vested in the Attorney General" with a

---

[76] Section 706 provides that: "… The reviewing court shall— … (2) hold unlawful and set aside agency action … found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional … power …."

few inapplicable exceptions. *See also* 28 U.S.C. §§ 510, 515-519. Under 28 C.F.R. Part 600.1, Attorney General Barr appointed Special Counsel Mueller to investigate the interference of Russia in the 2016 presidential election. Pursuant to Part 600.8, Special Counsel Mueller at the conclusion of the investigation "provide[d] the Attorney General with a confidential report explaining the prosecution or declination decision reached by the Special Counsel."

Under Part 600.9(c), the Attorney General "may determine that public release of these reports would be in the public interest …." The Attorney General exercised his discretion and ordered the Report be released in the public interest but only after certain categories of information in the Report were redacted including derogatory information about people in private life who were scrutinized by DOJ but not charged. The Attorney General's decision to release a redacted version of the Report but not to redact the defamation and defamatory implications in Footnote 112 was a "final agency action." *Doe v. Tenenbaum*, 127 F. Supp.3d 426, 460 (D. Md. 2012) (a decision of the Consumer Product Safety Commission to publish an agency report constituted final agency action under the APA).

   **C.**    **The Attorney General's Decision Not to Redact Footnote 112 Was Not Committed to Agency Discretion by Law.**

         **1.**    **DOJ Focuses on the Wrong Final Agency Decision—the Mueller Report—Instead of the AG's Decision Not to Redact the Footnote.**

DOJ argues that plaintiff's APA action fails because the Special Prosecutor's decisions in finalizing the Mueller Report were committed to agency discretion as a matter of law because there is no standard by which to judge the prosecutor's actions. But the final agency action at issue here has nothing to do with the preparation of the Mueller Report, rather, as discussed, the final agency action was the Attorney General's release of the footnote without redacting the defamation in Footnote 112.

### 2. The AG's Decision Is Not Committed by Law to DOJ's Discretion Because It Is Reviewable under Section 552a(g)(1)(C) of the Privacy Act.

Because this is not a situation where there is no standard under which to judge the Attorney General's decision, the decision not to remove the defamatory implications of Footnote 112 was not a decision left to his discretion as a matter of law. The Supreme Court has made plain that all final agency decisions that adversely affect individuals are *presumptively reviewable*. *Sackett v. EPA*, 566 U.S. 120, 128 (2012). Accordingly, it has read the exception to review in section 701(a)(2) quite narrowly, restricted to "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion. *Weyerhaeuser Co. v. U.S. Fish & Wildlife Service*, 586 U.S. 9, 23 (2018). As the Court in *Weyerhaeuser* explained:

> This court has noted the "tension" between the prohibition of judicial review for actions "committed to agency discretion" and the command in § 706(2)(A) that courts set aside any action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Heckler v. Chaney*, 470 U.S. 821, 829 (1985). A court could never determine that an agency abused its discretion if all matters committed to the agency's discretion were unreviewable. To give effect to § 706(2)(A) and to honor the presumption of review, we have read the exception in § 706(a)(2) quite narrowly, restricting it to "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which  to judge the agency's exercise of discretion." *Lincoln v. Vigil*, 508 U.S. 182 (1993).

*Id.*

The presumption of reviewability applies here because there is a "meaningful standard against which to judge" DOJ's decision not to redact Footnote 112. As discussed above, the Privacy Act requires that under section 552a(g)(1)(C) DOJ is required "to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or

33

benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual."  Although nothing under the Attorney General's statutory powers under 28 U.S.C. §§ 509, 510, 515-519 required the Attorney General to release the Mueller Report, the Report is a "record" within the meaning of the Privacy Act. Because Footnote 112 is a "record" under the Privacy Act, DOJ was required by the Privacy Act to assure that it complied with the clarity requirements of 552a(g)(1)(C). Whether DOJ met that statutory standard is plainly something that the Court may decide under the APA. *See Heckler v. Chaney*, 470 U.S. 821, 830 (1985) (holding that judicial review under the APA is precluded only where the statute in question is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion).

## **CONCLUSION**

For the foregoing reasons, DOJ's Renewed Motion to Dismiss should be denied.

Respectfully submitted,

/s/ *Jerome A. Madden*
Jerome A. Madden
THE MADDEN LAW GROUP PLLC
1455 Pennsylvania Ave., NW, Suite 400
Washington, DC 20004
(202) 349-9836
JMadden@TheMaddenLawGroup.com
District of Columbia Bar No. 272260

**CERTIFICATE OF SERVICE**

I, counsel for Plaintiff, hereby certify that on January 31, 2025, I caused to be delivered by CM ECF a copy of Plaintiff's Memorandum in Opposition to the Defendant's Renewed Motion to Dismiss upon counsel for Special Counsel Mueller and the U.S. Department of Justice.

/s/ *Jerome A. Madden*
Jerome A. Madden

35