**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **GIORGI RTZKHILADZE**, |
| Plaintiff, |
| v. |
| **ROBERT S. MUELLER, III**<br>*in his individual capacity*, |
| and |
| **UNITED STATES DEPARTMENT OF JUSTICE** |
| Defendants. |

Case No. 20-cv-1591 (CRC)

<u>**MEMORANDUM OPINION AND ORDER**</u>

Georgian-American businessman Giorgi Rtskhiladze claims that a footnote to former Special Counsel Robert Mueller's April 2019 report on Russian interference in the 2016 election caused him reputational and professional harm. The footnote in question concerns Rtskhiladze's contacts with then-candidate Donald Trump's lawyer, Michael Cohen, about potentially compromising tapes of Trump during a visit to Russia. At the last outing, the Court dismissed Rtskhiladze's equitable claims for lack of standing and his damages claims for failure to state a claim. On appeal, the D.C. Circuit affirmed the resolution of Rtskhiladze's damages claims but reversed the dismissal of his equitable claims, holding that Rtskhiladze has standing to bring them after all.

The Court now takes up the government's renewed motion to dismiss. Having reviewed the parties' new round of briefs, the Court will grant the government's motion in part and deny it part. Rtskhiladze's Administrative Procedure Act ("APA") and Declaratory Judgment Act claims fail because neither the Mueller Report nor the Attorney General's decision not to redact

the challenged footnote constitutes final agency action.  Rtskhiladze's Privacy Act claim seeking correction of the objectionable footnote survives, however, because the Court cannot conclude on this record that the Mueller Report is housed outside a system of agency records subject to the Act.

## I.    Background

Because the Court's prior opinion recounted the factual and procedural background of this case, the Court will provide only a brief summary here.  See Rtskhiladze v. Mueller ("Rtskhiladze I"), No. 20-cv-1591 (CRC), 2021 WL 3912157, at *1–5 (D.D.C. Sept. 1, 2021), aff'd in part, rev'd in part and remanded, 110 F.4th 273 (D.C. Cir. 2024).

Mr. Rtskhiladze immigrated to the United States from Georgia in 1991 and purports to have devoted his career to "strengthening the bonds between the United States and Georgia."  Id. at *1 (citing First Am. Compl. ("FAC") at ¶ 9)).  As part of his role as a "strategic advisor" to an investment company known as the Silk Road Group, Rtskhiladze cultivated a relationship with then-businessman Donald Trump and his former attorney Michael Cohen.  Id. (citing FAC at ¶ 3).  Rtskhiladze worked closely with the Trump Organization on a licensing arrangement for a real estate investment in Georgia and communicated with Cohen about "several other Trump Tower licensing projects," including one in Moscow.  Id. at *2 (citing FAC at ¶¶ 18, 20).

In October 2016, Rtskhiladze received a telephone call from an unnamed friend who had overheard someone "bragging about some tapes related to a trip by Mr. Trump to Moscow."  Id. (citing FAC at ¶ 21).  The next day, Rtskhiladze texted Cohen that he had "[s]topped flow of some tapes from Russia," and though he was "not sure if there's anything else[,]" he was reaching out "[j]ust so u know . . . ."  Id. (citing FAC at ¶ 31).  This exchange came to the attention of former Special Counsel Robert Mueller during his investigation into potential

Russian interference in the 2016 election.  Id.  Mueller's team interviewed Rtskhiladze several times in 2018, and he provided the investigation with various documents, including the text messages quoted above.  Id.

In April 2019, the Department of Justice released a redacted version of the Mueller Report to the public.  Id. at *3.  Rtskhiladze was mentioned in several sections of the report describing his work on the Trump Tower Moscow project, including his offers to arrange meetings between Trump and Russian government officials to garner support for the undertaking.  Id.  (citing Special Counsel Robert S. Mueller III, Report on the Investigation into Russian Interference in the 2016 Election, Vol. 1, at 70 (2019) ("Mueller Report")).

As particularly relevant here, Rtskhiladze features in Footnote 112 of volume two of the Mueller Report.  Id.  That section of the report describes interactions between President Trump and former FBI Director James Comey concerning an investigation report prepared by former British intelligence official Christopher Steele ("the Steele Dossier").  Id.  The sentence in the text corresponding to Footnote 112 states "Comey then briefed the President-Elect on the sensitive material in the Steele reporting."  Id.  After citing the source material for that statement, the footnote reads in full:

> Comey's briefing included the Steele reporting's unverified allegation that the Russians had compromising tapes of the President involving conduct when he was a private citizen during a 2013 trip to Moscow for the Miss Universe Pageant. During the 2016 presidential campaign, a similar claim may have reached candidate Trump.  On October 30, 2016, Michael Cohen received a text from Russian businessman Giorgi Rtskhiladze that said, "Stopped flow of tapes from Russia but not sure if there's anything else.  Just so you know . . . ." 10/30/16 Text Message, Rtskhiladze to Cohen.  Rtskhiladze said "tapes" referred to compromising tapes of Trump rumored to be held by persons associated with the Russian real estate conglomerate Crocus Group, which had helped host the 2013 Miss Universe Pageant in Russia.  Rtskhiladze 4/4/18 302, at 12.  Cohen said he spoke to Trump about the issue after receiving the texts from Rtskhiladze.  Cohen 9/12/18 302, at 13.  Rtskhiladze said he was told the tapes were fake, but he did not communicate that to Cohen.  Rtskhiladze 5/10/18 302, at 7.

Id.

Rtskhiladze alleges that the footnote both misquoted his exchange with Cohen—Rtskhiladze had used the construction "some tapes" in his texts, rather than "tapes" as quoted—and erroneously described him as "Russian" rather than Georgian.  Id.  He asserts that the report caused him to lose an "Honorary Consul" position offered to him by the Government of Georgia and various business opportunities.  See id. (listing opportunities Rtskhiladze allegedly lost due to "false perceptions created by Footnote 112").

Rtskhiladze then submitted a Privacy Act request to the Department of Justice asking that it delete all references to him from the report.  Id. at *4.  In January 2020, the Department denied his request, claiming that the report was not maintained in a system of records from which information is retrieved using a personal identifier as required for a Privacy Act claim.  Id.  After Rtskhiladze received no response to his appeal of this determination, he filed suit in June 2020. Id.

The amended complaint advances four claims: (1) a Fifth Amendment claim alleging government defamation and seeking damages; (2) a "name-clearing" claim under the Administrative Procedure Act ("APA") and the Declaratory Judgment Act on the grounds that the statements in Footnote 112 were "defamatory . . . arbitrary, capricious, an abuse of discretion, not otherwise in accordance with law, and unconstitutional"; (3) a Privacy Act claim seeking an amendment of Footnote 112 due to alleged inaccuracies that have caused Rtskhiladze to suffer "adverse determinations"; and (4) a Privacy Act claim seeking damages.  Id.; Second Amended Complaint ("SAC"), ECF No. 56.

In its prior opinion, the Court accepted the government's argument that Rtskhiladze had not established standing for his injunctive and declaratory claims."  Id. at *7.  The Court

reasoned that the Senate Select Committee on Intelligence Report released in 2020 "is an independent and unchallenged source" of the facts and implications to which he objected "that would not be affected by a decision in Rtskhiladze's favor in this case." Id. And Volume V of the Senate Report, which Rtskhiladze conceded was accurate, "comes with all the same official attributes of the Mueller Report and equally implicates [him] in the imbroglio surrounding the Russian government's rumored possession of compromising tapes of Trump." Id. at *11. Therefore, the Court agreed with the government that Rtskhiladze could not show that his claimed reputation injury was traceable to Footnote 112 of the Mueller Report, rather than to the Senate Report. Id. at *12–13.

As for Rtskhiladze's damages claims, the Court first concluded that he had standing to bring them. Id. at *7. The Court nonetheless dismissed Rtskhiladze's Privacy Act claims because he had not plausibly alleged that the authors of Footnote 112 acted with the requisite state of mind to intentionally deprive him of his rights. Id. at *13. The Court also dismissed Rtskhiladze's remaining damages claims against Special Counsel Mueller and the Department of Justice as conceded or else impermissible attempts to amend his complaint through briefing. Id. at *14–15.

On appeal, the D.C. Circuit affirmed the dismissal of Rtskhiladze's damages claims. Rtskhiladze v. Mueller ("Rtskhiladze II"), 110 F.4th 273, 278–79 (D.C. Cir. 2024). The Court of Appeals reversed the dismissal of Rtskhiladze's equitable claims, however, reasoning that the Senate Report could not "extinguish the harm" alleged from the Mueller Report. Id. at 277. In the court's view, either "someone may find the Mueller Report but not the Senate Report" or "readers of both reports may continue to believe Mueller" because Congress does not speak for the Department of Justice. Id. at 278. Accordingly, the Circuit held that Rtskhiladze had

standing to bring his equitable claims and remanded the case to this Court to address the government's motion to dismiss them for failure to state a claim.[1]  Id.

The government followed with a renewed motion to dismiss Rtskhiladze's remaining claims, which he opposes.  For the reasons that follow, the Court will grant the government's motion in part and deny it in part.

## II.    Legal Standards

In analyzing a motion to dismiss under Rule 12(b)(6), the Court must determine whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is "facial[ly] plausib[le] when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  A court must "treat the complaint's factual allegations as true [and] must grant plaintiff the benefit of all reasonable inferences from the facts alleged." Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (citation omitted) (alteration in original).

## III.    Analysis

Rtskhiladze's remaining claims arise under (1) the APA; (2) the Declaratory Judgment Act; and (3) the Privacy Act.  Because Rtskhiladze has not alleged a final agency action, his APA and Declaratory Judgment Act claims fail.  His attempt to amend his complaint to bring a Fifth Amendment claim is also unavailing.  His Privacy Act claim, however, fares better.

---

[1]  The Court of Appeals also affirmed the Court's denial of Rtskhiladze's request to obtain a copy of the transcript of his grand jury testimony.  Rtskhiladze II, 110 F.4th at 281.

A. <u>APA Claims</u>

　　　1.  *Final Agency Action*

The APA limits judicial review to "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.  "While the requirement of finality is not jurisdictional, without final agency action, 'there is no doubt that [plaintiffs] would lack a cause of action under the APA.'"  <u>Soundboard Ass'n v. Fed. Trade Comm'n</u>, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (quoting <u>Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n</u>, 324 F.3d 726, 731 (D.C. Cir. 2003)).  "To constitute final agency action, two conditions must be met: (1) 'the action must mark the consummation of the agency's decisionmaking process' and (2) it 'must be one by which rights or obligations have been determined, or from which legal consequences will flow.'"  <u>United States v. Regenerative Scis.</u>, LLC, 878 F. Supp. 2d 248, 261 (D.D.C. 2012), <u>aff'd</u>, 741 F.3d 1314 (D.C. Cir. 2014) (quoting <u>Bennett v. Spear</u>, 520 U.S. 154, 177–78 (1997)).

The Mueller Report was "submitted to the Attorney General pursuant to 28 C.F.R. § 600.8(c), which directs that, '[a]t the conclusion of the Special Counsel's work, he . . . shall provide the Attorney General a confidential report explaining the prosecution or declination decisions [he] reached.'"  Mueller Report, Vol. II at 1.  The report describes "the factual results of [the Special Counsel's] obstruction investigation" and any charging decisions that were made. <u>Id.</u> at 2.  No legal consequences flow from the report, however, and it did not create rights or obligations for anyone, including Rtskhiladze.  And were that not clear from the report itself, the regulations governing the Special Counsel's office specify that they may not be relied upon to "create any rights, substantive or procedural, enforceable at law or equity, by any person or entity, in any matter, civil, criminal, or administrative."  28 C.F.R. § 600.10.

The Court's conclusion in this regard accords with the weight of precedent holding that agency investigative reports generally do not qualify as final agency action. For instance, the D.C. Circuit held that an agency's "investigation of [a company's] sprinkler heads, a statement of the agency's intention to make a preliminary determination that the sprinkler heads present a substantial product hazard, and a request for voluntary corrective action" did not constitute final agency action. Reliable Automatic Sprinkler Co., 324 F.3d at 731. As here, "[n]o legal consequences flow[ed]" from the agency's investigation or the letter setting forth its preliminary determination because there had been "no order compelling [the plaintiff] to do anything." Id. at 732. Similarly, the D.C. Circuit held that a report by the National Transportation Safety Board following an accident investigation did not constitute final agency action because "no legal consequences of any kind result[ed] from the NTSB's factual report or probable cause determinations." Joshi v. Nat'l Transp. Safety Bd., 791 F.3d 8, 11 (D.C. Cir. 2015).

Rtskhiladze responds that whether the issuance of the Report constituted final agency action does not matter "because the 'final agency action' relevant here is the Attorney General's decision not to redact or make more clear information in Footnote 112 about plaintiff before it was released to the public." Opp'n at 31. The Court struggles to see how this distinction helps Rtskhiladze. Whether Rtskhiladze is challenging the Attorney General's decision not to redact Footnote 112 or the Report itself, he must satisfy the requirements of finality to bring an APA claim. And for the reasons already explained, he has not done so. Rtskhiladze has pointed to no legal consequences arising from either the Report or the Attorney General's decision to release it without redacting or clarifying Footnote 112.

To be sure, Rtskhiladze alleges that the publication of Footnote 112 caused him financial and reputational harms, including the Government of Georgia's rescission of an "Honorary

Consul" position.  Second Am. Compl. ("SAC") ¶ 52.  But these "practical consequences" cannot save his APA claim.  <u>Reliable Automatic Sprinkler Co.</u>, 324 F.3d at 732.  The D.C. Circuit has made clear that the real-world effects of an agency action, "including reputational harm, financial harm, emotional harm, and informational harm," do not render an otherwise non-final agency action final.  <u>Joshi</u>, 791 F.3d at 11.

Nor does Rtskhiladze's citation of a single out-of-circuit district court case, <u>Doe v. Tenenbaum</u>, alter the analysis.  127 F. Supp. 3d 426 (D. Md. 2012).  That case concerned a challenge to the publication of an agency report in a database governed by a specific statutory scheme not at issue here.  <u>Id.</u> at 430–31.  Under the applicable regulations, manufacturers could "contest the publication of reports on the ground that they contain materially inaccurate information."  <u>Id.</u> at 431.  In that context, publication of the report in question marked the consummation of an adversarial process that involved "providing evidence with a view to meeting the burden of proof" and "amount[ed] to binding adjudication."  <u>Id.</u> at 462.  No similar scheme applies here.

Accordingly, the Court will dismiss Rtskhiladze's APA claims for failure to state a claim.

### 2.  *Committed to Agency Discretion by Law*

Even if Rtskhiladze could point to a final agency action, his APA claims fail for a second reason.  The Mueller Report, and the Attorney General's decision to release it, are committed to agency discretion by law.  Mot. to Dismiss at 12–13.  Under the APA, "a person suffering legal wrong because of agency action . . . is entitled to judicial review" unless the challenged agency action "is committed to agency discretion by law."  5 U.S.C. §§ 701(a)–702.  An action has been committed to agency discretion by law, and is therefore unreviewable, if there is "no meaningful standard against which to judge the agency's exercise of discretion."  <u>Starr Int'l Co., Inc. v.</u>

United States, 139 F. Supp. 3d 214, 224 (D.D.C. 2015) (internal quotation marks omitted) (quoting Heckler v. Chaney, 470 U.S. 821, 830 (1985)).

As already mentioned, internal regulations govern the publication of the Special Counsel's report. They provide that "[a]t the conclusion of the Special Counsel's work, he or she shall provide the Attorney General with a confidential report explaining the prosecution or declination decisions reached by the Special Counsel." 28 C.F.R. § 600.8(c). Following receipt, "[t]he Attorney General may determine that public release of these reports would be in the public interest, to the extent that release would comply with applicable legal restrictions." 28 C.F.R. § 600.9(c). The applicable regulations include no standard governing the content of the Special Counsel's report or the Attorney General's disclosure decisions, however. Rtskhiladze does not argue otherwise. Instead, he locates the applicable standard in the Privacy Act, which provides a civil remedy against federal agencies that "fail[] to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual." 5 U.S.C. § 552a(g)(1)(C).

Unfortunately for Rtskhiladze, he cannot import a standard from another statute to save his APA claim. "[B]ecause the APA provides review of final agency action only where 'there is no other adequate remedy,' 5 U.S.C. § 704, a 'plaintiff cannot bring an independent APA claim predicated on a Privacy Act violation.'" Wilson v. McHugh, 842 F. Supp. 2d 310, 320 (D.D.C. 2012) (citations omitted). Thus, either Rtskhiladze's APA claim is committed to agency discretion by law, or it is predicated on a Privacy Act violation and cannot be brought under the

APA. Either way, his APA claim fails, as does his request for a name-clearing hearing under the APA. SAC ¶¶ 73–74.

B. Declaratory Judgment Act Claim

Rtskhiladze also attempts to plead a claim under the Declaratory Judgment Act, 28 U.S.C. § 2201, along with his APA claim. SAC ¶¶ 73–74. But the Declaratory Judgment Act does not provide a plaintiff with an independent cause of action. Ali v. Rumsfeld, 649 F.3d 762, 778 (D.C. Cir. 2011). Instead, "the availability of declaratory relief presupposes the existence of a judicially remediable right." Id. (cleaned up) (citation omitted). Since Rtskhiladze's APA claim fails, so too does his Declaratory Judgment Act claim.[2]

C. Fifth Amendment Claim

In his briefing, Rtskhiladze also appears to seek a name-clearing hearing under the Fifth Amendment. Opp'n at 17–21. As an initial matter, this claim appears nowhere in his complaint. See SAC. Count I of the first amended complaint, which sets forth Rtskhiladze's sole Fifth Amendment claim, seeks only an "award of compensatory and exemplary damages" against former Special Counsel Mueller "for the violation of procedural guarantees in the Due Process Clause of the Fifth Amendment." SAC 7, ¶¶ 69–72, 79. In its last opinion, the Court rejected Rtskhiladze's efforts to "amend his complaint through an opposition brief" and dismissed his Fifth Amendment claim for damages against Mr. Mueller in his personal capacity. Rtskhiladze I,

---

[2] In support of his Declaratory Judgment Act claim, Rtskhiladze also includes an opaque citation to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 400 (1971), which the Court can make neither heads nor tails of. Opp'n at 17 n.71. The Court already dismissed Rtskhiladze's Bivens claim against Special Counsel Mueller, Rtskhiladze I, 2021 WL 3912157, at *14, and Bivens claims have not been extended to suits against federal agencies, Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 69 (2001).

2021 WL 3912157, at *14; see Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971).  Since then, Rtskhiladze filed a second amended complaint to correct a technical error but did not expand the scope of relief sought under Count I.  Once again, as his counsel surely appreciates, he may not amend his complaint through his opposition brief and seek a name-clearing hearing under the Fifth Amendment.

The Court could therefore stop there.  For thoroughness, however, it makes the following observations.  At the outset, it is unclear what cause of action under the Fifth Amendment Rtskhiladze is asserting.  Most of the cases he cites involve constitutional claims brought under 42 U.S.C. § 1983.  See, e.g., Haymon v. District of Columbia, 610 F. Supp. 3d 101, 106 (D.D.C. 2022).  Yet his Bivens claim, as just noted, has already been dismissed.  Perhaps Rtskhiladze simply seeks to avail himself of the Court's broad equitable power "to issue injunctions to protect rights safeguarded by the Constitution," Bell v. Hood, 327 U.S. 678, 684 (1946), but even then his claim fails on the merits.[3]

"In this circuit, a plaintiff may avail himself of two different legal theories to establish a reputation-based due-process violation."  Jefferson v. Harris, 170 F. Supp. 3d 194, 205 (D.D.C. 2016).  A "reputation plus" claim requires "the conjunction of official defamation and [an] adverse employment action."  O'Donnell v. Barry, 148 F.3d 1126, 1140 (D.C. Cir. 1998).  A "stigma plus" claim, on the other hand, "does not depend on official *speech*, but on a continuing

---

[3] The government argues that, in the absence of a Bivens claim, "it is unclear what statute—other than the APA— would provide a waiver of sovereign immunity and cause of action to raise an alleged violation of the Fifth Amendment."  Reply at 8 n.2.  However, Rtskhiladze could avail himself of the APA's waiver of sovereign immunity for his Fifth Amendment claim, as "[t]he fact that Plaintiff's claims are not themselves brought pursuant to the APA's cause of action is not an impediment to the application of the APA's sovereign immunity waiver."  McKoy v. Spencer, 271 F. Supp. 3d 25, 32 (D.D.C. 2017).

stigma or disability arising from official *action*."  Id. (emphasis added).  Both types of claims require the plaintiff to show an "adverse employment action."  Id.

For a plaintiff to bring a reputation-plus claim, "it is necessary . . . that the defamation be accompanied by a discharge from government employment or at least a demotion in rank and pay."  Mosrie v. Barri, 718 F.2d 1151, 1161 (D.C. Cir. 1983).  Applying this rule, courts in this district have dismissed reputation-plus claims for the plaintiff's failure to allege a discharge or demotion.  Lea v. District of Columbia, No. CV 22-1396 (JEB), 2022 WL 3153828, at *4–5 (D.D.C. Aug. 8, 2022); Croddy v. FBI, No. 00-651 (EGS), 2006 WL 2844261, at *3 (D.D.C. Sept. 29, 2006).  Here, Rtskhiladze has alleged neither, and so any reputation-plus claim cannot get out of the gate.

That said, one court in this district declined to read the Mosrie rule so strictly, reasoning that in context, the D.C. Circuit focused "not on the nature of the *employment* at issue, but on the nature of the *harm* suffered by the plaintiff seeking to bring a liberty interest claim."  Haymon, 610 F. Supp. 3d at 115 (emphasis in original).  Thus, the Court held that a plaintiff may also bring a reputation-plus claim based on the "existence of a special, tangible relationship between the government and the individual in specific contexts"—for instance, a government contractor. Id.  On that understanding, "private employees who depend in significant part for their employment on government approval" may bring such claims "when the government causes their private employer to terminate them."  Id. at 116.  But even under this expanded view, Rtskhiladze's claim fails.  He has alleged no "special, tangible" relationship with the government akin to a government contractor or a special police officer whose actions, at times, may be attributable to the state.  Id. at 115–16.

The Court turns next to Rtskhiladze's attempted stigma-plus claim. Courts in this District have declined to apply the discharge-or-demotion rule to stigma-plus claims, even when applying it to reputation-plus claims. Lea, 2022 WL 3153828, at *6. Even assuming that approach is correct, Rtskhiladze's claim fails for another reason. To bring a stigma-plus claim, a "plaintiff must show not only that the government has imposed some stigma upon [him], but also that it has worked some change in [his] status under law." Id. at *4 (citing Taylor v. Resol. Tr. Corp., 56 F.3d 1497, 1506 (D.C. Cir. 1995)). To do so, a plaintiff may either "show that the government's action 'formally or automatically excludes' [him] from government employment opportunities" or demonstrate that "the action precludes [him] from such a broad range of opportunities that it 'interferes with his constitutionally protected right to follow a chosen trade or profession.'" Id. (citing Kartseva v. Dep't of State, 37 F.3d 1524, 1528–29 (D.C. Cir. 1994)).

Rtskhiladze has done neither. He does not even attempt to avail himself of the first route, alleging no formal or automatic exclusion from government employment opportunities. See generally SAC. As for the second route, although Rtskhiladze's complaint includes the conclusory allegation that Footnote 112 "destroyed [his] ability to continue his career" "as a *de facto* ambassador for U.S.-Georgia relations," the facts he offers do not support that conclusion. Id. ¶¶ 50, 51.

To be sure, Rtskhiladze alleges a variety of harms caused by the publication of Footnote 112—including the cancellation or withdrawal of several high-value commercial transactions, the termination of his affiliation with a major financial institution, and the loss of an "Honorary Consul" position offered to him by the Government of Georgia. SAC ¶¶ 52, 61. But these adverse consequences, while significant, indicate no more than "some 'hampering' of his employment prospects." Jefferson, 170 F. Supp. 3d at 205 (citing Kartseva, 37 F.3d at 1529).

They do not suggest that he has been "largely preclude[ed] from pursuing his chosen career." Id. (cleaned up).

Accordingly, even if the Court were to reach Rtskhiladze's request for a name-clearing hearing under the Fifth Amendment—which, again, is included nowhere in his complaint—it would fail.

### D. Privacy Act Claims

#### 1. Section 552a(g)(1)(A) Amendment Claim

Rtskhiladze next brings a claim for amendment of Footnote 112 under Section 552a(g)(1)(A) of the Privacy Act, which permits an individual to pursue a civil action against an agency "[w]henever [it] makes a determination under subsection (d)(3) of this section not to amend an individual's record in accordance with his request, or fails to make such review in conformity with that subsection." 5 U.S.C. § 552a(g)(1)(A). Section 552a(d)(3), in turn, requires that "[e]ach agency that maintains a system of records shall" permit an individual who disagrees with the refusal of the agency to amend his record to request review of the refusal. Id. § 552a(d)(3).

A district court presented with an amendment claim "is not to assess the agency's review of the amendment request, but rather is to determine for itself whether the request should have been granted." White v. Off. of Pers. Mgmt., 787 F.2d 660, 663 (D.C. Cir. 1986); see also § 552a(g)(2)(A) (specifying de novo review). If the district court finds the challenged record to be inaccurate, it "may order the agency to amend the individual's record in accordance with his request or in such other way as the court may direct." Lee v. Geren, 480 F. Supp. 2d 198, 206 (D.D.C. 2007) (citing § 552a(g)(2)(A)), dismissed, No. 07-5175, 2007 WL 2405691 (D.C. Cir. Aug. 2, 2007).

As particularly relevant here, the Privacy Act defines a "system of records" as "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." Id. § 552a(a)(5).  The D.C. Circuit has interpreted this language to mean that "'retrieval capability is not sufficient to create a system of records'; the agency must *in practice* retrieve information by personal identifier.'"  Maydak v. United States, 363 F.3d 512, 520 (D.C. Cir. 2004) (emphasis added) (citing Henke U.S. Dep't of Com., 83 F.3d 1453, 1460–61 (D.C. Cir. 1996)).

The government seeks dismissal of this claim on the ground that the Mueller Report "is not maintained in a Privacy Act system of records retrieved by plaintiff's name."  Mot. to Dismiss at 15.  To support this contention, the government cites Department of Justice correspondence with Rtskhiladze regarding his request for amendment of Footnote 112.  Mot. to Dismiss, Ex. A ("Privacy Act Amendment Correspondence"), ECF No. 53-2; SAC ¶¶ 62–68. After Rtskhiladze submitted a Privacy Act request seeking the correction of Footnote 112 and the deletion of all references to him, the DOJ's Office of Information Policy ("OIP") denied his request.  Privacy Act Amendment Correspondence at 11–12 (page numbers designated by CM/ECF).  OIP's denial letter states that "although the Mueller Report includes personally identifying information, it is not maintained in a system of records from which information is retrieved using a personal identifier." Id. at 11.  Rtskhiladze appealed the denial to the Office of Privacy and Civil Liberties within DOJ.  Id. at 5–6.  The government attached a letter to its

motion to dismiss apparently affirming OIP's decision on appeal.  Id. at 2–3.  This second letter

postdates and is therefore not referenced in Rtskhiladze's first amended complaint.[4]

   Although these letters were not attached to Rtskhiladze's complaint, OIP's letter denying

his initial request for amendment is referenced in the complaint.  SAC ¶ 65.  Accordingly, the

court may consider the letter under Rule 12(b)(6).  Bender v. Jordan, 612 F. Supp. 2d 62, 65

(D.D.C. 2009).  The Court may not consider the second letter denying Rtskhiladze's appeal,

however, as it is not referenced in his complaint.

   A single conclusory assertion in OIP's letter denying Rtskhiladze's Privacy Act request is

insufficient for the Court to conclude that the  Mueller Report is not maintained within a

qualifying system of records.  The letter is not a sworn affidavit or declaration and includes no

details other than the bare assertion that the report is not contained within a system of records.

The Court is particularly unwilling to give much weight to this letter in light of the government's

subsequent clarification that the system housing the Mueller Report may be indexed and

information within it may be retrieved by other names—just not by Rtskhiladze's.  Notice of

Clarification, ECF No. 54, at 1.

   That being said, Rtskhiladze nowhere in his complaint alleges that the Report is housed

in a qualifying system of records.  Ordinarily, that would be fatal to his claim.  "[T]o state a

claim for relief for a violation of any of those subsections, plaintiffs must necessarily allege that

the records at issue . . . were actually incorporated into a 'system of records.'"  Gerlich v. U.S.

Dep't of Just., 659 F. Supp. 2d 1, 16 (D.D.C. 2009).  The circumstances of this case are unusual,

however.  As noted, in December 2024, the government filed a notice of clarification indicating

---

[4] Rtskhiladze also filed a second amended complaint in January 2025 to correct a minor
technical error.  See ECF No. 56.  Accordingly, the Court will cite to the second amended
complaint.  See ECF No. 56-3.

that the system in which the Mueller Report is stored is indexed—and information within it may be retrieved—by other personal identifiers, though not Mr. Rtskhiladze's. Notice of Clarification at 1. The government also withdrew its prior assertion that the Department of Justice's list of internal systems of records subject to the Privacy Act does not include the Mueller Report. Id. The Court may consider this correction to the OIP letter referenced in Rtskhiladze's complaint. Bender, 612 F. Supp. 2d at 65. These new facts "raise a plausible claim that the [report] was contained in a system of records[.]" Dick v. Holder, 67 F. Supp. 3d 167, 181 (D.D.C. 2014). It is plausible to infer from the fact that the Mueller Report is housed in a system of records indexed by some individuals' names—and that information within the system is retrievable by those names—that it is likewise is searchable by Mr. Rtskhiladze's name. Dismissal therefore appears premature at this stage, especially given the Court's obligation to "grant plaintiff the benefit of all reasonable inferences from the facts alleged." Trudeau, 456 F.3d at 193.

Indeed, in most of the cases cited by the government, courts considered whether a system of records qualified under the Privacy Act at the summary judgment stage, with the benefit of evidence such as sworn declarations from agency officials. See Lee, 480 F. Supp. 2d at 207; Krieger v. U.S. Dep't of Just., 529 F. Supp. 2d 29, 46 (D.D.C. 2008). In McCready v. Nicholson, for instance, plaintiff sought amendment under the Privacy Act of reports created by the Department of Veterans Affairs ("VA") while investigating allegations of misconduct. 465 F.3d 1, 4 (D.C. Cir. 2006). The Court of Appeals affirmed the district court's holding that the VA Inspector General's website was not a system of records, relying on a "detailed and non-conclusory" declaration from an agency official stating that personnel did not use the website to retrieve records "either *by use of a personal identifier* or otherwise." Id. at 13 (emphasis in

original).  On the other hand, the government had introduced no evidence addressing whether

other VA offices to which the reports had been sent "maintain[ed] these reports within a system

of records."  Id. at 15.  Accordingly, the Court of Appeals remanded so that the district court

could either grant the plaintiff a "reasonable opportunity to complete discovery," or explain why

discovery was not warranted on other grounds.  Id. (citation omitted).

      Likewise, in Williams v. Dep't of Veterans Affs., the Fourth Circuit was unable to decide

whether the requested records were housed in a qualifying system and remanded "for further

factual findings" on how the records were "stored in practice (in paper or digital form or both)"

and "retrieved in practice (by client name or identifying number via filename or file number;

utility program or search engine; or other means)."  104 F.3d 670, 676 (4th Cir. 1997).  So too in

Maydak v. United States, where the D.C. Circuit reversed the district court's grant of summary

judgment and remanded for a determination whether a prison's "compilation of photos

constitute[d] a system of records" in light of evidence that the institution, in practice, retrieved

photographs by personal identifiers.  363 F.3d at 520.  And although the D.C. Circuit granted

summary judgment for the defendant on this question in Henke v. United States Department of

Commerce, the court relied on evidence of the agency's record-retrieval practices obtained

through limited discovery.  83 F.3d 1453, 1459, 1462 (D.C. Cir. 1996).

      In contrast, the government cites no case in which a court dismissed a Privacy Act claim

under Rule 12(b)(6) because it concluded that the record in question was not maintained in a

Section 552a(a)(5) system of records.  With good reason.  The Court doubts that this fact-

specific question can ordinarily be resolved entirely on the basis of assertions included in a

defendant's motion to dismiss.  That is particularly so given that the Court must assess an

agency's record retrievals "in practice." Maydak, 363 F.3d at 520.  Accordingly, the Court will

deny the government's motion to dismiss Rtskhiladze's Section 552a(g)(1)(A) claim.[5]

### 2. *Section 552a(g)(1)(C) Claim*

In his opposition, Rtskhiladze also raises an alternative claim under Section

552a(g)(1)(c).  Opp'n at 21–25.  That section permits an individual to bring a civil action against

an agency when it "fails to maintain any record concerning any individual with such accuracy,

relevance, timeliness, and completeness as is necessary to assure fairness in any determination

relating to the qualifications, character, rights, or opportunities of, or benefits to the individual

that may be made on the basis of such record, and consequently a determination is made which is

adverse to the individual."  5 U.S.C. § 552a(g)(1)(C).

Much of the parties' briefing on this claim is beside the point, however.  Claims under

Section 552a(g)(1)(C) usually seek damages.  Here, the Court has already held that Rtskhiladze

may not recover damages because he has not pled that the agency acted in an intentional or

willful manner.  Rtskhiladze I, 2021 WL 3912157, at *13.  Thus, Rtskhiladze is left with only his

equitable claims.  And the Privacy Act "authorizes entry of injunctive relief in only two specific

situations: (1) when an individual succeeds in a suit for amendment of the individual's records

pursuant to § 552a(g)(1)(A), and (2) when an individual succeeds in a suit for disclosure of

agency records pursuant to § 552a(g)(1)(B)."  Kursar v. Transp. Sec. Admin., 581 F. Supp. 2d 7,

19 (D.D.C. 2008) (quotation marks omitted) ((citing Doe v. Stephens, 851 F.2d 1457, 1463 (D.C.

Cir. 1988)), aff'd, 442 F. App'x 565 (D.C. Cir. 2011).  "In so doing, . . . the Act precludes other

---

[5] At some points in his briefing, it is unclear whether Rtskhiladze means to suggest that a name-clearing hearing is an appropriate remedy for a Privacy Act violation.  To the extent he does, that argument is inconsistent with his complaint, which seeks a name-clearing hearing under the APA.  In any event, he cites "no caselaw supporting the use of a name-clearing hearing as a Privacy Act remedy."  Reply at 9.

forms of declaratory and injunctive relief, including such relief for suits under § 552a(g)(1)(C)." Id. (citation and quotation marks omitted).

The Court has already permitted Rtskhiladze's Section 552a(g)(1)(A) claim to proceed. And since the Court has dismissed Rtskhiladze's damages claims, there is no relief that he can separately pursue through a suit under Section 552a(g)(1)(C).

**IV.   Conclusion**

For the foregoing reasons, it is

**ORDERED** that [53] the government's Motion to Dismiss is granted in part and denied in part; it is further

**ORDERED** that the parties meet and confer and by June 13, 2025, file a joint status report proposing a schedule for further proceedings in the case, if necessary.

**SO ORDERED**.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: May 30, 2025